INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 1

IN THE DISTRICT COURT IN AND FOR RODGERS COUNTY
STATE OF OKLAHOMA

DOUG INGRAM, et al., )
)
Plaintiffs, )
)
v. ) CASE NO. CJ-2001-438
)
AIR PRODUCTS AND CHEMICALS, )
INC., a Delaware Corporation; )
SOLKATRONICS CHEMICAL, INC., )
a Delaware Corporation; JARRAD )
GARRISON, an individual, )
)
Defendants. )

VOLUME 1
DEPOSITION OF ROBERT JAY HARRISON, M.D., M.P.H.
TAKEN ON BEHALF OF THE DEFENDANTS
ON JUNE 21, 2005, BEGINNING AT 9:12 A.M.
IN SAN FRANCISCO, CALIFORNIA

APPEARANCES:

MR. KEITH A. WARD, Attorney at Law, of the firm RICHARDSON, STOOPS, RICHARDSON & WARD, 6555 S. Lewis, Suite 200, Tulsa, Oklahoma 74136, appearing on behalf of the Plaintiffs.:

MR. JOHN TUCKER, Attorney at Law, RHODES, HIERONYMUS, JONES, TUCKER & GABLE, ONEOK PLAZA, 100 W. 5th Street, Suite 400, Tulsa, Oklahoma 74103-4287, appearing on behalf of the Defendants.

MR. THOMAS L. KENYON, Attorney at Law, 7201 Hamilton Boulevard, Allentown, Pennsylvania 18195-1501, appearing on behalf of Air Products and Chemicals, Inc.

ALSO PRESENT: MS. CANDACE J. SMITH

REPORTED BY: CARYE C. TORRES, CSR #10685, CRP

Page 2

INDEX

Examination resumed by Mr. Tucker........ 3

* * * * *

EXHIBITS

Exhibit 1 was marked for identification.
(See "exhibit" in word index.)

* * * * *

Page 3

ROBERT JAY HARRISON, M.D., M.P.H.,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. TUCKER:

Q Would you state your full name for the record, please.
A Robert Harrison.
Q Where do you reside, sir?
A San Francisco, California.
Q What is your profession?
A Physician.
Q We are here today to take your deposition. My name is John Tucker. I represent the defendant in a lawsuit in Oklahoma.
I would like to ask you questions. I'd like you to answer them as best you can.
Fair enough?
A I understand.
Q If I ask a confusing question, please tell me it's confusing to you so that we get an answer that you mean to give.
Fair enough?
A I understand.
Q In fact, you have given previous depositions; is that correct?

Page 4

A Yes.
Q How many previous depositions have you given?
A Over a hundred.
Q For how many years have you been giving depositions?
A 20.
Q How many times have you testified in the courtroom?
A About ten.
Q The chemical which is the subject of this particular lawsuit is arsine; is that correct?
A Yes.
Q And how many cases have you testified either in court or by deposition that involved arsine?
A None.
Q How many cases have you as a professional been involved in in which you have made an analysis that considered arsine?
A Five or six, but these have been as a consulting or treating physician in my practice, not in conjunction with expert review of a case for legal purposes.
Q If we were to confine the question to

1 (Pages 1 to 4)

PROFESSIONAL REPORTERS
Experience and service that sets the standard
OKLAHOMA CITY 405-2
TULSA 918-5
FAYETTEVILLE 479-5
511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

EXHIBIT 1a

Page 5

evaluation of a lawsuit or a claim made by a claimant, would the answer be zero, until this matter?
A Yes.
Q You have had five or six experiences involving arsine as a treating physician or a consultant; is that what you're saying?
A Yes.
Q Tell me about those, please.
A These have been workers who have come to me for various symptoms, referred by other doctors or by word of mouth, where they've been exposed to a release of gases, of which arsine was possibly one of many. So I had to consider whether their symptoms could have been due to arsine among the potential gases that they were exposed to.
These were workers in the semiconductor industry which is in Silicon Valley, San Jose, Santa Clara area, 30 to 40 miles south of San Francisco where my office is located.
Q Was this one incident or five or six incidents?
A Five or six incidents over the years where I believe they were primarily maintenance workers

Page 6

who were installing, repairing, building a semiconductor fabrication facility, and there was a gas release of some type. And I say some type, because typically the workers weren't sure what they were exposed to. Arsine is among the gases that are used in semiconductor fabrication. So I had to consider whether their symptoms were due to arsine.
Q How current were the referrals when related to the event that caused the exposure that was complained of?
A At least several months afterwards. These were not cases in which I provided immediate treatment; that is, within hours or days.
Q What did you determine to be the gas to which these five to six individuals had been exposed?
A I think in none of these cases was I eventually able to find arsine as a source of a gas release. Rather, they were other respiratory toxins, that is gases that were highly irritating to the respiratory tract. And I don't remember what the mix of gases were. I do recall, however, that they were probably in these cases not exposed to

Page 7

arsine.
Q And you mentioned that their presenting complaints had to do with respiratory problems?
A Either respiratory or what I would term central nervous system, problems that were related to potential brain injury. Because there are solvents that are widely used in semiconductor manufacture, another source of toxicity, if you will, is on the brain from exposure to solvents.
Q When you say exposure to solvents you're talking about something other than arsine; is that correct?
A Correct.
Q Is that what you found with respect to these five or six people?
A Yes. It was either a respiratory irritant or exposure to a solvent that was used in the semiconductor manufacture.
Q Would it be fair to say the only reason that arsine was involved in making your differential diagnosis is because you're aware that in that industry and with your background in occupational medicine that arsine is one of the chemicals or gases that is potentially present in that workplace so it must be ruled out?

Page 8

A Correct.
Q Did any of the laboratory work on any of those individuals indicate any hemolysis?
A No.
Q So getting back to what I was asking originally, has there been another case in which you have been involved as a physician, either hired as an expert by a plaintiff or as a treating physician, that actually involved arsine gas?
A When you say involved, do you mean in which I actually diagnosed --
Q In which you --
A -- arsine toxicity?
Q That's a good way to put it.
A If that's the intent of your question, the answer is no.
There are cases in which I have obviously considered arsine poisoning, but I have not diagnosed a previous case or been involved in a case involving arsine poisoning until this particular one.
Q Well, would you agree, Doctor, that any time someone presents with self-reported complaints and there's been an opportunity for exposure to any material which could in some way

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 9

lead to any of these self-reported complaints, that at that point you as an industrial physician must rule out the possibility that that is the causative agent for those self-reported complaints?
A Let me make sure I understand your question.
When you're saying causative agent you're referring to arsine?
Q Any causative agent.
A Not exactly. What I do is I take a careful history, and I obtain, where available, records of the chemicals that were used, either the material safety data sheets or the product information, and based on my experience, I whittle down the list of potential exposures and consider those in my differential diagnosis.
Q Let me reask the question. I think we're saying the same thing, but I want to make certain we are.
If you have a person who comes to you and reports symptoms, so we have self-reported symptomology, and this person -- and you learn either through that person or through other sources that there are a variety of chemicals in the area of the workplace that could be a potential

Page 10

source of exposure, when you are determining what could be the cause of these self-reported symptoms, don't you have to look at each of those chemicals first to determine whether they could be the cause of those kinds of symptoms, and if not, rule those chemicals out, and if so, then you must make further analysis to rule out the other chemicals before you determine the cause or determine the validity of the self-reported symptoms?
MR. WARD: Object to the form.
THE WITNESS: If we're dealing with that finite group of chemicals, yes, of course that's correct. I think that your question at the beginning asked about a certain range of chemicals and the process by which I would normally go through and determine whether chemical X caused problem Y.
Q (BY MR. TUCKER) Of course, we know there are wide ranges of things that can be the consequences of exposure to many different chemicals, don't we?
MR. WARD: Object to form.
THE WITNESS: Can you reask that question.

Page 11

Q (BY MR. TUCKER) Would you agree that depending on what chemical any individual is exposed to, or not necessarily a chemical, a food, an element in a food, there can be all kinds of reactions a person could have to a particular exposure?
A That's not correct. There is a specific list of signs or symptoms that I would expect from each particular chemical exposure.
Q Let me try again.
Does the fact that a chemical can cause certain side effects upon exposure and the fact that an individual reports to you that he has self-reported those side effects, is that sufficient to complete your diagnosis to say with reasonable medical certainty that that man or that person was exposed to that chemical?
A Signs and symptoms that -- well, symptoms, which are complaints as reported by an individual, and signs, which is objective evidence either in a test or a physical examination, these signs or symptoms are one element that I use in making a diagnosis. There are other elements that I use to arrive at a diagnosis in an individual case. And I'd be happy to go through those later.

Page 12

I imagine that we'll end up discussing those at some point.
Q This morning you furnished us a revised CV.
Is this your most current CV?
A Yes, yeah.
Q What has changed as you made that more current?
A On the first page I added a -- an internship program that I established and direct. And on the third page I added the election to a National Organization of Epidemiologists.
Q What is your home address, sir?
A 1132 Dolores Street in San Francisco.
Q Is that here in the City someplace?
A Yes.
Q And we're in one of your offices here in San Francisco, California today; is that correct?
A That's correct.
Q It's a very pretty city.
A Thank you.
Q It's a very expensive city.
Are you married, sir?
A Yes.
Q Do you have children?

3 (Pages 9 to 12)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 13

A Yes.
Q How many do you have?
A Two.
Q How old are your kids?
A 20 and 18.
Q Are they in college someplace?
A One is in college. The other is finishing high school.
Q Have you ever been a plaintiff or a defendant yourself in a lawsuit?
A No.
Q Never been sued?
A No.
Q Have you ever been charged with any kind of a criminal offense?
A No.
Q I understand you have already given a legal assistant who is here with us today a copy of your complete file; is that correct?
A Yes.
Q Doctor, what does a clinical examination consist of?
A It begins with a history, as obtained from the patient; and the history has multiple components. I don't know how much detail you

Page 14

want me to go through at this point.
Q Well, let me ask you this: Do you do clinical examinations?
A Routinely.
Q And your charge, I understand, is $400 an hour for clinical examinations?
A In the medical-legal setting. The majority of the clinical work that I do, 90-plus percent, is office treatment of either work-related or environmental exposure or injury. And the charge for that treatment is determined either by insurance or by the workers' compensation fee schedule in California. So that obviously varies, depending on the kind of insurance somebody has when they come to see me.
Q Do you operate here on a salary?
A Yes.
Q For example, your charge to me today of $500 per hour for your deposition, does that -- do you just give that to your employer?
A It is given to my employer, but the faculty at UC San Francisco are permitted to keep up to a certain number of days of consulting income per year over and above their salary.
Q So if you did this every day, the

Page 15

university would keep part of the $500 an hour, but if you only do it some of the time, you get to keep the $500 an hour?
A You got it.
Q What is that amount of money you can keep every year? Is it by hours or by dollars?
A It's by days. I believe it's 21 days.
Q 21 eight-hour days?
A Correct.
Q For example, this year, which we're in the middle of 2005, how many consulting days have you used up?
A Three or four at most.
Q How about last year, how many did you use up?
A Ten to 15.
Q Now, does that count, for example, the work that you did for Mr. Ward on this matter where you reviewed files and so forth and you charged him?
A Yes.
Q That's the same deal? Counts as a day?
A Yes. It counts in terms of the hours towards a day, whether that is done during the workday or done in the evening or weekends.

Page 16

Q So last year you believe it was 10 or 11 days?
A Correct.
Q What warrants making a clinical examination if a patient is referred in for an evaluation? What warrants your decision to make a clinical evaluation of that patient?
A I'm not sure I understand your question.
Q Well, for example, you have the referral of the five or six guys from Silicon Valley who turned out to be exposed to something like a solvent, right?
A A solvent or irritating gas, that's correct.
Q And not arsine?
A Correct.
Q But my question is when those guys came in, did you give them a clinical examination?
A Anyone who's referred to me, to my clinical practice, I perform what you would term a clinical examination on, which entails the history and a physical examination, often a review of the records, either their medical records or exposure records or other material. So everybody who comes to my practice goes through the same routine.

4 (Pages 13 to 16)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard
OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 17

Q So why is that? Why do you do that? Why not just look at the records and help them that way?
A Sometimes if I just get records to review, if I'm consulting on a case, I do not examine people in my offices.
In my practice I see patients who are referred to me for evaluation and typically treatment. And they show up in the office, they call, they make appointments, I see them for what you term clinical examinations.
And that's 90-plus percent of my clinical practice. The other ten percent or so involves consultation only, which entails review of medical records and other material.
So are you asking what determines the 90 percent from the 10 percent?
Q Not yet.
In the legal case, some of the legal cases that you've handled, the law cases that you've handled where you've testified and given reports, you've made and conducted clinical examinations of the claimant; is that right?
A Let me understand what you mean by clinical examinations. You mean people who have

Page 18

been seen at my office and I do a direct history from them and a physical exam?
Q Right.
A Yes, that's correct.
Q How often do you give reports for lawyers about patients that you've never seen?
A Let me separate out your answer. Most of the opinions that I give for lawyers are workers' compensation examinations for the State of California. And those people come and get examinations in my office, but I think you're -- and correct me if I'm wrong, but I don't think you're asking about those.
Q No, sir, I'm not.
A So maybe you can restate your question, clarify the question.
Q Excluding workers' compensation referrals.
A So could you restate the question.
Q Well, in nonworkers' compensation cases have you examined your patients or examined the people about whom you were going to testify?
A Sometimes yes. Sometimes no.
Q How many times have you not?
A Let me give you a percentage rather than

Page 19

a number, which is easier for me. Percentage-wise, probably a third to a half of those type of cases.
Q These are the nonworkers' compensation cases?
A Correct.
Q And the workers' compensation cases, are those referred to you by the State of California or by a lawyer?
A Both. The State of California, insurance companies, or a lawyer representing the injured worker.
Q What is your breakdown on how many are referred to you by the lawyers representing the injured worker?
A 75 to 80 percent.
Q And how many times that those are referred to you do you end up providing treatment for that person, that 75 to 80 percent?
A Rarely do I end up providing treatment for those individuals. And that's because under California law, an evaluating physician who performs those disability evaluations in our workers' compensation system is usually not permitted to then also become the treating

Page 20

physician. So our system separates out the treating doctor from the evaluating doctor. There's very little overlap
Q Do those
A -- in those two type of cases.
Q Do those workers' compensation cases where you testify for claimants go toward your allowed 20 days per year?
A No. That is charged according to the workers' compensation fee schedule, and it's billed through the billing department of the university.
Q And do you get to keep any of that money?
A No.
Q It's a part of your salary?
A Correct.
Q Do you get any bonus system under your salary with the university?
A No.
Q Just a straight salary?
A Correct.
Q Is it correct that you have not examined any of the 13 plaintiffs who have been selected for this case?

5 (Pages 17 to 20)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

A Yes, that's correct.
Q I know from your records that you indicate that -- your report, rather, you indicate that you reviewed the examinations that a Dr. Hastings in Oklahoma performed on these 13 people; is that correct?
A Yes.
Q Did you rely on those examinations and his findings?
A In part.
Q Which part did you not rely on?
A Oh, I'm sorry. I relied on them in terms of my analysis of whether the 13 individuals were poisoned by arsine and may have suffered health effects. So there was one component of -- Dr. Hastings' examination was one component of the analysis that I performed.
Q Maybe my question wasn't as clear as I could have made it. Let me ask it another way.
You indicated you reviewed the examinations that Dr. Hastings performed and the reports that he wrote on his examinations; is that correct?
A Yes.
Q Did you rely upon examination that Dr.

Hastings made and his report of that examination in formulating your opinion?
MR. WARD: Object. Asked and answered.
THE WITNESS: Yes.
Q (BY MR. TUCKER) Do you know Dr. Hastings?
A No.
Q Have you ever met him?
A No.
Q Have you ever talked to him?
A No.
Q Do you know what his practice is?
A No.
Q Have you reviewed his CV?
A I don't recall.
Q If his CV is not in your file, would you have reviewed it?
A No.
Q Were Dr. Hastings' examinations and reports of those examinations consistent?
MR. WARD: Object to the form.
THE WITNESS: Yeah, I was going to ask you if you could clarify what you mean by consistent. I don't understand that word.

Q (BY MR. TUCKER) Well, for example, did he always keep his people and facts straight in the report?
MR. WARD: Object to the form.
THE WITNESS: I don't know. There may be or may not be some typos or errors in his report, but overall I found his reports complete and straightforward and understandable. I was not confused by them.
Q (BY MR. TUCKER) What did his examinations consist of?
A A history and physical examination, review of the records, and formulation of his opinion regarding the relationship between arsine exposure and the health problems that he found.
Q How much time have you spent looking at the records in this case?
A I provided you with copies of my billing, which has the number of hours that I've spent so far.
Q That would accurately reflect it?
A Yes.
Q How much time did you spend in preparation for your deposition today?
A Two hours.

Q How long did you meet with Mr. Ward in this case?
A One hour.
Q Was that yesterday?
A Yes.
Q Have you ever met with Mr. Ward or anyone else, any one of the plaintiffs' lawyers before?
A I've spoken to them on the phone, but I have not met them personally.
Q Do you know a Dr. Gad?
A Personally, no. I've read his reports, but I don't know him.
Q Have you ever met Dr. Gad?
A No.
Q Do you know a Dr. Teaf from Florida?
A No.
Q And you indicated you have not met Dr. Hastings?
A That's correct.
Q Do you know Dean Carter in Arizona?
A No.
Q Do you know Dr. Pike in Arizona?
A No.
Q Have you ever worked for this plaintiffs'

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

law firm before?
A No.
Q Are you working for them on any other matter?
A No.
Q I'm going to hand you back your current CV, sir. There's several pages of journal articles in which you appear as one of the authors, is that correct, on your CV?
A Yes.
Q Would you look through that list and identify for me the articles that deal with arsine.
A (Witness examines documents.)
In the section labeled "Book Chapters" I believe I discuss it as part of an overall chapter on chemicals in a textbook edited by LaDou, L-a-D-o-u. It's gone through several editions, the latest of which is 2003.
And I think I might have dealt with arsine in a chapter in an emergency medicine textbook that was published in 1994.
Q Is that identified in your CV?
A Yes. That is edited by Kravis, K-r-a-v-i-s. I think there might be a section on arsine in that one too.

Q Would you just put a little checkmark for me by that one with your pen. I don't find it on the other one, mainly because I can't find it.
A Sure.
MR. WARD: Are you going to make that a deposition exhibit?
MR. TUCKER: Probably.
MR. WARD: Well, since he's marking on it, I'm going to if you're not.
MR. TUCKER: Okay.
MR. WARD: Since there appears to be a communication by way of a checkmark, I'm going to ask that that be marked as a deposition exhibit.
Q (BY MR. TUCKER) Do you have a copy of that book?
A Looking at it, just by coincidence, it's right behind you. How lucky can you get.
Q Would you just find your chapter.
MR. WARD: Off the record.
(Discussion off the record.)
(Exhibit No. 1 marked for identification.)
THE WITNESS: Yes. On page 774 there is a very short discussion of arsine.
Q (BY MR. TUCKER) In the other book that you mentioned that's in its 2003 edition, do you

have that?
A We have it somewhere in the office here, yes. I could try to locate it during a break if you'd like.
Q That would be great.
A I'd be happy to make you a copy of the pages. I don't think you want the whole book.
Q Let me ask a question: I don't profess to be an instant proofreader, but the text of the one that I just read seems an awful lot like the text of the other book that you also identified, the LaDou text.
A It's similar. There's been some changes in the sections, but I adapted multiple versions for the LaDou text.
Q Like the old phrase, cut and paste?
A Correct.
Q But it looks to me like the arsine paragraphs -- and, again, I must confess, you saw me read it in about 15 seconds -- it appears to me that that's kind of a cut and paste from the LaDou text or vice versa; is that right?
A Probably --
MR. WARD: Objection to the form of the question concerning the length of time you took

reading it.
THE WITNESS: Probably that's correct.
Q (BY MR. TUCKER) Could I ask you to look at it and just confirm for me. I want to make sure what differences, if any, there are. What additional information is provided in this book that's not in the LaDou text or vice versa?
A I'd have to have the LaDou text next to me to see.
Q Would it be worth just taking a second and having you call so we can start locating it? I don't want to break now just to do that, but if you could ask somebody to look for it. I appreciate your time is limited.
(Dr. Harrison exits and re-enters the proceedings.)
THE WITNESS: I stand corrected. I didn't cover arsine in the LaDou book. I thought I had it in the chemicals chapter. I do not. It's written about by another author in that book.
Q (BY MR. TUCKER) Was the LaDou book -- how was the LaDou book revised for the 2003?
A Updated the references and some of the diagnosis and treatment recommendations;

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 29

depended on the chemicals. Some pretty much stayed the same if there was nothing new between 1997 and 2003.
Q Is arsine even mentioned in that book this time?
A Page 549, chapter 30.
Q Who wrote that?
A Ware, W-a-r-e, Kuschner, K-u-s-c-h-n-e-r, and Paul Blanc, B-l-a-n-c.
Q Who are those folks?
A Dr. Blanc is a colleague of mine in the division of occupational medicine. And Dr. Kuschner is a pulmonary specialist at Stanford.
Q And why didn't you write the chapter on arsine for the 2003 edition?
A You know, I think -- I stand corrected. I'm not sure that I included arsine in the chapter on chemicals, because there was -- it was covered elsewhere. I don't think I ever had anything on arsine in the LaDou book.
Q The reference to arsine that you just identified in the LaDou book, could I see that.
A Yes.
Q I hate to be so dumb, but would you point -- are you talking about here?

Page 30

A Yes.
Q Okay.
Would you tell me again who wrote this chapter on arsine.
A Ware Kuschner.
Q And he's with you here at the University of San Francisco?
A No. He's at Stanford University.
Q His title there is?
A You know, I had to look it up in the index of authors in the front. I think he's associate professor of medicine in the pulmonary specialty.
Q And Paul Blanc is?
A He's an occupational medicine specialist. He works with me here.
Q Professor of medicine, division of occupational environmental medicine, University of California San Francisco?
A Correct. Same division that I'm in.
Q And you're also -- does that mean full professor?
A Yes.
Q Are you also a full professor?
A Yes.
Q And do you know how Dr. Blanc and Dr.

Page 31

Kuschner were assigned the responsibility for the chapter on arsine?
A Dr. Joseph LaDou, who is also a professor at UC San Francisco in our same department in the same specialty of occupational and environmental medicine, is the editor of this book, and he asked many of his colleagues here at UC San Francisco to contribute chapters. He probably asked Dr. Kuschner and Dr. Blanc because they are knowledgeable about the inhalation of chemicals and gases and have -- you know, it's within their subject area of expertise.
Q Would Dr. Blanc and Dr. Kuschner be as qualified to express opinions on arsine exposure as you would?
A I don't know.
Q The chapter you wrote in that book is -- would either one of them be as qualified?
A I don't know.
Q Do you know what Dr. Blanc's experience has been with inhalants such as arsine?
A I don't know.
Q Your chapter in this book is multiple chemical sensitivity; is that correct?
A I have three chapters. One is on

Page 32

chemicals, which is pretty much all the chemicals that didn't fit into other chapters in the book. There were important chemicals that didn't seem to fit in elsewhere within the book. Dr. LaDou asked me to cover those. So there's some 20-odd that I cover in the chapter.
Then there's another chapter on multiple chemical sensitivity that you mentioned. And there's a third chapter on liver toxicology.
Q Do you know whether either of those gentlemen from Stanford or your colleague here, the professor, has had experience with arsine?
A I'm sorry. Do I know if they have?
Q If they have.
A I don't know.
When you say experience, have they treated or diagnosed patients with arsine or consulted on arsine cases?
Q Yes.
A I don't know.
Q I'm not going to introduce this whole exhibit, this whole article as an exhibit, because basically I'd like you to identify it for me, if you would. This appears to be an article written or part of a book written by Robert Jay

8 (Pages 29 to 32)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard
OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

Harrison, M.D.
Is that you?
A Yes.
Q Can you tell what book that was a chapter in?
A It's in a book entitled "Primary Care." It's actually one of the volumes in a series of a book called "Primary Care" published in December of 2000. It's a chapter from that book.
Q That's a different book than the LaDou book that we have here. It's a different LaDou book?
A It's not -- yes. It's a different LaDou book. It is actually not a single volume of a book. It's in a series called "Primary Care."
Q So is the document that you have in your hand a chapter, the chapter you wrote for the LaDou book that was identified in your CV? Do you want to look at your CV again?
A Yes.
(Witness examines document.)
That is on page 7 of my CV. It's the chapter entitled "Chemicals and Gases."
Q (BY MR. TUCKER) Mark that one for me, too, would you, because there's another chapter

that says the same thing.
A (Witness complies.)
Q Now, are you telling me that's a different book than the one that Mr. Ward's holding in his hand?
A Yes. The one he's holding in his hand is a different book from the one that I just marked.
Q Had you reviewed or did you review the chapter on arsine in "Current Occupational and Environmental Medicine" as authored by your colleague and the doctor from Stanford before you wrote your report in this case?
A No.
Q Have you ever read it?
A No.
Q Are you familiar with the format of the book, that it's divided first into acute effects and chronic effects?
A Yes.
Q Are you aware that these two authors identify the chronic effect of arsine exposure as renal damage?
A I don't know. I'd have to take a look at what you're referring to.
(Witness examines book.)

Yes. I see under chronic effects renal damage.
Q I'm just going to read a couple sentences from this. Tell me if you agree or disagree with me, okay?
Arsine is toxic to red blood cells, leading to hemolysis.
A Agree.
Q Damage to other tissues may result from secondary damage from hemolysis.
A Agree.
Q Laboratory findings are those of intravascular hemolysis.
A Agree.
Q Free hemoglobin level may help guide management.
A Agree.
Q Exchange transfusion has been advocated for free hemoglobin levels greater than 1.2 to 1.5 grams per dekaliter.
A Agree.
Q Do you agree with that guide as to the time to treat arsine in that fashion?
A In terms of treatment with exchange transfusion, yes, I agree.

Q The level being 1.2 to 1.5 grams per dekaliter?
A Agree. That's a red flag where one should consider exchange transfusion.
Q In that 1.2 to 1.5 grams?
A In terms of exchange transfusion, yes. When we're talking treatment here, we're talking about having packed red blood cells available. It's a red flag in the acute exposure situation where one might consider exchange transfusion depending on the clinical course.
Q The principal differential diagnosis includes hemolysis as a consequence of other causes.
A Agree.
Q Have we identified every item in your CV now that deals with hemolysis -- I mean with arsine?
A Yes.
Q Are there other articles in your CV that deal with hemolysis?
A No.
Q Do those articles deal with hemolysis, those chapters?
A Let me understand what you mean. By

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

hemolysis, do you mean in general, like, the cause of hemolysis, the differential diagnosis of hemolysis? Is that what you mean?

Q Yes. Particularly differential diagnosis of hemolysis.

A No. In that sense they do not. They just deal with arsine and the diagnosis and the treatment of arsine exposure, but not the flip side, which is what is a differential diagnosis of hemolysis.

Q What do you define as hemolysis?

A Destruction of red blood cells.

Q What are some of the causes of hemolysis?

A There's a lot of different medications that can cause hemolysis. There are immune blood problems that can destroy red blood cells. There are problems that involve the spleen where the red blood cells can get chewed up and cause hemolysis. There are different types of anemia, again, probably caused by immune abnormalities, where the body produces red blood cells and then they get destroyed within the blood.

Q You've identified some medical causes of hemolysis.

Are there mechanical causes of hemolysis?

A I am not sure I know what you mean by mechanical causes.

Q Well, you say that hemolysis is merely the term that describes destruction of red blood cells; is that correct?

A Correct.

Q Does hemolysis result from the way a blood sample is drawn? Can hemolysis result from that?

A Destruction of red cells can occur when blood is drawn, that is correct.

Q And does the technique used in drawing the blood sometimes cause hemolysis?

A Yes. It can be artifactual. It's not real hemolysis caused by a medical problem, if what you mean by mechanical I would term spurious or artifactual hemolysis caused by the way blood is drawn.

Q And when the laboratory reports a blood level that you say, uh-huh, this demonstrates some hemolysis or possibility of hemolysis, can you looking at the laboratory number say that it was caused by exposure to some chemical or gas

or inherent natural anemia as opposed to occurring mechanically as to the way the sample was selected and handled?

A Just from the single number, one would not be able to tell the difference. In other words, the number would be increased.

Q What other number would you look for to see, to confirm that it was not caused by the way the blood was drawn?

A Well, what we would then look for would be other signs of hemolysis. We might look for a hemoglobin coming out into the urine. We might look for a drop --

Q That's called hemoglobinuria?

A We might look for a drop in the red blood cell count.

Q What else?

A We can look for haptoglobin, which is another form of hemoglobin that can circulate around in the blood.

Q And would you expect to see haptoglobin decrease if you had hemolysis not caused by a blood draw? Did I ask that in a confusing way?

A Yes.

Q If you had medical hemolysis as opposed

to something that the nurse did when she drew the blood or the lab tech or whoever and how it was handled, what would you expect to happen to haptoglobin?

A Would you repeat that question. I'm sorry.

Q Why would you look at haptoglobin?

A Haptoglobin should increase if you had real intravascular hemolysis. If it was an artifact, I'd expect haptoglobin to remain normal. It should not increase.

Q It should increase -- say that again.

A If you had just a mechanical cause of hemolysis, if it was artifactual caused by the way the blood was drawn, your haptoglobin level should not increase, in other words, if you have intravascular hemolysis, a medical cause of hemolysis, or it's caused by a chemical.

Q Haptoglobin should remain level?

A Correct. You should not see a change in the haptoglobin.

Q If you did see a change, that change would be an increase or decrease?

A It should be an increase.

Q What's the chemical process that takes

PROFESSIONAL REPORTERS
Experience and service that sets the standard
OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 41

place to cause the haptoglobin level to increase?
A I have to check that. I can look that up at a break to see --
Q Just generally. Can you tell me generally?
A I don't remember.
Q But you're sure the haptoglobin would increase?
A I think it would increase. I guess by your question you're suggesting it should decrease.
Q Well, you're the doctor. I'm just sitting here, poor dumb lawyer from Oklahoma.
A You look smart to me.
Q You just like my bow tie. It fits in San Francisco.
MR. WARD: It's ill fitting in Oklahoma.
MR. TUCKER: Fits in Oklahoma.
MR. WARD: Okay.
MR. TUCKER: And it never gets in my soup.
Q (BY MR. TUCKER) In your practice, other than the five or six people who came to you, were referred to you to rule out the various things they might have been exposed to, has anyone ever reported to you and said, I've been exposed to

Page 42

arsine gas and I want you to evaluate or treat me?
A No.
Q Do you know if your colleague that wrote that chapter that we read from a little bit ago has had that experience?
A I don't know.
Q Let me give you back your CV here, if I might.
You've listed a lot of references that you relied on in forming your opinions. Did you read all those just to do this report, or are those things that you had read previously and had an understanding about?
A You mean in the report that I generated with a list of references?
Q Yes.
A Both. Some I looked at just for this case. Some I had been familiar with before.
Q And how did you determine which references to list?
A I did a literature review, a search of the medical literature called PubMed, which is the general on-line database of medical articles.
Q Do you have kind of a general master list of literature reference materials that you list

Page 43

whenever you write a report and then you add specific things to the case you're handling?
A No. I usually do it particular to the case.
Q That's a pretty long list of pretty complicated citations.
Did you have all those typed up for this report, or did you cut and paste?
A I have my CV in front of me. Did you mean to give me the report and the references?
Q The references that came with your report. I'm sorry, your report.
A Okay. So I'm sorry. The question was did I --
Q You have all those pages of references on your report.
A I think I have a page or two, that's correct.
Q Did you read all those things for this case?
A Yes.
Q And did you charge for all that?
A Yes.
Q I see two bills, November 29 and January 7, a total of eight and a half hours.
Does that represent all the time you

Page 44

utilized reviewing all the records in this case?
A I think there's a subsequent bill.
Q There's a bill for preparation of your report.
A Yeah. And there was two more hours reviewing the defense expert reports.
Q Which you haven't billed for yet?
A No. I have. There are two hours on there.
Q The review of expert reports is not your reports, that's the other people's reports?
A Right. I got the defense expert reports, reviewed those, and then prepared the second report that I made in this case.
Q Okay.
A So it looks like there's a total of ten and a half -- I think it's something like 12 and a half hours so far.
Q I find a letter in your file which is dated April 30, 2005, addressed to Mr. Fred Stoops.
A Yes.
Q What is that?
A That's the second report that I wrote.
Q Did you send that to them?
A Yes.

11 (Pages 41 to 44)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Q Did you tell them not to give it to us, or do you know why they wouldn't give it to us?
A I don't know.
MR. TUCKER: I'm inquiring why didn't you send it to us.
MR. WARD: Because there was a date by which the reports were to be exchanged, and we couldn't get it in a timely fashion, so we didn't do it.
MR. TUCKER: Okay.
MR. WARD: You're welcome to have a copy of it, but we didn't want you to bitch about getting it late.
Q (BY MR. TUCKER) How many depositions have you given?
A Hundreds. Well over a hundred. That's over the last 20 years.
Q How many times have you testified in a trial?
A About ten.
Q Have you testified this year?
A No, not at trial.
Is that what you meant?
Q Yes.
A Yeah. No, not at trial.

Q Have you testified in depositions this year?
A Yes.
Q How many depositions?
A Four or five.
Q What was the nature of the other depositions you gave this year?
A I'd have to give you -- I'd have to look those up. In general, the majority of the depositions involve workers' compensation cases where I write a report on the cause of an injury or illness and any associated disability, and then there's some follow-up deposition involving that report.
So I could go back and look at my calendar and see
Q Let me rephrase the question.
A -- what the nature of those were.
Q How many depositions have you given this year that were not workers' compensation related?
A Very few. There may have been one or two.
Q And the ten trials that you testified, are those workers' compensation trials or civil law

trials?
A Civil law trials. Workers' comp trials are rare.
Q The one to two cases that you've given depositions in this year, what were they about?
A I'd have to check. I just could look up my -- just go back from January and could tell you in three minutes by looking at my appointment book.
Q When you filed your Rule 26 report, as required by the Federal Rules of Civil Procedure, there was an identification of your cases, but because you filed it year end of '04, nothing for '05 was listed.
What cases would be added for '05?
A Do you want me to look at my appointment book? I could tell you really quickly.
Q I basically want to know if you have any new case in '05 that you didn't list in your '04 case list.
A I might, but I can't tell you offhand without looking at my appointment book. Because I could look and tell you
MR. TUCKER: Why don't we just take a break.

(Recess taken.)
Q (BY MR. TUCKER) This is a copy of what was attached to your report as received from the lawyer that you're here for. If you'd like to look at that for me. The -- I notice that we checked at least five of those articles that Dean Carter is included as an author on the article; is that correct?
A Yes.
Q Do you know Dean Carter?
A No.
Q Did you look up to see who he was?
A No.
Q Do you have any idea who he is?
A Just by reviewing his CV that was attached to his expert report.
Q You read that separately from this; is that right?
A Separately?
MR. WARD: Object to form.
Q (BY MR. TUCKER) You read his CV separately from when you prepared your report. You had not seen his report when you prepared the list of citations that's in your hand?
A That's correct.

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 49

Q And at least five of the articles that were in your literature review were written by Dean Carter; is that correct?
A Yes.
Q From reviewing his articles and reviewing his CV, could you tell whether you had ever read any of his articles previously?
A I don't know.
Q Would you have read any of his articles or the articles in his CV authored by him in connection with the case where you were ruling out arsine?
A Possibly, but I don't remember specifically.
Q After you received his report and reviewed it, did you make a determination as to whether he is an expert on arsine?
A I did not. I don't have an opinion about that.
Q And after reviewing his report, do you have an opinion about that?
A No.
Q His articles, however, do form a part of the basis for your opinions in this case; is that right?

Page 50

A That's correct.
Q Now, how many years did you say you had been providing testimony for attorneys?
A 20.
MR. WARD: Object to the form of the question.
Q (BY MR. TUCKER) How old are you?
A I'll be 51.
Q Well, I was 51.
MR. WARD: I was too.
Q (BY MR. TUCKER) When will you be 51?
A September.
I had my colonoscopy.
Q Thank you for sharing that with us.
A It's the 50th birthday present.
MR. WARD: There seems to be a conspiracy around doctors of that ilk, to describe it as your 50th birthday present.
Q (BY MR. TUCKER) What percentage of your income is derived from litigation and what percent is from your straight salary?
A I just want to be sure I understand. When you say litigation, you're not referring to workers' compensation? You're referring to the other medical-legal consultation?

Page 51

Q Actually, I'm, first of all, referring to all litigation, however you would break that apart.
What percent of your income that comes to your pocket is from litigation as opposed to other activities in connection with your profession?
A 90-plus percent of what I do is in treatment, research and teaching. And I receive a salary for that.
Q What is your salary?
A It's about 150,000 a year. I couldn't give you an exact figure, but it's in that ballpark.
Then there are cases for which I provide consultation, like this one, that's up to that 21 days per year that I discussed earlier. And that's probably on average 20- to $25,000 per year. It varies from year to year depending on the referrals that I might get.
Q And that's the only litigation income you have, is 20- to $25,000 per year?
A Directly. That's why I was asking you to clarify your question, because --
Q What's the indirect litigation income?
MR. WARD: Do you recall he said that workers' comp is part of his salary?

Page 52

Q (BY MR. TUCKER) What's the indirect litigation income?
A I just want to clarify that when you say litigation, there are patients referred to me who have a disputed workers' compensation case in the State of California, and so I guess you might say they're technically in litigation. They're represented by an attorney in many cases. Sometimes they represent themselves. But I guess you would consider they're technically in litigation. I derive no additional salary or benefit from those cases.
Q What percent of that 80 percent of your time that you said you spend on care and treatment of people, and research, is in those cases that are referred to you for evaluation and treatment?
A I'd be happy to answer that question, but it might be easier if I described the proportion of my workweek and my time and the various activities that I do.
Q Please.
A It will give you a complete picture, and I think I would answer your question.
Two days a week I see patients. And I see

13 (Pages 49 to 52)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 53

patients in an outpatient department at the University of California San Francisco in the specialty of occupational and environmental medicine. That's an outpatient department similar to gastroenterology or cardiology or hematology, any of the other specialties.

Three days a week I teach and I do research. And I spend that time with the California Department of Health Services, which is a public health agency for which I am also salaried. I don't see patients there. I run an epidemiology and a research group supported by public money from the State of California and also by a lot of research grants from the federal government.

So of the two days a week that I see patients at UC San Francisco, 90 percent of that time is in workers' compensation diagnosis and treatment or consultation. I might see somebody once, either as part of a disputed workers' compensation claim or referred by another doctor, or an employer, or self-referred, word of mouth from a former patient. And those are typically billed to workers' compensation insurance carriers, sometimes to somebody's regular health

Page 54

plan.

The other 10 percent or less of my time in those two days a week involves other forms of legal consultation, which is the form of this particular case. And for that I am permitted to derive outside income, which is roughly 25,000, but it sometimes is less, sometimes a little bit more, depending on word-of-mouth referrals.

Q Well, if you did not receive these workers' compensation referrals, would you receive the same compensation here at the -- your teaching position and treating position?

A Yes. I mean, ultimately -- the easy answer is yes, but ultimately, if you know anything about the way universities are structured, the department chair might come to me and say, well, we're not covering your salary.

Q You need to see more outside cases and give us the revenue?

A No, would probably say go get more research grants, or see more patients in the clinic.

Q And the way that you solve that issue is you see workers' compensation cases; is that right?

Page 55

A The way that the clinic revenue comes in is through -- primarily through workers' compensation cases, because that's the nature of my specialty, people are injured or made ill on the job. And that's the form of insurance that they have.

Q Did you have any --

A But I also have research grants at the university which largely covers my salary.

So if I saw no patients during my two days of practice, or if I saw 5,000, it really wouldn't make a difference. We're here primarily to consult and, frankly, to teach. We have all sorts of students that I supervise as part of my teaching practice.

Q Are you the only one that reviewed the materials in preparation -- in anticipation and preparation of the report in this case?

A Yes.

Q Does anyone else do review of materials for you?

A No.

Q Does anyone else do a literature search for you?

A No.

Page 56

Q Do you have any assistants who did any work on this case?

A No.

Q Do you have any students that did any work on this case?

A No.

Q We took a break. During that break did you identify your 2005 cases?

A Yes.

Q Could you give me that updated list, please.

A Four cases. Three of them happen to involve exposure to mold in homes. I'll give you the name of what I believe to be the identifier on the case.

Q Okay.

A Waskey, W-a-s-k-e-y, on behalf of plaintiff. Attorney is Breall, B-r-e-a-l-l. Tan, T-a-n, on behalf of plaintiff. The attorney is Lifschitz, L-i-f-s-c-h-i-t-z. Chavez, on behalf of plaintiff. Same attorney, Lifschitz. And then the fourth case is Alvarez, A-l-v-a-r-e-z, on behalf of plaintiff. Attorney is Michael Freund, F-r-e-u-n-d. And that's a at least 50-, perhaps more, plaintiff case involving exposure to metam sodium and a

14 (Pages 53 to 56)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 57

secondary toxic chemical after it was applied to an agricultural field adjacent to a homeowners tract in Southern California, an inhalation exposure situation to homeowners who were next to a field that was an overspray.
Q Where is the Alvarez case pending?
A I could look that up for you. The plaintiffs live in Arvin, A-r-v-i-n, California. The attorney is in Berkeley. I don't know where the case is pending.
Q What about Waskey and --
A These are attorneys in --
Q -- Chavez?
A Sorry. These are attorneys in San Francisco, but I don't -- and these were homes in the San Francisco Bay Area. So I assume it's one of the San Francisco Bay Area counties.
Q Well, if you would during -- before we resume tomorrow, if you can get the case number and case style like you did in the cases you provided for us.
A Yeah. I have to pull the files.
Q You'd be able to do that, wouldn't you?
A Yes.
Q Have you testified in both those cases

Page 58

this year?
A I've done depositions in all four. No court testimony.
Q Other than that do you have other new cases in '05 in which you have not yet given a deposition?
A I know of one. There may be others. It would be more difficult for me to -- well, possible for me to see if there are others that are pending. The one that comes to mind is a railroad case in Montana against Burlington Northern Railroad, shoulder and back injuries. I've done a number of examinations for possible ergonomic and musculoskeletal injuries among railroad workers for Southern Pacific Railroad, Burlington Northern Railroad.
Q On behalf of the railroad or on behalf of claimant?
A Claimants.
Q Is it all through one lawyer?
A The particular case that I just started is one attorney. I've done previous depositions which have been listed for you on the table. Larry Lockshin is a Sacramento attorney who I've done several cases for over the years. This is another

Page 59

attorney in Montana.
Q So when I look through this case list, every time I see Larry Lockshin and a railroad, I know it has to do with a shoulder and back ergonomic injury?
A Yes.
Q And would that be true of any other case I see involving a railroad defendant?
A Yeah. Those would all be musculoskeletal.
There is another case that I'm working on. I'm trying to think of the attorney. It's -- again, it's a railroad case, but it's lung cancer, exposure to diesel exhaust. I could look that one up too, if you want me to.
Q That's a 2005 case?
A Yeah. I have haven't done a deposition or court appearance. I've looked at the records.
Q How was the person exposed to diesel exhaust?
A A mechanic on the train maintenance yards. Idling locomotives.
Q Did you find that was the proximate cause of a form of lung carcinoma?
A Yes.

Page 60

Q What form of lung carcinoma is proximately caused by working in a diesel rail yard?
A I think this case had an adenocarcinoma of the lungs. Diesel exhaust, known carcinogen, nonsmoker.
Q I'm going to ask you about some of these cases on your recent case list, if you'd tell me what they're about.
Bonnie Ballou, attorney Peter Nicolaysen.
A You're going to stretch my memory. I don't remember.
Q Well, there's no case number and no location. So we weren't able to look for it ourselves.
A What year was it?
Q 2001, October 15.
A How much does it really matter to you? Because I could find it, but it's going to mean digging in boxes of records. That case -- anything more than two years old has been archived.
Q Let's hold it and talk about it.
How about Benner versus Becton Dickinson, Shery Levy, attorney?
A Needle stick. I think that was hepatitis.

15 (Pages 57 to 60)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

The issue was whether or not there was an alternative safety engineer device manufactured by Becton Dickinson.
Q What was your testimony about?
A Was the injury caused by exposure to the sharp device, and were there alternatives that are accepted and widely used.
Among other responsibilities I've had over the years here at UC San Francisco is director of our employee health service. So I've established and overseen programs to implement safety devices in our hospital.
So I gave an opinion about whether there were safety engineer devices that would have been available to help prevent the infection.
Q Where was that case?
A The law office is in Philadelphia.
Q Biggs versus Chung, attorney James Donahue.
A What year was that?
Q November of last year.
A Mold case. Homeowner.
Q What kind of mold?
A Well, we're talking in all these mold cases -- if we're going to go through this list -- of

a variety of different types, and I don't remember in each of the cases what exact mold species there were. Again, if it's important to you, I can go pull their chart.
Q What happened in that case?
A I don't know. You mean in terms of the outcome?
Q Yes.
A I don't know.
Q Bradford versus Alaska Airlines.
A Several plaintiffs' exposure aboard Alaska Airlines planes to hydraulic fluid, jet oil, and/or their pyrolysis products that get sucked into the ventilation system during mechanical problems.
Q Was there a fire on the airplane or something?
A No fire, but it has to do with a problem with some of the seals on the hydraulic systems, and ways in which --
Q So what happened?
A -- these chemicals get into the aircraft.
Respiratory and neurological problems to the flight attendants.
Q What happened to the airplane?
A Oh, basically, what you experience if

you're a passenger or a flight attendant is a severe odor, sometimes a mist that you can see in the air, respiratory and neurological problems.
Q Does this happen all the time?
A No.
Q What was the outcome of that?
A Don't know.
Q Beth Buie?
A Who was the lawyer, and what was the year?
Q Larry Bagby, 2002, B-u-i-e, "Buie."
A Don't remember.
Q Brad Choate, Robert Fowler, attorney.
A I don't recall.
Q Gaba versus DiPaolo, Brian McConaty, attorney.
A The only thing I remember about that one is I've done a few medical malpractice cases over the years, and I think that was one of them.
Q Did you testify twice in that case?
A Did I list two depositions?
Q Two days of testimony.
A Oh, yes, I must have.
Q Where was that?
A I don't remember.

Q Doke versus Estep.
A Don't remember.
Q Benjamin Stringer.
A Don't remember.
Q That was a year and a half ago.
A Don't remember.
Q Dunker versus Diablo Auto Body, Sean Gleason.
A Toxic chemical of some type. I don't remember anything else.
Q Robert Franta, attorney is Daina Van Devort.
A Don't remember.
Q Green versus Blackburn Propane, Scott Gallagher.
A That one was pretty recent. Carbon monoxide exposure from a faulty water heater, sleepover party of eight- to ten-year old kids, almost died, brain injury.
Q Where was that?
A Midwest somewhere. I know that's a big part of the country. East of the Mississippi.
Q Peter Grimwood, lawyer Derek Jacobsen.
A Tanker men unloading oil tankers in the San Francisco Bay, exposure to multiple solvents,

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 65

probably benzene, some type of hematological malignancy. I don't remember which. That was a longshore case or something like that.
Q Patricia Horkan, A. Gary Bell.
A I don't recall.
Q That was about a year and a half ago.
A Don't recall.
Q IBM workers litigation, Amanda Hawes, attorney.
A Well, I can't forget that one. I was deposed for years. You'll see that one has the most depositions listed, and there was a court appearance about a year and a half ago.
Two test plaintiffs, breast cancer, non-Hodgkin's lymphoma, multiple defendants, ultimately IBM remained. Jury trial on whether IBM had actual knowledge that they produced systemic chemical poisoning that in turn led to cancers in these particular plaintiffs.
Q What was the outcome of that case?
A Victory for IBM, jury ruled they could not find IBM had actual knowledge.
Q A defense verdict?
A Correct.
Q Steven Knickerbocker. Attorney Jonathan

Page 66

Hartman.
A Don't recall.
Q McKibben versus Ziebart.
A Glyco ether, which is a type of solvent, exposure in a rust-proofing shop. Leukemia in a front office worker who may have -- who probably also had some exposure to the solvent. There was another leukemia case of the same type also from that exact same shop.
Q And you opined that was more than coincidence?
A Correct.
Q What was the outcome of that case?
A I don't know.
Q But that was not workers' compensation?
A Correct.
Q Where is that case?
A Midwest. I have to look that up.
Q Robert Moreland, Karen Kahn, attorney.
A Homeowner exposed to mold.
Q Ortiz versus Mission Housing.
A Lead poisoning. Defendant was -- well, I think it was either the San Francisco Housing Authority or the building owner or the contractor responsible for the remediation. A woman with

Page 67

very high blood lead. The question was was it from her home that had lead paint, or from intentional ingestion of something unknown. Never were really able to determine whether she did ingest something, like a snack food.
Q What happened to that case?
A I don't know.
Q Pena versus Santa Clara County, Donna Diaz, attorney.
A One of many employees for Santa Clara County referred by their employer, building damaged by water, mold overgrowth.
Q Perez versus Chevron, Rafael Metzger.
A Leukemia in a maintenance worker at one of the Bay Area oil refineries.
Q Why wasn't that a workers' comp case?
A She does have a workers' comp case also. In fact, I just got her records from her workers' comp lawyer. I don't know who -- there was a defendant in that case. So it was definitely civil litigation. I don't know why.
Q Jeremy Ritchie, Richard Shapiro, lawyer.
A I don't remember.
Q Smithberg versus Spiker, Danielle Ellis.
A I don't remember.

Page 68

Q Tang versus Marisco, Steven Birnbaum.
A Longshore case, warehouse worker unloading ships, lung cancer. I think it was either something like bunker oil or coal dust or something like that.
Q What happened to that case?
A Don't know.
Q Tolbert versus Monsanto, Mark Engelhart.
A I think that was the one in Louisiana, large class action alleging a whole variety of different health effects from exposure to dioxin from a Monsanto facility, environmental contamination.
Q Did you only have one plaintiff out of that class action, or more grammatically correct, have only one plaintiff?
A No. I think there were multiple plaintiffs.
Q How many did you have? The case is listed under one name. I guess I'm asking did you have multiple plaintiffs?
A I had multiple plaintiffs. More than ten, but less than 30. I mean, there were multiple plaintiffs.
Q What happened in that case?

17 (Pages 65 to 68)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 69

A Settlement.
Q Did you examine any of those plaintiffs?
A I don't remember.
Q Did you examine in the McKibben versus Ziebart case either the office worker or the other worker?
A No.
Q In the Bradford versus Alaska Airlines case, did you examine the flight crew and passengers that were involved in that case?
A This case only involved the flight crew; and I did examine them.
Q Was that a California-based flight crew?
A Seattle-based.
Q And the Peter Grimwood case, the case of the tanker man with the solvents, did you examine Mr. Grimwood?
A No.
Q Ortiz and Mission Housing, the lead case, did you examine that woman?
A Yes -- no. I talked to her on the phone. I take it back -- no, no, no. I was right in the first place. She did come into my office.
Q Pena versus Santa Clara County, the mold case, did you talk to that person?

Page 70

A Yes.
Q Examine that person?
A Yes.
Q Townsend versus Zhang.
A Who was the lawyer?
Q Martin Ambacher.
A Don't remember.
Q Valente versus UNUM?
A Dentist with tendonitis of the hand, disabled, disputing -- well, the insurance company was disputing her disability. So it was a long-term disability claim.
Q What happened in that case?
A Decision for plaintiff. Went to trial. I testified. They awarded her long-term disability.
Q Wilhite versus ABM, Tony Freitas.
A Don't remember.
Q Hazel Williams.
A I think that was an old one. Don't remember.
Q Joseph Maloney, do you know Mr. Joseph Maloney?
A Rings a bell, but I don't remember.
Q Wilson versus Global, Robert Huntley.
A A nasal cancer in a semiconductor,

Page 71

equipment installer and maintenance man, solvent and radiation exposure -- sorry, sulfuric acid and radiation exposure. That was in Boise, Idaho.
Q Did you examine Mr. Wilson?
A No.
Q What happened in Mr. Wilson's case?
A Decision on behalf of plaintiff.
Q And that was what kind of a case?
A Nasal cancer.
Q I mean, what was the claim? Against whom? For what?
A It was an Idaho workers' compensation case against the employer.
Q Now, are there any other workers' compensation cases on this list I've just gone through with you? Is that the only one?
A When you say are there other workers' compensation cases, I've got hundreds of workers' compensation cases.
Q On this list that I just read to you from, your list of cases that you provided to me.
A Oh, I see. I think that would be the only one.
Q On this list of cases which is, let me count them real quick, it's about 35, the one --

Page 72

one of those is a workers' comp case.
Are all the rest of those cases in which you've testified for a plaintiff or claimant?
A (Witness examines document.)
Let me correct my response. The Pena case is a workers' comp case. Donna Diaz is the attorney for Santa Clara County. So that was on behalf of the defendant. All the rest are on behalf of plaintiff.
Q Are you familiar with the, for want of a better word, what's been called the Daubert process?
A Yes.
Q What is your understanding of how that works?
A I actually discussed it to refresh my memory yesterday evening.
Q With whom?
A With the plaintiff counsel, just to go over and remind me what the Daubert criteria are.
Q Is that in addition to the hour you spent with him otherwise?
A No. That was as part of that hour.
And I jotted down some notes. And I'd be happy to go grab them.

18 (Pages 69 to 72)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 73

Q Probably ought to do that.
A And we can --
Q Yes.
(Recess taken.)
Q (BY MR. TUCKER) You brought a file folder back, Doctor?
A Yeah. Good luck.
Q This would be the file jacket for the file that you previously gave us?
A Right.
Q And these appear to be your handwritten notes.
A Correct.
Q And just so there's no misunderstanding about what they say, would you read those handwritten notes for us.
A Sure. So let me go through --
Q First of all, tell me why you wrote it down.
A Oh, because I thought you might ask me.
Q Well, that's a good answer, but it's a nonanswer.
Why did you write it down?
MR. WARD: I object. That's an appropriate answer. That's his answer.

Page 74

MR. TUCKER: Okay. I object to his --
MR. WARD: I object to the argumentative question.
MR. TUCKER: I object to the answer as being nonresponsive.
Q Why did you feel the need to write down what you've written on the file jacket?
A Thinking you might ask me about Daubert and what it means.
Q Where did you get the information that you wrote down on the file jacket?
A Yesterday evening with plaintiff counsel. I asked what -- where are you-all, defense and plaintiff counsel, in this case. May I, if I will, explain? I will give you the answer, but by way of an explanation.
Q Please.
A Because I wanted to understand where the case was. And I understand that there's a Daubert motion, that the issue has to do with the Daubert rule.
I then asked if I would -- to basically refresh my memory about what the central criteria or elements of the Daubert rule entail. Plaintiff counsel reviewed that for me, I believe reading

Page 75

from a court decision of some type, but I'm not exactly sure what that was. He didn't give it to me.
Q What did you write down?
A Well, four elements, plus a fifth issue. So let me just read to you my notes of those four elements.
The first is acceptable to testing and has been tested.
Q What does that mean?
A That the opinion offered by the expert is acceptable to testing and has been tested.
I then wrote some notes under each of these four elements, because in thinking about that and how that applies to the opinions that I offer about causation in a chemical exposure case, or in this case in particular, as a physician there are certain elements that come to mind for each of these. So my notes then reflect my thoughts about those elements.
Q Yes.
A And one is what differential diagnosis has been considered in a particular case. What is known about the toxicology of a particular chemical, and what is the likelihood that the

Page 76

symptoms are produced in this case by arsine. And how as an occupational medicine expert would I arrive at that conclusion that it's -- that my opinion has been tested according to that Daubert criteria.
So the second -- should I continue?
Q Yes.
A Okay. The second is has the expert opinion been peer reviewed, from whence is my opinion drawn, particularly, you know, from the scientific and medical peer-reviewed literature.
The third is what is the known or potential rate of error associated with the methodology and the studies controlling the techniques of the operation.
Q Is that something that plaintiffs' attorney told you, or is that what you wrote down?
A That one reflects -- because it sounds -- no harm intended -- to be rather legal, in legalese, I believe something that he read to me from a legal opinion or a legal standard.
And then what I do is apply that legal interpretation or ruling to the elements that I consider in rendering an expert opinion as, you know, a physician or occupational environmental

19 (Pages 73 to 76)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 77

medicine expert.
So the factors I would consider is temporality, biological effect, evidence from laboratory tests, consideration of other causes, and the known variability in the human response to a given dose of a chemical.
And then the fourth Daubert criteria is whether the expert opinion is accepted in the scientific community. And the factor that I consider there would be what does the literature say, peer reviewed, opinions published by authoritative medical organizations. That was -- that was my note on that one.
So those are the four -- I also have differential diagnosis on that one. I'm not sure why I put that down.
And then the only other note on here is -- and I don't know whether this is a Daubert criteria or whether this was something cited in a legal opinion somewhere, but there should be -- and this is the note I have -- grounding in the methods and procedures of science such that there is actual knowledge rather than just some subjective belief on the part of the expert.
So I was considering in my discussions

Page 78

last night what is meant by the term "actual knowledge," and I understand it to be more than just a subjective decision that's not based on review of any actual facts or circumstances of a case. So it would basically preclude an expert from rendering an opinion just based on his or her historical experience but without any actual knowledge of the circumstances of a given case.
So given that, the other note that I made here that in this particular case regarding the laboratory tests of the plasma hemoglobin that I discussed in my reports, that there's some, I think, pretty high odds that this would happen by chance alone to five or six people among the 13 cases that I reviewed as well as several others that I understand had elevated plasma hemoglobins. So I wrote down here that there's not likely to be other plausible explanations for that and, you know, that I think would bear on the issues of scientific procedures, you know, from a statistical point of view, that might be relevant to this Daubert issue.
So those were the notes that I took.
Q What is a plasma hemoglobin level that's diagnostic for exposure to arsine?

Page 79

A The number?
Q Mm-hmm.
A Well, in my chapter I think I have 1.5 as confirmatory.
Q 1.5 what?
A Do you want to give me my --
Q Big book?
A -- big book or that article that I wrote. Get the numbers right. I think you tabbed it.
MR. WARD: Yeah, I tabbed it where we had it open.
THE WITNESS: Well, I write it as 1.5 percent. So I think you could either convert that as grams per liter or, let's see, milligrams per --
Q (BY MR. TUCKER) Earlier you said -- used the -- we were talking about it, reading out of the other book you talked about grams per dekaliter.
Do you remember that earlier today?
A Yeah. That's why I wanted to check the numbers.
Q So what are you referring to there?
A 1.5 percent, which is the same -- do you want to give me the other chapter and we can get the exact number out of there?

Page 80

Q This one?
A No. I think it's in the primary care --
MS. SMITH: I think we dropped that a while ago. So you'll have to dig.
Q (BY MR. TUCKER) I'm going to give you back the original book there.
A Yeah. I have it the same here as 1.5 percent. So we just need to confirm that as a percentage, and it's -- I think that would be grams per liter, but I can double-check that to make sure that the units are correct.
Q How would you double-check it?
A I could look it up in a laboratory manual of some type.
Q Did you make any reference to it at all in your text? Did you cite to any reference in your text?
A I did. I cited the Fowler article, you know, that's the New England Journal from 1974. So we could check that.
There were a number of other references that I brought with me that would have the units. I don't want to give you an incorrect answer.
Q Let me hand you LaDou's book that the chapter on arsine was written by your colleague.

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006



INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 81

Does that help refresh your recollection?
A (Witness examines book.)
Well, I'm looking to see whether -- yeah, okay.
Good. It's grams per dekaliter. Thank you.
Q You understand I'm not being critical, but it seems to me like in an emergency medicine text which you're probably trying to deal with emergencies, it would be better if the author were to say one and a half percent of what for the reader who's trying to become aware of a subject he's evaluating.
Would you agree with that?
A Well, I agree it would be better to put the units in there, because laboratories report it out in different units. So you're right.
Q So if there's another edition, would you recommend to the editor that that be corrected in your article?
A Yes. I would agree with you. Make it easier. Particularly since, as I say, labs report it out in different units. They all may not report it out as percent.
Q As that chapter reports it, one and a half

Page 82

percent in a vacuum really isn't much use to anyone?
A It is if you understand --
Q You had a problem with it?
A I had a problem with it.
Q And you're being presented as a $500-an-hour expert. So how about the poor resident that gets the guy that walks in the emergency room?
A Yeah, particularly after being awake for 24 hours.
Q I'm handing you what I think has been identified as your file; is that correct?
MS. SMITH: Part of it.
Q (BY MR. TUCKER) Part of your file.
A Part of it.
Q It does not include your billing records which I put some other place. This is part of the file. What I'd like you to do is sort through that and just tell me what that top page is.
A Notes from telephone calls with Mr. Ward and Fred Weiss, and then the latter call was with Mr. Stoops.
Q Who is Mr. Weiss?
A I don't know. He was on the phone call

Page 83

with Mr. Ward.
Q Without interpreting your notes --
A Maybe that's Mr. Stoops. I have no idea.
Q Without interpreting your notes, would you just read your notes. I can't read your writing.
A Very few people can.
September 27th, 2004 -- and I'm going to -- I use some abbreviations here, but I am going to read the actual words for what the abbreviations mean.
Is that okay?
Q Sure.
A Okay.
Date of injury, July 11th, 2001. Toxicologist, Dr. Gad, 58 pounds arsine release, chronic exposure also, 192 clients, Port of Catoosa, most without hemolysis. Is there an injury without hemolysis? Deterioration in health, peripheral neuropathy, memory loss, chronic fatigue syndrome, kidney disease, suicides, skin eruptions, Rule 26.
And that was a telephone call, and I have the phone number and I have, again, Keith Ward and Fred Weiss.

Page 84

And then the next is October 12th, 2004, a telephone call, Fred Stoops, about 20 minutes. Requested additional medical records. Will send disk.
Q Is September 24th when you first got the assignment to take this case?
A September 27th.
Q 27th?
A Yes, that's correct. That was the first telephone call I had asking if I would provide assistance.
Q What's the next entry in your file?
A I'm sorry, the next document?
Q Right.
A Is -- I'm putting these back in chronological order. Easier to follow.
A letter from Richardson Stoops dated October 6, 2004.
Q And the next item? I mean, how many pages is that letter?
A One page.
Q Next item?
A A letter from Richardson Stoops dated October 12th, 2004, two pages.
Next a two-page letter from Richardson

21 (Pages 81 to 84)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 85

Stoops dated December 16th, 2004.
Next a one-page letter from Richardson Stoops dated December 16th, 2004.
Next a four-page letter from Richardson Stoops dated December 22nd, 2004.
Next a two-page letter from Richardson Stoops dated May 9th, 2005.
Next is an April 30th, 2005 report from myself to Mr. Stoops.
Next -- do you want me to continue?
Q Yes.
A Next are various documents that I reviewed and that are also listed in my two reports in this case. One is a one-page list entitled "Ingram Versus Air Products, Clients with High Plasma Hemoglobin." And stapled to that is a map entitled "Location of Clients with High Plasma Hemoglobin" with -- well, with many names.
Q Did you prepare that chart that's in your left hand?
A No. That chart was prepared by someone else and forwarded to me by Richardson Stoops.
Q Are the plasma hemoglobin levels set on that chart?
A Yes.

Page 86

Q What does that chart report as high plasma hemoglobin? What's their lower cutoff?
MR. WARD: Object to form of the question.
THE WITNESS: They don't have the normal range. They just have the absolute value.
Q (BY MR. TUCKER) And what is an absolute value?
A I'm sorry. What are the absolute values?
Q What does that mean, absolute value?
A These are actually the plasma hemoglobin counts, but the laboratory normal is not given in this table.
Q So is there any way to compare what's on that chart with the number that's in your text article of 1.5 grams per dekaliter? Without doing the calculation, do you just know right off the top of your head by looking at those numbers?
A Can I have my original report, because the laboratory ranges are given by the lab.
Q You're looking at that?
A Yes.
Q Can you tell from that?
A Well, you have to know the upper limit of the lab normal.

Page 87

Q And that varies by lab?
A Yes.
Q So what does that absolute number mean to you? What are they reporting there? They're reporting 27 -- for example, this gentleman right here they're reporting Eugene King 101 something. 101 what?
A You mean what are the units?
Q Mm-hmm. Right.
A This chart does not tell us what the units are.
Q Being a doctor and being a specialist in occupational medicine, what would those units be?
A I'd have to go and look at the laboratory tests.
Q Different laboratories report different units different ways?
A They may. So we have to know what the units of measurement are.
Q What is the standard way to report it?
A You mean from the lab?
Q Mm-hmm.
A I don't know what the standard way would be, but we could look --
Q What's the most common way you've seen

Page 88

it?
A It's the way it's reported here.
Q Well, let me ask the question another way.
A It's not a mystery. We could go look at the medical records and tell you what the probable units are.
Q I'm asking a doctor question. This is a doctor question.
The lab reports in this case are like lab reports that you receive with absolute numbers in the hundreds of cases that you look at every year, right?
A Correct.
Q Is there any kind of a customary way of reporting absolute values for plasma hemoglobin?
A You would report it in some value relating to milligrams or grams over a unit of volume.
Q And so it would depend on what -- whether they were reporting in grams or milligrams, right?
A Correct.
Q And whether they were reporting in dekaliters or milliliters?
A Or liters.

22 (Pages 85 to 88)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Q Or liters?
A Yes.
Q You've highlighted four people on that list.
Why are those four highlighted?
A I don't know. I didn't do the highlighting. That came to me highlighted.
Q What else is in your file that -- that little part of the file I've given you so far?
A A one-page document entitled "Key to Location at Port of Catoosa on July 11, 2001." And that's stapled to a map showing the location at the Port of Catoosa on that date for 13 clients.
Q Okay.
A Next is a map that is entitled "All Client Locations on July 11, 2001."
Q What's the difference in those two maps, this one and the one you just told me about?
A The first map locates the 13 clients specifically --
Q Okay.
A -- by name. And the second map, I believe, locates other clients, but I don't have the key.
Q Okay.

A Then there's another document that is entitled "Ingram Versus Air Products, Clients with High Hemoglobin," and that's attached to a map.
Q Is that a different chart than the one you had before?
A Yes. The chart we discussed earlier was clients with high plasma hemoglobin. These are high hemoglobin counts.
Q And how are those expressed?
A In the chart or typically?
Q How are --
A In the chart they're just expressed as numbers, but without a unit of measurement.
Q How are they typically expressed? What unit of measurement?
A It's expressed typically in grams.
Q What's typical, though, here in California? What's typically done here in San Francisco? What's typically done at your university?
MR. WARD: Object to the compound nature of the yes.
MR. TUCKER: I'm trying to narrow it down.
MR. WARD: Which one do you want? You

have to say which one.
Q (BY MR. TUCKER) When you send your patients that come to see you for blood work, how is it reported?
A I think we're getting it back in grams per either deciliter or liter. I have to double-check. I've been doing this for 25 years, but if you tell me what the hemoglobin is, it's expressed uniformly over the country. If you tell me the hemoglobin is 16.7, it would be in uniform units in every lab, but I don't -- and I think it's in grams either per deciliter or liters.
Q Okay.
A The next map is entitled "Locations of Clients with Hematuria," and it's attached to a one-page chart entitled "Ingram Versus Air Products, Clients with Hematuria or Blood in Urine."
Q Okay.
A And then there is a ten-page stapled document. It's untitled and undated, but I recognize it as a printout of a Medline or PubMed search that I performed.
Q What is it?
A There are articles, many with attached

abstracts regarding arsine exposure and toxicity.
Q Did you cite all of those in your report?
A I don't remember.
Q That's the last item?
A Yes.
(Proceedings interrupted.)
Q (BY MR. TUCKER) Just reminding you of your appointment?
A No. Someone else. Thanks.
Q Can you date that?
A Sometime prior to the preparation of my first report which I think is dated December of 2004. So it would be sometime in December.
Q How long did it take you to write your report?
A The hours are reflected in my bill.
Q I'm handing you four sheets of paper. I'll ask you to tell me if those represent all your bills in this case to date.
A Yes.
Q And do you have any time records more detailed than the records that are contained on those four pieces of paper?
A No.
Q How do you know that you spent two

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Page 93

hours, three hours or four hours on a given topic?
A I keep track of the time.
Q What do you do with the track you keep?
A In the basket.
Q You gave me a thumbs down, which means you throw them away?
A I throw them away.
Q How many times have you testified in federal court?
A I don't know. I've testified in court about ten times.
Q That's live in court?
A Live in court. I don't know how many of those were in federal court.
Q How many times have you testified outside of San Francisco in court?
A Not many. I would say no more than five.
Q That's through your entire 20-year career of handling matters like this?
A Yes.
Q So you have testified in five trials in California and five trials outside California, approximately?
A I would say that's approximate, but to be honest with you, my memory is not great. I don't

Page 94

keep track. I mean, my memory is very good when it comes to picking up my daughter after school and important matters, but I don't keep a really careful accounting in any form of trial testimony.
Q When is the last time you testified live?
MR. WARD: At a trial?
MR. TUCKER: At a trial.
MR. WARD: Or a deposition?
MR. TUCKER: At a trial.
MR. WARD: Does a person ever testify not alive?
MR. TUCKER: A video deposition.
MR. WARD: But the person is not alive when they give that?
Is your question when is the last time you testified at a trial?
MR. TUCKER: That's fine.
MR. WARD: Okay.
THE WITNESS: The most -- the three most recent trial testimonies, and I'm not sure what order these were in, were the Valente case on the disability, and the dentist.
Q (BY MR. TUCKER) What happened to the dentist?
A You know, she's the one that had the

Page 95

tendonitis of the hand.
Q That's the disability insurance policy?
A The disability insurance policy claim.
Q Once again, the insurance company wouldn't pay. I understand. Got that one.
What's the other one?
A The lady with the high blood lead, and the IBM case.
Q I've forgotten, where was the high blood lead case?
A It was in San Francisco. I'm not sure in what court.
Q And then the IBM case was here in San Francisco?
A San Jose.
Q How many times have you prepared a -- do you understand this report that you filed here is kind of referred to as a Rule 26 report?
A Yes.
Q How many times have you drafted a Rule 26 report for submission?
A Not a huge number. Several. Less than five. The last one that comes to mind -- you know, I don't remember, but the last one that came to mind -- well, the last one I did, I looked at to

Page 96

remind me what the format was that I used for a Rule 26 report when I prepared this one.
Q Yes.
A But I can't remember now what case I took a look at.
Q What was it about?
A If I could remember what it was about, I'd remember the name.
Q You don't have to do it now, but I'd like you overnight, if you would, to get us a copy of the report you looked at to refresh your recollection as to how to do a report.
A I'd be happy to. I am not sure I'm going to be able to remember it between now and tonight any better than I am now.
Q How did you find it when you wanted to look at it?
A I remembered it in December when I did this Rule 26 report.
Do you want to give me the list of cases again? Maybe it will jog my memory.
Q Mm-hmm.
A (Witness examines document.)
Would Rule 26 reports be required in railroad cases?

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Q I don't know.
Are they in federal court?
A I don't know.
I don't think I -- I am not trying to keep something from you. I just simply cannot remember now. I remembered in December, and maybe it was because I had recently worked on it and prepared a Rule 26 report, so I said, uh-huh, let me make sure I get the format right.
Q Would that be for a case in which you have not yet testified?
A It could be.
Q Are there cases that you have that are not workers' comp cases in which you may or may not testify, you don't know yet?
A There are; and, I mean, there may be some other cases that I'm working on aside from the ones that I mentioned to you. It depends how comprehensive a list. It's going to take me some time to recreate that all for you, of cases that I haven't testified but I may have been contacted and somebody has said, will you take a look at this case.
Q Well, how many cases do you have right now in your shop that are not workers' comp but

that you've been asked to take a look at for a claim?
A A few. I could tell you the ones that are sitting on my living room floor between --
Q How many are there?
A Too many. But they're almost all workers' compensation cases that you're not interested in, or at least I don't think you're interested in, because they're disability exams that I have to take home to dictate that I can't finish in my office. But I think you're asking about other kinds of cases that are not workers' comp cases for the State of California. And there are probably a few sitting on my living room floor for me to look at. I could tell you those between now and tomorrow.
Q Do you have a rough count as to how many cases that you've got that you've accepted responsibility to look at as an expert that are in your office or in your practice right now that are not comp cases? I mean, is it ten? 20? 30? 40?
A Oh, no. It's less than five. There aren't very many. And if you want, I can tell you what those are in a quick way.
Q Okay.

A But if they've been filed and they're sitting on my shelf right outside my office door here, the only way I'm going to be able to really get to those to give you an absolute accurate list, maybe it's eight as opposed to the three that are on my living room floor, I'm going to have to stand there, and I'm going to have to pull those charts. I'm not sure that you're interested in that.
Q Let's don't do that.
A Okay.
Q Has a court ever disallowed your testimony as an expert?
A Well, let me ask you what disallowed means. Because the only time that I ever heard that that happened -- and I don't know whether it was disallowed or exactly what the ruling was -- was years ago in a case involving Apple Computer. It was called Brust, B-r-u-s-t. And the defendant was Apple, and I don't remember the attorney. And it involved tendonitis in a woman that was using the mouse repetitively, and she sued Apple. And the judge ruled in some fashion that my testimony could not move forward, and I'm not sure whether he dismissed the case completely or he just restricted my testimony, but you could

look that one up, because I remember it made a local, you know, daily or weekly legal paper.
Q Why was your testimony disallowed?
A Well, as I understand it, the burden of proof in terms of -- or the argument that had to be made was was there literature that specifically showed that a computer mouse causes tendonitis of the wrists.
And this was about, I don't know, 10 or 12 years ago, and there were plenty of studies that showed that if you did tasks that are similar to the use of a computer mouse, you could get tendonitis of the wrists, but there were no specific studies that at least at that time convinced the judge that the use of a computer mouse caused wrist tendonitis.
Q So it's your belief that your testimony was disallowed because there was no specific literature that showed that there had been testing to confirm that the mouse causes tendonitis?
A Well, yeah, I'm just guessing. I never read the court opinion.
Q Were you ever given a copy of the opinion to look at?
A No.

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 21, 2005

Page 101

Q The order?
A No. I'm just guessing. I would guess that perhaps the judge ruled that there wasn't sufficient peer-reviewed literature or it hadn't been sufficiently tested, or applied some other of the Daubert standard to that case.
Q Has that happened to you in any other case?
A Not to my knowledge.
Q How about the case of Casey versus Ohio Medical?
A I don't remember.
Q You don't recall anything about the case?
A No.
Q How did you find out that your testimony was disallowed or disqualified in Brust versus Apple?
A The lawyer told me, the plaintiff attorney told me.
Q But he didn't offer to give you the order?
A No. He may have offered it to me. I don't remember whether I asked for it. I remember reading about it because I was in a law office like the next week for something else, and the attorney said, oh, you know, you were written up in the

Page 102

local press.
It was at a time, as I remember, there were a lot of lawsuits filed against IBM and Apple on their keyboard and mice. I don't think very many of them went forward, from what I can remember.
Q When you were talking about Daubert with Mr. Ward yesterday, did you mention that case?
A Yes, oh, yeah. The discussion came up as to whether I had, you know, been -- I don't know what the verb is, but Dauberted out or however you might call this, and I said, yeah, that's the only one that I'm aware of, was the Brust case.
But, you know, you suggest I guess by asking me the questions that there might have been another one, but I don't -- the vast majority of cases I have no idea what happens.
Can we take a time check, because I don't know whether you're about to --
MR. TUCKER: My watch says 12:01, but I set my watch a little fast.
THE WITNESS: It's about 12 o'clock. And if this is a logical time to break, I was going to suggest that.

Page 103

MR. TUCKER: This is a logical time to break.
(The deposition proceedings adjourned at 12:02 p.m.)

Page 104

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN MATEO )

I hereby certify that the witness in the foregoing deposition, ROBERT JAY HARRISON, M.D., M.P.H., was by me duly sworn to testify to the truth, the whole truth and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of June, 2005.

CARYE C. TORRES, CSR #10685
STATE OF CALIFORNIA

26 (Pages 101 to 104)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

IN THE DISTRICT COURT IN AND FOR RODGERS COUNTY
STATE OF OKLAHOMA

DOUG INGRAM, et al., )
)
Plaintiffs, )
)
v. ) CASE NO. CJ-2001-438
)
AIR PRODUCTS AND CHEMICALS, )
INC., a Delaware Corporation; )
SOLKATRONICS CHEMICAL, INC., )
a Delaware Corporation; JARRAD )
GARRISON, an individual, )
)
Defendants. )

VOLUME 2
DEPOSITION OF ROBERT JAY HARRISON, M.D., M.P.H.
TAKEN ON BEHALF OF THE DEFENDANTS
ON JUNE 22, 2005, BEGINNING AT 8:45 A.M.
IN SAN FRANCISCO, CALIFORNIA

APPEARANCES:
MR. KEITH A. WARD, Attorney at Law, of the firm RICHARDSON, STOOPS, RICHARDSON & WARD, 6555 S. Lewis, Suite 200, Tulsa, Oklahoma 74136, appearing on behalf of the Plaintiffs.:
MR. JOHN TUCKER, Attorney at Law, RHODES, HIERONYMUS, JONES, TUCKER & GABLE, ONEOK PLAZA, 100 W. 5th Street, Suite 400, Tulsa, Oklahoma 74103-4287, appearing on behalf of the Defendants.

MR. THOMAS L. KENYON, Attorney at Law, 7201 Hamilton Boulevard, Allentown, Pennsylvania 18195-1501, appearing on behalf of Air Products and Chemicals, Inc.

ALSO PRESENT: MS. CANDACE J. SMITH

REPORTED BY: CARYE C. TORRES, CSR #10685, CRP

INDEX

Examination resumed by Mr. Tucker......... 107
Examination by Mr. Ward.................. 369
Further examination by Mr. Tucker......... 409
Further examination by Mr. Ward........... 433
* * * * *

EXHIBITS

Exhibits 2 through 46 were marked for identification. (See "exhibit" in word index.)
* * * * *

ROBERT JAY HARRISON, M.D., M.P.H.,
having been previously sworn, testified as follows:

EXAMINATION RESUMED

BY MR. TUCKER:
Q We are resuming your deposition after our recess at noon yesterday.
The reporter asked if I wanted you to be resworn, and I'm sure you probably remember your oath from yesterday, don't you, sir?
A I do.
Q And you'll still follow it as much today as yesterday, right?
A Yes.
Q I asked you yesterday if you had a chance to meet with an attorney, plaintiffs' attorney, before your deposition, and you said yes, for about an hour the other day, and you had a chance to meet further with him today?
A No.
Q Did you not visit with the lawyer sitting to your right this morning about this case privately?
A For about three minutes.
Q Was that at your request or his request?
A His request. He asked me if there was

anything I was concerned about or how I was doing.
Q What did you tell him?
A Fine.
Q Have you ever talked to Dr. Hastings in Oklahoma?
A No.
Q Do you know whether or not Dr. Hastings has given any depositions in this case?
A I do not.
Q So I guess if I were to ask you if you had read his depositions, the answer would be no?
A That's correct. I have not read his deposition.
Q What does the phrase descriptive toxicology mean to you?
A I don't know. I've never heard that term.
Q Have you heard the term mechanistic toxicology?
A No.
Q Have you heard the term regulatory toxicology?
A Yes.
Q What does that mean?
A It's a term that describes the uses of

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Page 109

toxicology for purposes of setting regulation standards, thresholds for exposure in the environmental workplace.
Q What does the acronym NOAEL stand for?
A No observed effect level. And I don't know what the "A" stands for.
Q Do you know what the no observed effect level is for arsine gas?
A Yes.
Q What is it?
A I need to reference my file.
MS. SMITH: What part of your file do you want?
MR. TUCKER: Would you like to walk around and take a second and look at it?
THE WITNESS: (Examines documents.)
Q (BY MR. TUCKER) For the record would you tell me what document you're reviewing, Doctor.
A Yeah. Just a second, I will.
I'm reviewing a document from the California Environmental Protection Agency Office of Environmental Health Hazard Assessment -- also goes by the acronym OEHHA or "OEHHA", so if I use the word,that's what I'm referring to. It's

Page 110

dated March of 1999, and it's an acute toxicity summary for arsine. The no observed effect level is 5 parts per million, and that's based on an animal study of one-hour exposure with reduction in hematocrit as the end point.
Q And is reduction in hematocrit one of the indicators of red blood cell destruction?
A Yes.
Q Or hemolysis?
A Yes.
Q Is that an example of regulatory toxicology?
A Yes.
Q Is that a standard that's observed here in California?
A Which standard are you referring to?
Q The one you --
A NOEL?
Q Yes, uh-huh.
A This particular document is a standard -- this particular document is used in California to set what's called an acute reference level.
Q Who set the NOAEL, the no observed effect level? What regulatory agency set it?
A (Witness examines document.)

Page 111

Your question is incorrect in that an NOEL is not a regulatory level per se. So regulatory agencies don't adopt an NOEL. Regulatory agencies use an NOEL from the literature to then set other kinds of regulatory levels.
Q Is the number which you gave me, 5 parts per million, the recognized no observable effect level for arsine gas?
MR. WARD: Object to the form.
THE WITNESS: It's used by the California Environmental Protection Agency as the NOEL for arsine gas based on acute toxicity using hematocrit as the end point. So that has been used by the State of California to set a reference level which is much lower that incorporates a number of other factors.
Q (BY MR. TUCKER) Builds in a safety factor, doesn't it?
A Builds in a factor to protect humans from toxicity due to arsine gas.
Q But I just want to make clear that we're all on the same page, that five parts per million for the one-hour animal is accepted, it is the accepted no observable effect level of arsine gas;

Page 112

is that right? Did somebody else say 15 parts per, or 4 parts per million? Do you understand my question?
MR. WARD: Object. You can't ask two questions. You have to let him answer one.
Q (BY MR. TUCKER) Is my question more clear?
A I was going to ask you to clarify what you meant by the word "accepted."
It is correct that 5 parts per million is used as the NOEL by the State of California Environmental Protection Agency Office of Environmental Health Hazard Assessment; and that in turn is then used as the basis to set a reference exposure level for arsine in air and water.
Q And all I want to know is does New York have 15 parts per million and Texas 6 parts per million, or is 5 pretty much the nationwide number that's used?
A I don't know. I don't know what other states or other regulatory agencies use.
Q What about the United States Environmental Protection Agency?
A I don't know.

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 22, 2005

Page 113

Q What is IDLH?
A Immediately -- remind me what the "D" is. Immediately something to life and health.
Q Dangerous?
A Thank you.
Q What is the IDLH for arsine gas?
A (Witness examines documents.)
Q Again, as you answer, if you'd say what you're obtaining the information from.
A (Witness nods head.)
3 parts per million. And that's based on documentation from the National Institute for Occupational Safety and Health, available through their Web site.
Q Is that called NIOSH?
A Correct.
Q Who is NIOSH? I know you gave me the name, but is that a government agency, a private agency?
A Government agency.
Q Federal government?
A Correct.
Q What does MLD stand for?
A Maximum lethal dose.
Q Is there a difference between mean lethal and maximum lethal?

Page 114

A I don't know.
Q What is the MLD of arsine?
A (Witness examines documents.)
Let me read to you from a document from NIOSH entitled "Current Intelligence Bulletin for Arsine"dated August 3rd, 1979. It states -- and I'll quote -- "The mean lethal dose is unknown for man, but in small mammals it is about 0.5 milligrams per kilogram body weight. Inhalation of 250 parts per million of arsine gas is instantly lethal. Exposures of 25 to 50 parts per million for one-half hour are lethal, and 10 parts per million is lethal after longer exposures."
Q What does TLD stand for?
A Threshold limit value.
Q Do you know the threshold limit value for arsine?
I might -- for the record, Doctor, let me ask you, each time I've asked you one of these questions, have you known the answer without referring to your reference materials?
A Yes.
Q But you've always referred to your reference materials, and there have been some intervals before you gave me the answer; is that correct?

Page 115

A No.
Q What is the TLD for arsine?
A The TLD for arsine is 0.05 parts per million.
Q What information did you review to determine the amount of arsine gas that escaped in the accidenton July 11th?
A The quantity?
Q Yes.
A The materials outlined in my initial report. Would you like me to refer to that?
Q You can look at your report if you want to.
Do you remember what you read to learn about it, generally speaking?
A (Witness examines documents.)
Can we go off the record for a second, please?
MR. TUCKER: Sure.
(Discussion off the record.)
THE WITNESS: (Examines documents.)
There was an investigation of the July 11th, 2001 arsine incident prepared by Eugene Ngai of Air Products.

Page 116

Q (BY MR. TUCKER) Is that where you got the information about the event?
A That's one of the places. There may have been others, but that was the primary report.
Q What was your understanding of the manner in which the release occurred? Not the physical incident as to say what part failed to cause the accident, butwhat happened when the accident occurred as far as the release of the arsine is concerned?
A Arsine was released from a cylinder.
Q How did it escape? Is what -- in what manner did it escape?
A I don't quite understand your question. It was released into the air from the cylinder.
Q I'm not asking a very good question. That's a good example of when I want you to tell me I'm not, okay?
Did it release instantaneously?
A It released over a period of time.
Q Do you know what period of time?
A I do. I'd have to look in the report to look at the exact period of time, but it was roughly, I believe, over about an hour.

3 (Pages 113 to 116)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Q Were you originally retained in this case by telephone?

A I was originally contacted by telephone, that's correct.

Q And at the time what were you told about the case?

A It's reflected in the little page of notes that I read to you yesterday, but basically, that there was 58 pounds of arsine that was released fromthe Solkatronics plant on July 11th, 2001. There was 192 clients. They had been seen in various emergency departments. There was evidence of hemolysis. And I was asked if I could provide expert consultation as to whether there was an injury to these clients that occurred as a result of the release of arsine gas.

Q Was the fact that you were told there was evidence of hemolysis of importance to you in considering whether to accept this position and this assignment?

A No.

Q If there had been no evidence of hemolysis, would you have still accepted the assignment?

A Yes.

Q If there had been no evidence of hemolysis, would you have expected to find that there was exposure to arsine gas?

A Would you say that again, please.

Q If there were no indication of hemolysis, would you have expected to find, had you completed your analysis, that there was exposure to arsine gas?

MR. WARD: Object to form.

THE WITNESS: There could still -- there still could be exposure to arsine gas.

Q (BY MR. TUCKER) But just not at a level to cause hemolysis?

A That's correct.

Q Okay.

A So the exposure question is separate from the health effects question. These individuals can be or could have been exposed to arsine gas hypothetically without evidence of hemolysis.

Q And could they hypothetically have health effects without evidence of hemolysis?

A The individuals could have psychological effects as a result of the exposure, but I doubt whether they could have physical effects without evidence of hemolysis.

Q Did you request any particular materials from plaintiffs' attorneys to assist you in making your evaluation?

A Their medical records.

Q When you say "Their medical records," you mean the records of the individuals about whom you were being asked to consider giving an opinion?

A Correct.

Q And did you receive those records?

A Yes.

Q In what form did they arrive?

A On a few of the individuals hard copies oftheir records came, because they were not included on a CD-ROM. The vast majority came on I think it was two or three CD-ROMs.

Q When you say, "Their medical records," could you tell me without obviously going through each individual person that you were asked to review the general nature of the records that you received. And by the general nature I mean the time span that they covered.

A The medical records generally covered the date of the incident or the few days after the July 11th, 2001 incident and follow-up medical

examinations. On some of the individuals there were medical records prior to the July 11th, 2001 date. I don't believe that there were comprehensive medical records on all of them; but, generally speaking, I was satisfied that there was medical records that gave me enough information to determine whether or not there were preexisting problems.

Q Did you request anything that you did not receive?

A I asked plaintiff counsel if there were documents that created an exposure scenario with isopleths or gradients of exposure following the release on July 11th, 2001, whether any expert orgovernmental organization had done a quantitative dose reconstruction using meteorological data to give me an idea about whether -- or to give me an idea about the arsine concentrations at various distances and directions from the point of release.

Q Did you receive any information about meteorological conditions, or did you discover or discern that in reviewing the materials that were provided to you?

A Everything I have is in the materials that

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 22, 2005

Page 121

are provided to me that I've listed in my reports. There may be some information here and there about the wind conditions and the direction, but there's no quantitative dose reconstruction.

Q Do you have any memory of what the wind conditions were?

A No independent memory.

Q Do you have any independent memory of the temperature conditions?

A No.

Q When you're doing a differential diagnosis of someone who's presenting with fatigue and headache, is it important as a part of differential diagnosis to determine the environment they've been in before they presented?

A Could you clarify what you mean by environment.

Q Well, if it's a hundred degrees and bright sunshine and you're standing out in the sun without any water, would that be a factor you would want to consider as a physician in making a differential diagnosis of a person who's complaining of a headache or nausea, for example?

MR. WARD: Object to the form.

Q (BY MR. TUCKER) If they just spent the

Page 122

last two hours outdoors in hundred-plus-degree sun?

MR. WARD: Object to the form.

THE WITNESS: To the extent that I think that heat stress might be a cause of those symptoms, it would be important to know something about the temperature and humidity at that point in time.

Q (BY MR. TUCKER) Because with that symptom that would be something you'd want to rule out as a part of a differential diagnosis, isn't it?

A Possibly.

Q That's what differential diagnosis is, is ruling in and ruling out, right?

A That's the definition of differential diagnosis, that's correct.

Q Those kind of symptoms could be caused by heat stress, couldn't they?

A Which symptoms?

Q For instance, headache and nausea.

A Headache and nausea are symptoms that can possibly occur due to heat stress.

Q Earlier we talked about evidence of hemolysis would be required.

Page 123

What evidence of hemolysis, that is to say, what extent of hemolysis would be considered evidence of hemolysis? Can you give me a level?

A As I pointed out in my report, I consider the plasma for hemoglobin above the expected normal range evidence of hemolysis. There may also be a drop in hemoglobin or hematocrit, hemoglobinuria or hemoglobin in the urine.

Q Let me interrupt you.

Do you mean any number plasma free hemoglobin over the laboratory reference value would be considered to be sufficient hemolysis for you to tie that to arsine?

A Well, that's a slightly different question --

Q Okay.

A -- than the first question you asked. Youjust said what was the evidence of it, and it's --

Q Answer the last one.

A So ask the last question again.

MR. TUCKER: Could you reask that.

(Record read by the reporter as follows: "Q. Do you mean any number plasma free hemoglobin over the laboratory reference

Page 124

value would be considered to be sufficient hemolysis for you to tie that to arsine?")

THE WITNESS: I do, I think, have to ask you to clarify the question. When you say tying it to arsine, can you clarify what you mean by that. In this particular case? In general? Are you asking --

Q (BY MR. TUCKER) Is there a point beyond which you would say that a level I'm looking at in a plasma free hemoglobin test result is more than would be expected from an artifact, as we discussed yesterday, such as mishandling of the sample or misdrawing of the sample or injury to the tissue site or preexisting bruise to the area?

MR. WARD: Object to the form.

THE WITNESS: If I had one individual with an increase in their plasma free hemoglobin in the setting of an arsine gas exposure that involved manydozens of individuals and there was only one person, I would consider the possibility that that was an artifact due to the factors that you mentioned.

But if there were several individuals who are treated in the context of a potential exposure

5 (Pages 121 to 124)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 22, 2005

Page 125

to arsine gas release and they all have elevated plasma free hemoglobin, I have to consider whether or not there's some sort of systematic artifactual error. Did they all have their blood drawn in a way that caused mechanical hemolysis, or is it more likely that it was actually due to arsine gas exposure.
Q (BY MR. TUCKER) That's probably a good answer, but it's not really to the one I asked.
The question I really wanted an answer to is with your one guy or your one person, is there a level of hemolysis reported, plasma free hemoglobin reported by a laboratory, is there a number at which you'll say, well, this is not an artifact, I rule out artifact and I say I look for something else?
A Is there a level at which -- no, there's no level. Any level above the lab normal range, I would consider whether or not it's possibly due to an artifact or due to exposure.
Q Let's go to your one person that had anarsine -- possibility of arsine exposure. Arsine was in the area and that person may have been exposed. And you get a laboratory reference value exceedance on the plasma free hemoglobin blood

Page 126

report, okay? Is there a number of exceedance at which you would say, I clearly discard the concept of artifact and this man must have been exposed to arsine?
A No, there's no number. Anything above the laboratory, the upper limit of the laboratory range I would consider in my differential diagnosis arsine gas exposure or artifact due to the blood draw.
Q Other than questions about the gradients of exposure, was there anything else you requested that you did not receive?
A No.
Q Did you review anything outside of what was sent to you?
A Other than the references that I attached to my report, no.
Q Now, are the references that are attached to your report different than the references that are contained in these books in front of you, which are research materials, marked "Research Materials"?
A Possibly. I haven't gone and done a side-by-side check. There's probably some overlap.

Page 127

Q Did you read this notebook marked "Arsine Incident, Catoosa, Oklahoma, July 11th, 2001 Research Materials"?
A Yes.
Q From whom did you receive that?
A Plaintiff counsel.
Q Did you direct him to prepare that and tell him what to put in it?
A No.
Q This was material the plaintiffs' counsel obtained and forwarded to you?
A Correct.
Q Do you know where it came from?
A No -- well, of course, yes, I know where it came from, as does anybody who reads the volume. It's all referenced. So one can look back and see what the original sources are.
Q Let me --
A I think what you mean is do I know why he sent me that particular information?
Q Do you know who put together that compendium of information or selected it for it to come to you?
A No.
Q Would the footnoted references in your

Page 128

report constitute the complete independent research that youperformed in this file?
A I also looked at the materials that the plaintiff counsel sent me independently.
Q Well, I see.
A I would characterize that as independent research also.
Q When I say independent research I mean research that was driven by you selecting what it was that was important for you to find and read.
A I would include the volumes sent to me by plaintiff counsel. I would not characterize that as anything but independent research. I read through the materials and selected that which I considered important to me.
Q And were the things that you attached as footnotes to your report the things that you considered important?
A You mean the references?
Q Yes.
A Those are the references that I consider important from the medical literature that I reviewed. There also are other important documents that I reviewed that are listed in my report. So I incorporated all the materials that I

6 (Pages 125 to 128)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102

considered important that plaintiff counsel sent to me as well asthe literature that I attached to my report.
Q I'm still a little puzzled about this blood level thing we've talked about. I was thinking back to what we read yesterday from your colleague's book on the chapter on gases.
Do you recall that?
A Yes.
Q Do you recall he said the thing that confirms the diagnosis of arsine exposure is plasma free hemoglobin level of 1.5 grams per dekaliter?
A Yes.
Q Would you agree with your colleague?
A Yes. As far as we have a common understanding of what the word "confirms" means.
Q Of course. I have no idea what your colleague meant when he put it in the book. I just read it. That was his word, wasn't it, as I recall?
A I think the book -- I think the text stands for itself. That's what it says. That's correct.
Q But do you agree with him? In the medical sense, obviously, it has some medical meaning or he wouldn't have put it in his text that

way. If you read that, as a physician reading a fellow physician's work in the book that you have a different chapter, do you agree with what he wrote?
A I agree with what he wrote in terms of the context and the way we understand what he wrote and the desired intent for clinical management of arsine toxicity, yes, I agree.
I just want to clarify that sentence is intended to guide physicians for the acute treatment of arsine toxicity.
Q If you had one gram per dekaliter, are you saying you couldn't tell for sure, but there's a good chance it's arsine?
A Yes.
Q Okay.
A It doesn't mean that you have to be above that level to have arsine poisoning or have had evidence of exposure to arsine. It's a number that's meant to guide the physician in terms of thinking about treatment for arsine poisoning.
Q Is there a difference between a number that would indicate that you might have had exposure to arsine and a number that would be one that would, as you say, cause arsine poisoning

or have an arsine effect on you?
A That's a good question, because it really gets into at what level of intravascular hemolysis would one expect to have either acute or chroniceffects from arsine exposure. And there's probably a variability in response.
I think it is very difficult to find a point or a number below which one would never expect to find health effects from acute or chronic exposure to arsine and a number above which one would guarantee there would be long-term health effects.
Generally speaking, the lower the evidence -- the lower the number indicating hemolysis, the less likely it would be the long-term health effect; and the greater the number, consequently, the greater the likelihood we may expect to see long-term complications.
Q I agree with that theoretically, but when you talk about a variable response, there still has to be a lower limit to that variable response below which you'd expect to see no response; isn't that correct?
MR. WARD: Object to the form.
Q (BY MR. TUCKER) Isn't that correct?

A Well, there doesn't have to be. That's not correct. And in the field of toxicology there are many, many instances in which there is not a set lower number.
Q When you have a situation where you have anumber of people making the same complaint, believing that they had the same exposure and believing they have the same kinds of injuries, that sort of narrows that range down a little bit, doesn't it?
MR. WARD: Object to the form.
Q (BY MR. TUCKER) Can't everybody be at the very lowest range, can they?
A I don't understand your question. Perhaps you can reframe it as a hypothetical.
Q I mean, it ceases to be an idiosyncratic reaction when everybody has it.
A Are you giving me -- give me a hypothetical.
Q Do you agree with that?
A Not without -- I'm sorry.
Q Does the reaction cease to be idiosyncratic when everybody has the same reaction?
A Depends on the dose. At a very high dose

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

I might expect a hundred percent of the population to have signs or symptoms of exposure. So that's why I think it would help me, or perhaps clarify the question for me if there was a specific hypothetical.

Q Let me just see if I understand what you've told me so far: Are you saying that you really do not know what the low-end cutoff would be on determiningarsine exposure with respect to reading a hemolysis report --

MR. WARD: Object to form.

Q (BY MR. TUCKER) -- a plasma free hemoglobin report?

A Could you clarify the question. A low-end effect level in terms of producing acute symptoms or chronic symptoms?

Q Chronic symptoms.

A Could you reframe the question, then, because I didn't understand it.

Q We started out with the first thing which your colleague says is that one and a half grams or grams per dekaliter confirms the diagnosis of arsine exposure, whatever he meant by "confirms."

A That's correct. I agree that's what it says in the book.

Q You say that's for somebody that's treating somebody that's coming in the door and he wants to know about whether he has to do treatment measures or not.

A Correct.

Q And if the person has one gram per dekaliter reported as their plasma free hemoglobin, that's most likely arsine, but without doing other stuff you can'tguarantee it -- without doing other evaluation of the person, you can't guarantee that's an arsine result, right?

A No. That's not what I said earlier. I think that's a different question.

Q Well, with one gram per dekaliter --

A If you're -- sorry.

Q With one gram per dekaliter, do you have arsine exposure, one gram of plasma free hemoglobin and an opportunity for arsine exposure?

A If that's above the upper limit of lab, yes. You would consider that is potentially due to arsine gas exposure in the setting of an arsine gas release where there is a probability that somebody was in the vicinity or could potentially have been exposed and they show up in an emergency room

and they had one gram per dekaliter of plasma free hemoglobin, one would say, yes, this person was exposed to arsine.

Now, it would lower the likelihood that they may need emergency treatment. You might not have to order packed red blood cells and transfuse somebody, but you would say, yes, they were exposed to arsine.

Q What if they have a half a gram?

A Again, if it's above the laboratory range of normal in a setting where multiple individuals areexposed and they're showing up in the emergency department and there's a pattern where people have elevated plasma free hemoglobins above the upper limit of the lab normal, it becomes very unlikely that they're all due to mechanical artifact -- although that certainly should be considered by the emergency room doctor -- and becomes much more likely that they were exposed to arsine.

Now, then the question becomes do they need to be treated in the emergency department, and what are potentially the long-term health effects of that exposure. But we would conclude, yes, they were exposed to arsine, but the next

series of questions is, okay, is there acute or chronic toxicity.

Q What about if it were a hundredth of a gram?

A Again, I think you'd have to hypothetically give me the laboratory, the normal report range for the lab.

Q Let's say your man, it's -- what is a normal report range for your laboratory out here in San Francisco?

A Offhand, I don't know.

Q What was the report range for St. John or St. Francis Hospital in Tulsa?

May I see that page real quick?

A (Witness examines document.)

10.4 percent.

Q So using that as your reference range, if a person came in with a hundredth of a gram per dekaliter?

A That's within the normal range.

Q How about a tenth of a gram?

A Again, anything less than 10.4 grams per dekaliter is within the normal range.

Q So when you're looking at the reference values you're believing that 10.4 is stating what

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 137

measurement?
A I believe that's in grams per dekaliter. Don't absolutely quote me, because I report it in my table the way it's reported out from the lab; and I don't have the medical records in front of me.
Q We were talking earlier about when the information -- I just happened to see as you turned your pages, I see what's marked as Plaintiffs' Exhibit 72. Can you tell what that is?
A (Witness examines document.)
These are meteorological measurements made by I think the U.S. Weather Service or some equivalent agency.
Q Do you know where you got that?
A And -- well, I got it from the plaintiff, because it's labeled Plaintiffs' Exhibit 72. It looks like it's derived from a weather station in Tulsa, Oklahoma.
Q Looking at that, can you tell me which way the wind was blowing?
MR. WARD: Object to the form.
THE WITNESS: I can tell you the way the wind was blowing at specific times at that weather station in Tulsa, Oklahoma. I can tell you in

Page 138

direction.
Q (BY MR. TUCKER) That's what I want to know.
A Yes.
Q Which way was it blowing?
MR. WARD: Object to the form. He only said he could tell you at specific times and specific stations.
THE WITNESS: That was my next question to you: At what time?
Q (BY MR. TUCKER) Did it turn in different directions, or was it generally the same general direction?
A It looks like it was generally in the same direction. It varied from 100 to 200 degrees.
Q What does that mean to somebody sitting herelike me that doesn't think about compass points, but thinks about north, south, east and west?
A I couldn't tell you. That's beyond the area of my expertise.
Q You don't know whether that's coming from the southwest or the northwest or the northeast?
A I don't know. You need to ask a --

Page 139

probably ask a meteorologist that question.
Q I'm just curious, since you wanted to know the gradients of exposure, knowing which way the wind was blowing would be important to have an understanding of the gradients, wouldn't it?
A It's important to the kind of expert that would reconstruct the gradients of exposure, and that would be an industrial hygienist or engineer or a meteorologist who knows how to take this kind of information and combine it with emitted dose from a point source. That is not a physician that would do that kind of reconstruction.
Q So would it be important to you to know, for example, if you have a -- if you have what you've described as a point source for an event when you're determining whether you're looking at laboratory data that represents a real dose response to something or represents an artifact or some other similar anomalyin a blood result, wouldn't it be of interest to you to determine the general location of the persons with those results as they relate to the point source and the way the wind was blowing at the time of the point source occurrence?

Page 140

A Well, it would be important to have as much information as possible, which is why I asked plaintiff counsel if somebody did that kind of quantitative dose reconstruction.
I ask for that in all cases that I review, because dose is obviously one determinant of causation in any case or group of cases. So I'd like to have a quantitative measure of dose.
And because we don't have that, or at least I don't have that for my review, and I don't know whether it was done and was not shared with me, I did look at the location of the individuals with elevated plasma hemoglobins to try to see whether I could correlate their location and distance from the point source release to see whether it correlated in terms of where they were, distancewise, from the point source.
Now, that doesn't give us the complete picture, obviously, because the wind could be blowing completely in the opposite direction, but it gives mesome clue; and I commented on that in my report.
Q You did. And I see you have the weather reports there for the day in question that shows what the wind speed was, and you show that it

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

was pretty much from the same consistent direction.
Are there people here at the University of San Francisco that you could ask what compass points mean, or could you look in one of your reference sources or look on the Internet, as you did, and determine which direction the wind was blowing?
A It would be easy for me to find out what these degree measurements mean in terms of points on the compass, but it wouldn't -- it would help only if it was relevant to the particular exposure situation.
In other words, this was taken in Tulsa, Oklahoma. I don't know whether this wind station is relevant to Solkatronics at the point of emission or to the surrounding neighborhood.
Q Do you know how far it is from the Tulsa weather station to the Port of Catoosa?
A I have no idea.
Q Did you look on a map?
A No.
Q Do you know where the Port of Catoosa is?
A No.

Q Do you know where Catoosa is?
A In Oklahoma, but exactly where, no.
Q Have you ever been to Oklahoma?
A No.
Q Pull out your little chart there where people are located. Do you have that chart around someplace?
A There were several.
Q Pull out the one where the folks were located that you found that you charted with having evidence of hemolysis.
A Okay.
Q Would you agree with the general proposition that before you can have a response to a dose of any material, whether it be arsine or anything else, you first must have an opportunity for exposure?
A Yes.
Q Now, is one of the people on there that had an issue with in your mind hemolysis a gentleman by the name of Sumter? Is this your chart right here, sir?
A Yes. He had a plasma hemoglobin of 111 percent.
Q Look at your chart, your map chart, and

tell me which direction from the location of the arsine accident was Mr. Sumter located.
A He is to the northwest of Solkatronics.
Q Look at Mr. Schnitzer. I believe he may be on your list also, Mr. Bart Schnitzer.
A Okay. Help me out with Mr. Schnitzer, because he's not on -- he did not have an elevated plasma hemoglobin and he's not on --
Q Did not have.
A Mr. Schnitzer, no. He's the one with renal failure, but he did not have an elevated plasma hemoglobin.
Q Look at the map of the 13 plaintiffs.
A Okay.
Q Do you find him on that map?
A Yeah.
Q Where is he located?
A He is --
MR. WARD: Object to the form unless you ask at what point in time.
Q (BY MR. TUCKER) Where is he located on this map?
MR. WARD: Okay.
THE WITNESS: Okay. He apparently is at or around Superior Supply & Steel, which is to

the east of Solkatronics.
Q (BY MR. TUCKER) Kind of in the opposite direction from Mr. Sumter?
A Yeah. I won't quibble with kind of -- I mean, one was to the northwest, and the other is to the east.
Q Well, they're kind of at opposite ends of the compass, aren't they?
MR. WARD: Object to the form.
THE WITNESS: Yeah. That's where -- I don't want to quibble with you. But one is at the northwest, the other opposite would be the southwest. So east is the other way, but it's not exactly the other way.
Q (BY MR. TUCKER) The other way is close enough for me.
A Thank you.
Q Knowing that you were giving opinions on people that are at the other way on the compass from each other, didn't it seem like it might be nice to know which way that wind was blowing?
A That's why I asked if there was a -- any kind of dose reconstruction done. It's not enough for me to know which way the wind is blowing. I need to put that information, if it's possible, in

Page 145

the hands of people that know how to do this kind of modeling.
I've been involved, just parenthetically, ina lot of exposure situations, mass exposures to toxic gas releases in the San Francisco Bay Area. Unfortunately, we have a lot of oil refineries here, and in those situations I have always asked for and sometimes had quantitative dose reconstructions done, and they have to take into account wind conditions and characteristics, chemically, of the compound, and uncertainty factors to make certain assumptions about exposure concentrations. It's not as simple as just knowing wind direction.
Q Just so we're clear, you could have found out the wind direction because you had the materials in your file, but you didn't determine what the compass points meant as referenced by the weather reports you had, so you really didn't figure out which way the wind was blowing when you wrote your report?
A Yes. Let me be clear: I did not take into account wind direction. What I would take into account, if it would be available, would be a report by an expert in the suitable field of dose

Page 146

reconstruction following a point source release.
Q What materials have you received since rendering your December 27th report?
A Do you want me to list those? They're outlined in my April 30th, 2005 report.
Q If you would, please, uh-huh.
A I had that report on the meteorological conditions prepared by Dr. Anderson White, a report by Dr. Dean Carter dated March 17th, 2005, a report by Dr. William Banner dated March 17th, 2005, a report by Dr. Steven Pike dated March 18th, 2005, and two affidavits, one by a Mr. Bruce Stewart and another by Mr. Terry Morris.
Q Did you review a subsequent report or did you receive a subsequent report by Shane Gad from the East Coast?
A Yes.
Q Did you receive any information with regard to soil samples?
A Yes.
Q What information did you receive with regard to soil samples?
A An October 19th, 2001 report from Phil Roberts and Tim Joseph of URS.
Q What did you learn from that report?

Page 147

A These two individuals concluded that -- and I'm quoting -- "There are no apparent impacts to soil from the July 12th, 2001 arsine gas release at the Solkatronics facility."
Q What impact were they evaluating?
A They were looking at arsine -- actually, arsenic in the soil.
Q And does that have any importance to you, that finding?
A No. I don't know how to relate these conclusions, if at all, to airborne exposure to arsine on July 11th, 2001.
Q And I know you're not a soils scientist and not purporting to be; is that correct?
A Correct. I don't know whether we would expect arsine gas to settle in soil, to increase the amount of arsenic in soil upwind from the point source release. What I take from this report is that the focus here is on whether or not any surface soil cleanup was required pursuant to regulation.
Q Did you investigate what happens to arsine once it's exposed to the air?
A Could you clarify your question. What do you mean what happens to it?

Page 148

Q When the arsine is released, does it stay arsine forever? Did you investigate, did you look up what happens to arsine when it exists free of a cylinder out in the air, chemically what happens to it?
A No, I did not look that up.
Q Do you have any idea?
A I do not know. I don't know what happened over a period of hours or even minutes to hours to weeks to months.
Q In making your differential diagnosis, wouldn't it be important to know if the arsine that's released remains arsine or decomposes into some other materials, and if so, what the rate of decay is, or decomposition of those materials, wouldn't that be important?
A That would be important as part of a dose reconstruction, you know, the exposure gradient, the risk assessment, whatever we want to call this analysis, that takes into account meteorological conditions, distance from the point source release and any changes in the arsine gas over time. This would all be important in determining what we call, you know, isopleths, you know. You can map out what the potential concentration and parts per

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——— 405-272-1006
TULSA ——— 918-583-8600
FAYETTEVILLE ——— 479-587-1006

Page 149

million is at distances from that point source.
Q You indicated that you had received affidavits.
Were those the affidavits of Mr. Morris and Mr. Stewart?
A Yes.
Q Have you had the opportunity to review the depositions of Mr. Morris and Mr. Stewart?
A No.
Q What was significant to you, if anything, about the affidavits of Mr. Morris and Mr. Stewart?
A They suggested that there was more than just a single release of arsine gas on July 11th, 2001, that there were working conditions that they described that indicated that there may have been other exposures as well.
Q Is the file which you have in front of you which we've been marking off and on, is that all the materials that you relied upon to form your opinions in your reports?
A Aside from the references that I attached to my original report, that's correct.
Q Yes, sir.
Did you review -- did you review Shane

Page 150

Gad's original report?
A Let me tell you exactly the reports that I did review of Dr. Gad: December 30th, 2004 and April 15th, 2005.
Q Did you agree with his reports?
A Can you be more specific? He reached a lot of conclusions.
Q May I see your copy -- I see you've highlighted it. Let me ask you some questions about the Gad materials that you have there.
A Just to clarify --
MR. WARD: Object to the form. You're assuming he's the one that highlighted it.
THE WITNESS: I was going to mention that I did not do the highlighting.
Q (BY MR. TUCKER) Who did the highlighting?
A I don't know.
Q Did it arrive in your possession highlighted?
A Yes.
Q So you might or might not have highlighted the same things; is that right?
MR. WARD: He hasn't testified he highlighted any of it.

Page 151

THE WITNESS: That assumes that I like to use a yellow highlighter.
Q (BY MR. TUCKER) Do you know who did highlight these?
A I do not.
Q Do you know why they were highlighted?
A No.
Q Are you capable of doing your ownhighlighting if you choose to do so?
A Yes. I've been a student for many years. I know how to highlight.
Q So with respect to the report of December 30, '04, did you agree with Shane Gad's findings?
MR. WARD: Object to the form. Again, which findings?
MR. TUCKER: Let me rephrase the question to satisfy Counsel.
Q Did you agree with all of his findings? Let me ask it another way: Did you agree with any of his findings?
A Yes. I agreed with his findings, but to properly answer your question, I need a few minutes to read through Dr. Gad's report and see if there are areas of disagreement.
Q Fine.

Page 152

(Recess taken.)
THE WITNESS: On page 1 and 2 Dr. Gad lists the signs and symptoms of arsine exposure for arsine toxicity. And I agree with those.
He then goes through each individual and gives an opinion about whether or not the individual was exposed to arsine and has current medical problems due to that exposure. And if you like, it may beeasier to just go through them one by one.
Q (BY MR. TUCKER) Why don't you tell me what you disagree with. That's where I'm going to go with this anyway, as to what you disagree with, if anything.
A Generally, I'm in agreement, but my review of their medical records was done independently, and I come to in most of the cases similar conclusion, but in some cases our opinions may differ slightly.
Q Tell me the ones that are different.
A Okay. I think it's easier to go through them one by one.
Q Well, if you want to.
A Yeah. I mean, I think it's actually easier, because that's the way he organized it, and that's



the way it's organized in my table.
Q Okay. This table?
A Yes. It's the table attached to my original report.
For Mr. Charles Biddle I agree with Dr. Gad that I'm not able to render or give an opinion without additional information on the time frame when Mr. Biddle began experiencing headache and memory loss. These are central nervous system symptoms that are consistent with the effects of arsine poisoning,but I need more information. So I'm generally in agreement with Dr. Gad.
Should I continue?
Q Please.
A For Javier Cardenas I'm in agreement regarding the central nervous system symptoms that are consistent with the effects of arsine gas exposure.
For Linda Castro I'm in agreement that she was exposed to arsine. Dr. Gad mentions significant kidney problems starting shortly after the exposure. He may be looking at different or other medical records. I didn't see that in my review. So I'd need more information. And I'm in agreement that her central and her peripheral

nervous system symptoms are consistent with the effects of arsine exposure.
Obdulio Guerra I'm in agreement with Dr. Gad.
Theresa Haggard I'm in agreement, particularly as it affects the central nervous system symptoms, headache and fatigue. Those symptoms are consistent with the effects of arsine gas exposure.
Josh Hinton I'm in agreement with Dr. Gad, again, central nervous system symptoms.
Doug Ingram I'm in agreement with Dr. Gad. Again, his central nervous system symptoms are consistent with the effects of arsine gas exposure.
Karl Kharas I'm in agreement with Dr. Gad, again, central nervous system symptoms consistent with the effects of arsine gas exposure.
Allen Miller I'm in agreement with Dr. Gad, central nervous system symptoms consistent with the effects of arsine gas exposure.
Dale Patton, I'm in agreement with Dr. Gad, specifically central and peripheral nervous system symptoms consistent with the effects of arsine gas exposure.

Bart Schnitzer I'm in agreement with Dr. Gad, central nervous system symptoms consistent with the effects of arsine gas exposure.
Mr. Schnitzer has developed renal failure that I think is not related to the arsine gas exposure that is mentioned by Dr. Gad.
Q Not related?
A I do not believe that is related to the arsine gas exposure. That occurred seven months after exposure. He had an increase in one of his antibodies against kidney marker. Time frame doesn't fit.
Jennifer Shavers I'm in agreement with Dr. Gad, central nervous system symptoms consistent with the effects of arsine, but need more information.
Q What do you mean, "need more information"?
A I am in agreement with Dr. Gad. I don't have an opinion at this point. Her symptoms currently are consistent, but there are some gaps in the record. Ideally I'd have more information on Ms. Shavers. She was not seen on the date of the incident. So there's no documentation in the medical records on her acute symptoms.

And then the last one is Joe Sumter, S-u-m-t-e-r. I'm in agreement with Dr. Gad, peripheral and central nervous system symptoms consistent with the effects of arsine gas exposure.
Q Are you Board certified in toxicology?
A No.
Q Do you consider yourself an expert in toxicology?
A Yes.
Q Have you ever taken the Boards for toxicology?
A No.
Q Do you consider yourself an expert in epidemiology?
A Yes.
Q Is there a Board certification process for that specialty?
A No.
Q Are you Board certified in neurology?
A No.
Q Did you do any investigation about the nature of arsine gas?
A Could you clarify your question.
Q Well, for example, do you know the molecular weight of arsine?

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 22, 2005

Page 157

A I have lots of material. I could give you the molecular weight of arsine from all the material that I reviewed.
Q Did you review for the molecular weight of arsine? Did you look it up?
A Yes. I mean, it's in all the material that I've reviewed. It's in multiple locations.
Q Do you know what the relative density is of arsine gas relative to atmosphere?
A It's in the material. The answer is no; and I could give it to you if you like. I don't know it from memory.
Q Okay.
You don't know the decomposition rate of arsine gas?
A Again, I could give you the number by looking at the material. I don't know it from memory.
Q Was that something you looked up as a part ofyour evaluation of this case?
A Yes. It's something that I looked up, I reviewed, to understand and to refresh my memory and to evaluate the toxicology of arsine gas.
Q What in epidemiology is a chronic exposure?

Page 158

A Exposure that occurs over time. It's usually considered months to years as opposed to acute exposure, which would be minutes, days, to weeks.
Q Does an acute exposure differ in symptoms from a chronic exposure?
A It may.
Q How?
A It depends on the chemical. There's some overlap, but there are also, depending on the chemical, differences in the signs and symptoms.
Q With arsine gas what would the differences be?
A The acute exposure presents with nausea or can present with symptoms such as nausea, vomiting, abdominal pain, headache, dizziness, weakness. The chronic symptoms that are reported -- well, let me -- let me differentiate before I answer the question.
There are symptoms of chronic arsine exposure, that is somebody exposed over days.
Q That's my question. We're on the same pageif you answer that question.
A Okay, because that's not the case here.
Q We're on -- okay.

Page 159

A These people were not exposed over days. We're talking, in my opinion -- my opinion is pertinent to the July 11th, 2001 exposure.
Q So you're ruling out anything other than acute exposure from this July 11th incident?
A I am not ruling it out, but I don't have an opinion about whether there may have been other exposures over time.
Q The opinions you're testifying about in this case are limited to the exposure on July 11th, 2001; is that correct?
A Correct. There may have been other intermittent exposures to some or all of these individuals, but my opinion is confined to the July 11th, 2001 arsine release.
Q Speaking generally, then, what are the -- would be the differences in the symptoms from a chronic exposure? What are the symptoms that a continuing or chronic exposure would cause?
A And we're defining chronic for the moment as exposure, ongoing exposure to arsine over months to years?
Q Yes, sir.
A Okay.
Headache, fatigue, low-level nausea,

Page 160

numbness and tingling in the hands and feet, dizziness, trouble concentrating, memory loss.
Q Now, those are all self-reported symptoms, aren't they?
A Symptoms, by definition, are self-reported.
Q Okay.
Those are all self-reported -- those are all things that are self-reported?
A They're all complaints.
MR. WARD: Object to the form. Asked and answered.
THE WITNESS: They're all problems that are reported by individuals. They're what we call subjective. They're symptoms that are reported by a patient or an individual.
Q (BY MR. TUCKER) And you told us earlier that that's why uniquely with arsine you have this opportunity to look at whether or not hemolysis has occurred by taking blood tests; is that right?
A Correct.
Q Because the red blood cell is uniquelyresponsive to the contact with arsine, isn't it?

14 (Pages 157 to 160)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006

A Correct.
Q And when it contacts arsine, as I understand, and correct me if I'm wrong, in general terms, the red cell ruptures and that releases the contents of the cell resulting in being able to measure plasma free hemoglobin?
A Correct.
Q That's why we look to that to determine whether or not a person has any objective or laboratory findings of a possibility of arsine exposure; is that right?
A Correct.
Q Now, remember we also looked at the book that you wrote, yesterday, do you remember that, the chapter that you wrote --
A Yes.
Q -- in a different book?
And in what sense did you mean -- remember we read from it yesterday? This is the chapter we're talking about, "Chemicals and Gases" by Robert Harrison.
A Yes.
Q What book did that appear in?
A Called "Primary Care."
Q "Occupational and Environmental

Medicine"?
A No. That's not in the -- oh, yeah, it is "Primary Care Occupational and" -- no, it's not. That series is called "Primary Care." This was a special issue on occupational and environmental medicine.
Q But you wrote it?
A I did.
Q And on page 975, let me read to you what you wrote talking about arsine gas.
A (Witness nods head.)
Q "Physical examination may reveal a bronze skin color and enlarged liver."
Do any of the medical records that you reviewed for any of the persons that are presented as claimants here demonstrate a bronze skin color or enlarged liver?
A No.
Q "Laboratory tests --" you wrote "-- show a picture of hemolytic anemia, elevated plasma hemoglobin and hemoglobinuria"; is that correct?
A Correct.
Q What is the difference between hemoglobinuria and hematuria?
A Hemoglobinuria is hemoglobin that's

spilling out into the urine. That's the hemoglobin moleculecirculating in the urine. Hematuria are the actual intact red cells that are spilling out into the urine.
Q Can both discolor the urine?
A Yes.
Q And what is the laboratory procedure for evaluating urine?
A There is a chemical test for the hemoglobin molecule in the urine, it's called a dipstick.
Q So you put the dipstick in the urine and read the dipstick.
What does that tell you?
A That tells you whether there's hemoglobin in the urine, that could be the circulating hemoglobin molecule, or it could be the red blood cell itself.
Q So for laboratory procedures, you put the dipstick in the urine, and if the dipstick reacts, then you find that you have hemoglobin in the urine and then you must do a further test to determine whether it's hematuria or hemoglobinuria; is that correct?
A Correct.

Q What is the further test that you then perform?
A You look under the microscope to see if there are red cells.
Q To determine that you have hematuria or free red blood cells in the urine, what do you see in the microscope?
A You see more red blood cells than would normally be in the urine. There's about three to five per field that you look at under the microscope.
Q If you do not see an increased elevation of red blood cells but you have a reaction on the dipstick, what then do you have?
A Hemoglobinuria.
Q And it's hemoglobinuria that you indicated in your article, which would be elevated plasma hemoglobin, hemolytic anemia and hemoglobinuria; is that right?
A Yes.
Q Which of the 13 plaintiffs about which you have given an opinion's laboratory responses indicated hemoglobinuria?
A (Witness examines document.)
I don't think it was measured. I was

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Page 165

pretty sure when I went through their medical records and summarized them in my table that I made a note of whether hemoglobinuria was -- well, I made a note whether the urine was dipped for hemoglobin, and I don't believe it was, or if it was, I didn't put it inmy table.
Q Do some of those reports demonstrate that urine was evaluated for red blood cells?
A Oh, yeah. Okay. There was one -- let me see, there were two. Castro had negative blood, but that was on July 14th, 2001, three days after the arsine release. Hinton had a urinalysis that was negative for blood. Okay. I guess -- okay.
They were measured. I stand corrected. Ingram had a UA that was negative for blood. Kharas' UA was negative for blood. Miller negative for blood. And Sumter negative for blood.
Q Sumter negative for blood?
A Yeah.
Q When you say "negative for blood," that means the dipstick never reacted?
A Correct.
Q So they never tried to divide up whether they had hemoglobinuria or hematuria, correct?
A Correct. It probably means they didn't

Page 166

have hemoglobinuria.
Q To get back to my specific question, in the medical records did any of the 13 plaintiffs' medical records demonstrate any finding of hemoglobinuria?
A No -- well, for the ones who were tested, no.There were some that weren't tested, and we don't know.
Q Your next sentence says, "A history of arsine exposure with a plasma hemoglobin level of greater than 1.5 percent confirms the diagnosis of arsine poisoning."
In what sense were you using the word "confirms," Dr. Harrison?
A To guide treatment of acute arsine poisoning. Not to guide an opinion about whether or not somebody was or was not exposed to arsine. I didn't discuss that in the chapter that I wrote.
Q Can we presume, then, since you say a history of arsine exposure with a plasma hemoglobin level of greater than 1.5 percent confirms the diagnosis of arsine poisoning, would you agree, then, that a plasma hemoglobin level of less than 1.5 percent would not have a confirmed diagnosis of arsine poisoning?

Page 167

A That's not what I meant, no. That's incorrect.
Q How about one percent?
A What I would say in response to your question, if I wrote it in the book, if it was designed for this purpose, if a clinician needs to have evidence of arsine exposure, they could use anycombination of markers of hemolysis, that includes hemoglobin, hematocrit, hemoglobinuria, haptoglobin or plasma free hemoglobin.
In a setting of multiple exposure or point source release, if there's evidence that many individuals above the range of laboratory or mechanical abnormality appear with abnormalities in any one of those tests, the clinician should suspect arsine gas exposure and follow these individuals, observe them in the emergency department to determine if they require more emergent treatment.
Q I'm just trying to put these things together.
Did any of the folks on your sheet there have a plasma hemoglobin level reported greater than 1.5 percent?
A Well, that's interesting, because the

Page 168

lab -- whatever that hospital was, I can't remember now -- reports normal less than 10.4 percent. That's their upper limit of normal. There were many of these individuals that had elevated plasma hemoglobins. The highest recorded among these 13 individuals was Mr. Ingram at 33 percent -- I'm sorry. No. It was Mr. Sumter. He had a plasma hemoglobin of 111 percent.
So I don't know if what we're dealing with isa, you know, difference in the way the lab is reporting their normal values compared to the way I read it in the literature and reported it in my book.
But the short answer to your question is yes, but I'm going --
Q I forgot my question.
A Your question was did any of them have elevated plasma hemoglobin above one percent.
Q No. My question was one and a half percent as used in your book.
A Right. As used in my book, yes, they all did, but I think what's more important to know is what the lab range of normal value is in the emergency department.

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Page 169

Q Here's my question: If you've got so many folks that are far over that value, for example, you said 1.5 percent, which is one and a half grams per dekaliter, confirms the diagnosis, you also say that above 1.5 percent one author has recommended transfusion. Yet all these folks with levels that appear to you to be perhaps as much as a factor of a hundred times higher than the amount, that confirms the arsine doses, and yet nobody had an exchange transfusion.
How do you account for those? Are thosefolks in Tulsa incompetent?
A No. I think what accounts for it is the reference that I made when I wrote one and a half percent may be different from the way the lab in Tulsa is running their plasma free hemoglobins and reporting the normal change.
Q Well, I have your article here. I want to ask you a couple other questions while you've got your chart handy too.
In talking about arsine you talked about manifestations include malaise, weakness, dizziness, so forth, and nausea.
A (Witness nods head.)
Q Those are the self-reported and, as your

Page 170

counsel suggested, subjective symptoms; is that right?
A Yes.
Q These acute symptoms are followed in four to six hours with urine darkened by hemoglobin, right?
A Correct.
Q So we have no record of that?
A Correct.
Q Jaundice appears after 24 to 48 hours.
We have no record of that; is that correct?
A Correct.
Q And the jaundice really is the bronzing ofthe skin?
A Correct.
Q The triad of abdominal pain, hematuria and jaundice is characteristic.
And by hematuria we're referring to it as a subset --
A Correct.
Q We don't have any evidence of that?
A Correct.
Q I think you previously suggested that what happens when you're exposed to something

Page 171

entirely depends on the dose and duration; is that right?
A Not completely. It depends on the dose and duration of exposure within a variability of human response. So to any given dose, duration of exposure, if there's a hundred people exposed to that same level for the same period of time, there will be some variability in response.
Q Something doesn't have to be a poison to kill you; is that right? By that I mean water can kill you if you have too large a dose?
A Correct.
Q Or I suppose, for that matter, so could Diet Coke?
A I suppose so. Diet Coke is a lot less toxic,one would hope, than arsine gas.
Q We'd hope no more toxic than water, right?
A Well, I don't think water is toxic.
Q But water, if you have too much of it, if the dose is too large, even water can kill you?
A If a person has a severe medical condition, it's rare, but it causes people to drink water constantly, their thirst mechanism is defective, and those people can run into medical

Page 172

problems.
Q I mean, we read --
A That's a disease condition.
Q But you can overdose on water sufficiently if you sit here and there's a condition when you drink too much water. Is there a medical name?
A There's a medical condition. It's a rare medical problem where somebody -- where their thirst mechanism does not shut off. But aside from that rare medical condition, it's impossible to overdose from water.
There's also, of course, a difference between intentional and unintentional exposure. With cases of chemical exposure, unless somebody is suicidal, people don't intend to be exposed to these toxic substances. They didn't make a choice.
Q You said earlier that you understood therewere close to some 200 people that were making a claim here?
A 192 is my understanding.
Q Are you aware that Dr. Hastings has given an opinion and claimed that all of those 192 plaintiffs have central nervous system damage?
A I'm not aware of that. I just am aware of

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Page 173

the 13 reports that Dr. Hastings has issued.
Q We talked about artifacts that can cause elevated plasma free hemoglobin levels above a normal reference range.
A (Witness nods head.)
Q We've talked about the way that the blood is drawn can do it; is that right?
A Yes.
Q And that would be would a too-small needle bore could do it?
A Yes.
Q A too-large needle bore could do it?
A Yes -- I don't know.
Q Would the speed with which it's drawn do it?
A Not to my knowledge. When you say speed, I mean, if you draw the blood with a lot of suction?
Q Yes.
A I think -- I would have to say conceivably ortheoretically, but that's not usually a consideration when blood is drawn in the emergency department. It's either by highly trained or skilled nurses or phlebotomists. They're generally not -- if they can't draw blood

Page 174

from a vein, they're generally not sucking to try to get every last ounce of blood out of somebody.
Q In toxicology is there a particular kind of technique for drawing blood to determine arsine levels or to determine plasma free hemoglobin levels that are considered to be better than others to draw that?
A Not that I'm aware of. I'm not aware of any specific instructions in an emergency department other than routine venipuncture using the vacuum type of tubes that are used in everyday practice. Those would be, I would consider -- I believe those are satisfactory. The vacuum pressure on those tubes do not hemolyze red blood cells.
Q Can other things other than the artifacts caused by the removal of blood also cause hemolysis? Other than arsine, what else can cause it?
A I'd have to check this, but you might have an issue if the blood was sitting around a lab, you know, whether you could get some hemolysis from direct mechanical, you know, transport of the blood in alaboratory setting. I guess that's conceivable.

Page 175

Q I'm thinking about something out of the laboratory setting, like, for example, spider bites.
A Oh, you mean are there other causes of intravascular hemolysis? Oh, yes. I hadn't considered those, but, yes, certainly spider bites. There might be other insect bites that cause a toxin to be injected into the body to cause hemolysis.
Q What are they besides -- can you think of some other things besides spider bites?
A Not offhand. There's a long list of causes of intravascular hemolysis.
Q Could you name some?
A A lot of other medical conditions.
Q Could you name some of them?
A I think you might have asked me this question yesterday, but they include the hemolytic anemias, an immune disorder that causes the body to destroy red blood cells, chronic liver problems with scarring of the liver, enlargement of the spleen.
Q How about sunburn?
A Not heard of that.
Q How about bruising?
A Bruising could cause you to have -- if it

Page 176

was a severe bruising. Or, for that matter, marathonrunners, if you check their blood after a 26-mile run, they'll have small amounts and sometimes even larger amounts of blood in their urine, but they actually don't have hemolysis. They have destruction of muscle which causes myoglobin to come out into the urine, but you can pick that up spuriously. You would think it's blood, but it's actually another form of protein.
Q We're talking about hemolysis in the blood that we picked up and reported as plasma free hemoglobin is what I'm looking for.
A I'm not aware of that.
Q How about heavy manual labor?
A I don't think it could cause intravascular hemolysis. You could get the myoglobin or the muscle protein. I don't think you could get the intravascular hemolysis just from heavy exercise.
Q Do you have a map that demonstrates where the various 13 folks are that you've given opinions on? And do you have any opinion as to the concentration levels of what the gas was in your opinion that they were exposed to in their particular areas?
A In terms of the concentration levels,

PROFESSIONAL
REPORTERS
Experience and service that sets the standard

INGRAM v. AIR PRODUCTS ROBERT HARRISON June 22, 2005

Page 177

numberswise --
Q Yes.
A -- is that what you're asking?
Q Yes.
A No. I don't have a number to attach to it. My only opinion is that there was enough arsine exposure to cause absorption as evidenced by the increase in several of these individuals of plasma free hemoglobin.
Q If the evidence were that none of these individuals had an increase in plasma free hemoglobin, would you believe that there was no evidence that they had any effects from the arsine incident?
MR. WARD: Object to the form.
THE WITNESS: I'd have to know -- I think that's sort of a hypothetical question. You know, if hypothetically none of them had elevated plasma free hemoglobins that were caused by exposure to arsine, that they were caused by other medical conditions or mechanical problems.
Q (BY MR. TUCKER) My question is if you look at a person who doesn't have an elevated plasma free hemoglobin then and was tested contemporaneously with the event, within that

Page 178

time frame that you would have an elevated plasma free hemoglobin response and they don't have one, would you be telling us that nonetheless because they have a headache and claim they're dizzy that theyhad exposure to arsine?
MR. WARD: Object to the form.
THE WITNESS: If the plasma free hemoglobin was normal or if all the other biological measures of arsine exposure that we mentioned are regular, were within the normal range, I would either conclude that they were not exposed to arsine gas or they were exposed to arsine gas at a level that wasn't sufficient to cause enough intravascular hemolysis to cause abnormalities in any of these lab tests.
So, in other words, they still could have been exposed, but we just didn't pick it up on the lab tests. So then the question would become, well, are the symptoms that you're reporting to me caused by exposure and we just didn't have a normal lab test, or are they caused by something else.
Q (BY MR. TUCKER) Do you know of any peer-reviewed literature that says that you can have arsine exposure sufficient to cause physical

Page 179

symptoms without having a level of hemolysis?
MR. WARD: You mean any level of hemolysis?
Q (BY MR. TUCKER) An abnormal level of hemolysis.
A I don't think you'll find an opinion on thatquestion in the literature.
MR. TUCKER: Can we take a bathroom break?
THE WITNESS: Absolutely.
(Recess taken.)
Q (BY MR. TUCKER) You indicated in your report that you reviewed an MSDS; is that correct?
A Yes.
Q What is your understanding of what an MSDS is?
A It's a summary of the ingredients and their associated physical, chemical toxicity, health effects, emergency procedure, characteristics --
Q What --
A -- that accompanies a product.
Q What does it stand for, MSDS?
A Material safety data sheet.

Page 180

Q Do you know who prepares the MSDS for a particular substance?
A It varies company to company. There's no law that says who actually prepares it. Sometimes it's a toxicologist. Sometimes it's a physician, contract firm.
Q Let me rephrase the question.
Would it be correct to say that MSDS isprepared or obtained by an individual manufacturer to affix to its product when it's shipped?
A Yes. I mean, that's -- the manufacturer of the product originates the material safety data sheet, and usually sends it with the product to the user.
Q And as I understand, there is no -- while there may be a federal requirement that there be an MSDS, there is no federal standard that approves a particular MSDS; is that right?
A That's correct.
Q Are MSDSs peer reviewed?
A If by that you mean they're submitted to a scientific journal or authoritative organization with objective anonymous outside peer review, they are not.

19 (Pages 177 to 180)

PROFESSIONAL
REPORTERS
Experience and service that sets the standard
OKLAHOMA CITY 405-272-1006
TULSA 918-583-8600
FAYETTEVILLE 479-587-1006
511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 181

Q That's what peer review means generally, isn't it?
A Yes. I just want to be sure we agree. No, MSDSs are not what we would consider to be peer-reviewed documents.
Q Did you make any determination of whether or not there were any people working at Solkatronics on the day of this event?
A I made no independent determination. The report about the incident which I mentioned earlier has some information in it describing thecircumstances, the exposure and some of the individuals involved in the response, but I didn't make a determination of how many were actually employed by Solkatronics and where.
Q Would you expect -- whatever the dispersion model for this dose response curve that you talked about earlier might be, would you expect that the further you got from the initial point of release, the more dispersed the gas would be, or, said another way, the lower the concentration of the gas?
A As a general assumption, yes. There might be some variability depending on the topography or buildings that are in the way, but

Page 182

generally speaking, yes.
Q The closer you are, the more dense the concentration?
A Yes.
Q Do you know whether -- I gather that you do know that there were people working at the Solkatronics plant when this incident occurred?
A Yes.
Q Do you know how those employees were affected by the event?
A I do not.
Q Do you know whether any of those employeescame into contact with the cloud?
A I do not.
Q Did you read whether any of the employees were actually exposed to the gases that traveled out from under the -- mechanically from where the accident occurred?
A I don't know.
Q Did you ask for the medical records of the Solkatronics employees?
A No.
Q Did you review any information that determined -- that disclosed the medical records of the Solkatronics employees?

Page 183

A No.
Q If there were Solkatronics employees that were actually in the cloud that was released, would you expect them to show the most reaction?
A If the Solkatronics employees were in the cloud of arsine gas and they were the closest to the point source, yes, I would expect them to have among the highest doses of arsine gas.
Q Would you expect them to be most likely to have had a hemolytic reaction?
A Depending on the concentration of arsine gas to which they were exposed. If they had the highestconcentration, I would expect them to have the greatest potential for the hemolysis reaction showing up in blood tests.
Q Did you read how the accident occurred?
A Yes.
Q And did you read that when the accident occurred that the gas was released?
A Yes.
Q Did you read that something caused that gas to become a cloud?
A Yes.
Q And you understand that arsine itself is colorless, right?

Page 184

A Yes.
Q But the fact that it turned to a cloud created some opportunity to track what happened to it, didn't it?
A Yes.
Q Do you know how long it stayed together as a cloud before it dispersed and was not sufficiently concentrated to be so identified anymore?
A No.
Q Do you know where it went when it escaped?
A No. I mean, you mean the direction and the exact locations about where it went; is that what youmean?
Q Generally. Do you know generally where it went?
A It went into the air, but the direction and the exposure concentrations --
Q When you read the statement, the report, incident report from Eugene Ngai, did he talk about the fact that there were Solkatronics employees on the roof that were in the cloud?
A I don't remember.
Q Would it be significant to you to know

PROFESSIONAL
REPORTERS
Experience and service that sets the standard