INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 185

1   what the medical records were of those persons
2   who were, if there were such persons that went
3   through the cloud, what those medical records
4   disclosed?
5       A   My review of their medical records may or
6   may not affect the opinion I have or that I've
7   expressed in my reports in this case. It would
8   depend what -- well, let me explain why.
9       If the issue is whether or not these 13
10  plaintiffs whose records I have reviewed were
11  exposed to arsine, as indicated by their elevated
12  plasma hemoglobins or by symptoms that they
13  reported, I'm not sure the extent to which my
14  opinion in that regard would change by looking at
15  the medical records of Solkatronics employees who
16  were on the roof. I'm just not sure if one would
17  necessarily bear on the other.
18      Q   Well, would it be of interest to you to
19  determine what the plasma free hemoglobin levels
20  of those folks were that were actually exposed to
21  the concentrated cloud of arsine gas?
22      MR. WARD: Object to the form of the
23  question. There's not any evidence that they were
24  exposed.
25      THE WITNESS: It would matter if there

Page 186

1   was information on exposure concentrations at
2   various distances from the release point.
3       Q   (BY MR. TUCKER) Would you agree that
4   the concentrations are going to be greater at the
5   point of release than they're going to be, say, 3-
6   or 400 yards away?
7       A   In general, but if all I was given was
8   their medical records, and let's say hypothetically
9   their medical records show they had normal
10  plasma free hemoglobins, and all the other tests
11  were normal as far as intravascular hemolysis but
12  I didn't have any other information about
13  exposure levels, my opinion is not going to
14  change, because what I'm still missing is what is
15  the exposure range, what is the exposure
16  concentration.
17      Q   Well, with respect to persons who were
18  located a distance away from Solkatronics, do you
19  have the exposure concentrations for those people?
20      A   I don't have it for anybody.
21      Q   But you --
22      A   All we have is a marker of arsine gas
23  absorption in the form of plasma free
24  hemoglobins.
25      Q   Would you agree that's the only marker

Page 187

1   that you have on these people that applies?
2       A   Yes, it is the only marker. And the
3   only -- as we've already discussed, it's either real
4   or it's spurious because of mechanical problems in
5   the blood draw.
6       Q   And all the other markers, blood markers
7   or urine markers, that would demonstrate arsine
8   exposure, none of those are -- appear to have been
9   found in any of these 13 people; is that correct?
10      A   Correct.
11      Let me also add that I didn't review their
12  records, but there's a summary table that plaintiff
13  counsel gave to me that has elevated plasma
14  hemoglobins for other individuals among the 192
15  plaintiffs, suggesting to me either a remarkably
16  systemic mechanical or laboratory error.
17      Q   Which form were you referring to?
18      A   I think you've marked it as Exhibit 4.
19  It's a table that says, "Clients with High
20  Plasma Hemoglobin." Some of those are the 13
21  plaintiffs whose medical records I reviewed. Some
22  are not.
23      Q   This is a total of 19 out of 192?
24      A   Yes.
25      Q   And with respect to that -- what is that

Page 188

1   chart supposed to demonstrate, clients with high
2   plasma free or high plasma hemoglobin?
3       A   Yes.
4       Q   Is plasma hemoglobin, as it said that in
5   that chart as prepared by plaintiff's counsel, in
6   your mind plasma free hemoglobin?
7       A   Yes, I believe it's the same thing.
8       Q   While we have this here, first of all, do
9   you know about -- my math isn't that great, so I
10  won't try to subtract 19 from 192, but would it
11  seem to you that the balance of the 192 did not
12  have high plasma hemoglobin?
13      A   I don't know, because I don't know how
14  many of the balance had it measured.
15      Q   Do you have any information any of the
16  rest of them had high plasma free hemoglobin?
17      A   No.
18      Q   Now, in this chart in the first column,
19  first substantive column we have the name of the
20  individual; is that right?
21      A   Yes.
22      Q   And then the third column is where that
23  person was located, right?
24      A   Yes.
25      Q   What is the second column?

21 (Pages 185 to 188)



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY —————— 405-272-1006
TULSA —————— 918-
FAYETTEVILLE —————— 479-

EXHIBIT
1b

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 189

1    A   That's the plasma hemoglobin count,
2  which I believe is the same as the plasma free
3  hemoglobin.
4    Q   What does the plasma free hemoglobin
5  count mean to you?  For example, take Karl
6  Kharas 21.1, that's 21.1 what?
7    A   As reported by the lab it's in percent.  So
8  if you actually go and look at it, as I did, the lab
9  is reporting it at 21.1 percent with an upper limit
10  of normal of 10.4 percent.
11      One of the things I did is I checked the
12  Exhibit 4 table against the results in the medical
13  records for the 13 plaintiffs that I had, and they
14  all match.  So this is accurate, and it refers to the
15  percentage as reported by the lab.
16    Q   So for each of these 19, this is referred to
17  as a percent, just as it is called out on your chart
18  which is a part of your report, which is called the
19  "Medical Records Summary Robert Harrison,
20  M.D."?
21    A   Yes.
22    Q   Looking at these people that are reported
23  to have high plasma hemoglobin, as you look
24  around there's a chart there that places where
25  these folks were?

Page 190

1    A   Yes.
2    Q   Do they appear to be at all points of the
3  compass?
4    A   Yes.  Most of them are at what is
5  designated with a box.  S to the northwest of
6  Solkatronics, and then Karl Kharas is further to
7  the northwest, and he's working at ASEC
8  Manufacturing.  I think the S actually is Air
9  Exchangers.
10    Q   So thinking in terms of epidemiology 101,
11  looking at that, what possible hypothesis would
12  you look at that you'd want to consider just
13  looking at the pattern of your complaints --
14  complainants that have this characteristic that
15  you've identified as high hemoglobin?
16    A   A Couple of pieces of information.  One is
17  what is the denominator; in other words, what is
18  the population at risk at these various points.
19    Q   Okay.
20    A   And how many of those were tested on the
21  day of the incident at a point in time where the
22  values would still be relevant.
23    Q   Do you know the answer to that question?
24    A   I'd want them tested within about 12, no
25  more than 24 hours.

Page 191

1    Q   Do you know the answer to that question?
2    A   Yes.
3    Q   You said I want to know this.
4    A   Yes.
5    Q   You want to know the population of these
6  areas and the times of testing.
7      Do you know that information?
8    A   Yes.  I would want it between 12 and 24
9  hours.  No more than about 24 hours later.
10    Q   Let me be more clear:  Do you have that
11  information about the other -- about these other
12  folks?
13    A   Oh, I'm sorry.  I didn't understand your
14  question.
15      I do not have the information on the total
16  denominator, and then of the total denominator or
17  at-risk population, how many were tested.
18      And the second piece of information
19  would be the concentration gradients, which would
20  depend on the factors that I discussed earlier.
21    Q   You don't have that?
22    A   I don't have that.  What I have is a
23  cluster or group of individuals who are working --
24  of those 19 with elevated plasma hemoglobins
25  among the 192 plaintiffs, the majority of them are

Page 192

1  to the northwest of the point source release,
2  suggesting perhaps that that was the direction of
3  the release in terms of wind direction, topography
4  or other factors, but that's not necessarily the
5  case, because it could be that the individuals of
6  Air Exchangers happen to be the ones to go to the
7  emergency department and happen to be the ones
8  to get plasma hemoglobins drawn.
9    Q   Do you know at what time the authorities
10  cleared the area to be completely -- entire area to
11  be completely all safe?
12      MR. WARD:  I object to the form of the
13  question.
14      THE WITNESS:  I read the complete
15  report, but I don't remember the exact time frame,
16  the hour that the authorities released this area
17  for, you know, reoccupation.
18    Q   (BY MR. TUCKER)  Sometime between 4
19  and 5 o'clock in the afternoon ring a bell?
20    A   Yeah.  I'll take your word for that.
21    Q   But you don't remember?
22    A   I don't remember without going back and
23  reading the exact report.
24    Q   What is mass psychogenic illness?
25    A   Mass psychogenic illness is a

22 (Pages 189 to 192)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY  ———————405-272-1006
TULSA  ———————————918-583-8600
FAYETTEVILLE  ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                June 22, 2005

Page 193

1    psychological phenomena where a population
2    shares anxiety, concern about an event or an
3    exposure. The individuals present with a series of
4    physical symptoms, but they're driven by a
5    psychological reaction.
6        Q    That's a very real phenomena, isn't it?
7        A    It is.
8        Q    In fact, you've testified about that before
9    in some other instances, haven't you?
10       A    Probably. I mean, it's certainly among
11   the diagnoses that I consider whenever there's a
12   population exposed.
13       Let me add one other definition that I
14   think that you'll find pretty commonly accepted,
15   and that is that the individuals have to be within
16   the same location. So if you had people who were
17   located, let's say, half mile away and who came
18   independently for medical treatment and never had
19   any contact with each other, you would not define
20   that as mass psychogenic illness.
21       Q    What about contact that you might get
22   because of the news reports?
23       A    I don't think strictly speaking we would
24   define that as mass psychogenic illness. We
25   would certainly take news reports into

Page 194

1    consideration as a physician, you know, in that --
2    in reviewing their history and determining whether
3    an individual's symptoms are due to psychological
4    distress, but we wouldn't define it as a mass
5    psychogenic illness.
6        I believe, you know, a mass psychogenic
7    illness has to be, you know, naval men on a
8    submarine, or teachers in a school, individuals
9    who are all under the same roof or same location.
10       Q    What comes to mind when you describe
11   that to me, Doctor, as the new movies start coming
12   out I'm putting to point the old radio show Orson
13   Welles' War of the Worlds. You're too young to
14   have heard it live.
15       A    No, I haven't heard it live.
16       Q    But we've all heard the story about it,
17   about how people reacted that they thought that
18   the Martians had invaded the earth because the
19   radio said so.
20       MR. WARD: Is there a question in that?
21   Wait. Wait.
22       Q    (BY MR. TUCKER) Would that response
23   be kind of a form of a mass psychogenic response?
24   I hate to use the term illness, but mass
25   psychogenic response?

Page 195

1        A    Yes. Obviously, it's a form of a mass
2    psychological response. I'm just recalling kind
3    of the strict definition that I've read in the
4    literature --
5        Q    Okay.
6        A    -- on mass psychogenic illness in the --
7        Q    You're thinking of a confined area of
8    employment, like one bus, one area of
9    employment, one bus?
10       A    Where there's word of mouth, where
11   there's direct communication, where people
12   actually see other people become ill, and they
13   then develop symptoms themselves.
14       Q    Did you learn whether or not on the day
15   of this event there were presentations made to
16   employees all around the Port of Catoosa that had
17   evacuated their facilities as to the subjective
18   symptoms of exposure to arsine?
19       MR. WARD: Object to the form of the
20   question.
21       Q    (BY MR. TUCKER) Are you aware of
22   whether or not that happened?
23       A    I'm not aware whether or not that
24   happened.
25       Q    I'll ask you to assume that that did

Page 196

1    happen.
2        Would that be sort of bringing everybody
3    within the same bus?
4        MR. WARD: Object to the form of the
5    question.
6        THE WITNESS: I don't think so.
7        Q    (BY MR. TUCKER) Could it be?
8        A    Could it be? No. I've been involved in
9    several -- as I said earlier, several chemical
10   releases, and, you know, physician and public
11   health responses, and have gone on the radio, on
12   television and have written information for people
13   who were exposed that day or that hour, and we
14   always advise people, you know, this is what you
15   ought to do, and if you have these type of
16   problems, you might want to seek medical
17   attention, because people have to know what the
18   health effects are and what they need to be alert
19   to.
20       And what I have always found in those
21   situations, and there has probably been half a
22   dozen involving thousands of people in the
23   community, is that most people come forward
24   because they're worried or they have symptoms,
25   and they're concerned about whether or not

23 (Pages 193 to 196)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 197

1  they're connected to the exposure.
2        But that doesn't create mass psychogenic
3  illness or some factitious disorder. It just allows
4  the doctors taking care of those people to
5  determine whether or not they have true health
6  effects or whether there may be long-term
7  complications.
8        Q   Well, for example, one of the things
9  that -- let's just ask you to assume -- was
10 disclosed to all these folks in the afternoon after
11 the event was that you might have gotten the odor
12 of garlic, which is characteristic of arsine gas.
13 And then lots of people at distant points from the
14 area of the release come in with headaches,
15 complaining of headaches and nausea and
16 weakness, and said they smelled garlic.
17       Would that be indicative of the kind of
18 response that can occur from disclosing that
19 information to a population?
20       MR. WARD: Object to the form.
21       THE WITNESS: So I guess your
22 question -- if I understand your question
23 correctly, can you put in somebody's mind that
24 they smelled garlic even though they didn't,
25 because of a news release?

Page 198

1        Q   (BY MR. TUCKER) That's one way to put
2  it.
3        A   I just want to make sure I understand
4  that that's your question.
5        Q   That's a good question. Answer that one.
6        A   It's possible.
7        Q   I mean, at some point away from the area
8  of the release, somebody that smelled garlic and
9  has a headache would be ruled out as someone
10 having beenexposed to arsine gas, wouldn't they,
11 at some distance?
12       A   Oh, yeah. I mean, at some distance. If
13 somebody came into the ER on July 11th, 2001
14 and lived ten miles away and they spent all their
15 day inside and said they smelled garlic, I would
16 tell them, you know, it probably wasn't related to
17 the arsine gas. You don't have anything to worry
18 about.
19       Q   Do you know where you'd draw the line?
20 At what distance?
21       A   I don't know in this situation. It gets
22 back to what your exposure concentrations are.
23       On the day of this incident, from what I
24 could tell from reading the emergency room
25 records, the emergency room doctors and the

Page 199

1  treating doctors didn't know where to draw the
2  line. They didn't have the information on
3  exposure concentrations; and they reasonably, I
4  think, drew the appropriate lab tests where they
5  could, because they didn't have information about
6  air concentrations. So they were doing blood tests
7  instead.
8        Q   I'm going to read something to you and
9  ask if you think this would fit into the definition
10 of putting people on the same bus or the same
11 plant or the same school. Okay?
12       A   (Witness nods head.)
13       Q   If you were near the Port of Catoosa in
14 July of 2001, you should read this. Arsine is one
15 of the deadliest chemicals in the world. In July
16 2001 a cloud of arsine gas was released into the
17 air at the Solkatronics plant in the Port of
18 Catoosa. Arsine is a highly toxic and lethal form
19 of arsenic that causes severe injury and/or death
20 in extremely small amounts. It is so deadly that
21 one of its uses is for chemical warfare. It is most
22 hazardous when it is airborne, as it was when it
23 was -- was released by Solkatronics on July 11,
24 2001. The arsine release at Solkatronics was the
25 largest -- worst and largest accidental spill in the

Page 200

1  history of the United States. Local physicians
2  have determined that the arsine released by
3  Solkatronics has caused permanent damage to the
4  kidneys, liver, lungs and central nervous systems
5  of many persons who were in or near the Port of
6  Catoosa. Arsine is extremely hazardous to and
7  causes permanent injury to the liver, lungs,
8  central nervous system and other internal organs.
9  Symptoms of arsine poisoning may include cloudy
10 urine, low back pain, memory loss, persistent
11 headaches, numbness in the hands or other
12 extremities, or prolonged feelings of fatigue.
13       Now, reading that, if you are a person
14 whowas near the Port of Catoosa in July 2001,
15 would that be the kind of thing that would, to use
16 your earlier description, put you in the same
17 schoolhouse or the same plant?
18       MR. WARD: Object to the form. Reading
19 it when? Contemporaneous to the event, or
20 months later? When are you suggesting that the
21 person read this?
22       MR. TUCKER: I'm not suggesting any
23 particular person did read it.
24       MR. WARD: Or at any particular point in
25 time?



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 201

1    MR. TUCKER: Not yet.
2        MR. WARD: Objection. Object to the
3    form.
4        THE WITNESS: Just what you read to me
5    would not put people in the same bus or the same
6    factory in terms of mass psychogenic illness.
7    Q    (BY MR. TUCKER) And is mass
8    psychogenic illness a relatively tight definition?
9    A    Well, that's what I was, you know --
10   Q    I see you traveling over it.
11   A    Sorry.
12   Q    You're thinking about it.
13   A    I believe it has a pretty tight definition. I
14   think you'll see some variation in the medical
15   literature.
16       I am trying to remember, actually,
17   whether it has a, you know, psychiatric definition.
18   I don't think it does. I think you'll find
19   descriptions and definitions in the medical
20   literature after an event or an exposure. It's the
21   reason why I believe you'll find that people have
22   to be in the same boat, if you will.
23   Q    Would hearing that kind of information be
24   the sort of thing that would create, you would
25   expect, would create a response that might be

Page 202

1    similar to some of the characteristics of a mass
2    psychogenic response?
3    A    No. I think what it would do is some
4    people would read that and might become very
5    worried about a health problem that they have and
6    wonder whether it was related to exposure to
7    arsine. Some people might read that and say,
8    well, I have no problems, and I'm not worried.
9    And then there would be people in between.
10       And each of those people would need to go
11   to their doctor or to a specialist and ask the
12   questions to help sort out whether their problems
13   are or are not due to arsine exposure.
14   Q    Do you know whether arsine was used in
15   chemical warfare?
16   A    I don't know. You mean, was it
17   actuallydeployed? Used?
18   Q    Has it ever been deployed as a chemical
19   warfare agent?
20       MR. WARD: When you say used as an
21   agent you mean --
22       MR. TUCKER: Deployed as a chemical --
23       MR. WARD: Or held in reserve for
24   deployment?
25       MR. TUCKER: Or held in reserve for

Page 203

1    deployment.
2        THE WITNESS: You know, I don't know
3    on either count. I don't know whether any
4    government has -- has manufactured arsine and
5    held it in reserve. I don't know if it was ever
6    deployed in the field. It would make a -- certainly
7    would make a very good chemical warfare agent.
8    Q    (BY MR. TUCKER) Why would it make a
9    good chemical warfare agent?
10   A    It's very highly toxic.
11   Q    How does it compare with Lewisite?
12   A    I don't know.
13   Q    What is Lewisite?
14   A    It's another chemical warfare agent. It's
15   on the list of potential terrorist agents.
16   Q    Do you believe that arsine is a chemical
17   warfare agent, a viable chemical warfare agent?
18   A    I don't know. I've been involved in
19   chemical terrorism preparedness planning and
20   training for the State of California because I'm
21   part of the Department of Health Services. And
22   my particular unit, you know, does the toxicology
23   and epidemiology studies. And arsine gas,
24   because it is widely used in the San Francisco Bay
25   Area, is on our list of agents to prepare for in the

Page 204

1    event that a terrorist would get ahold of a tank of
2    arsine from a semiconductor plant.
3    Q    The semiconductor plants don't have
4    arsine there as a nerve gas agent for chemical
5    warfare, do they?
6    A    No.
7    Q    They use it to make computer chips?
8    A    Yes, that's correct. But in terms of your
9    question would it make a suitable chemical
10   warfare agent, it would make a suitable agent for
11   a terrorist to use.
12   Q    I understand that.
13   A    And so I'm thinking, well, it's pretty
14   toxic. Whether or not, you know, the Army or
15   another foreign government ever thought of using
16   arsine --
17   Q    That's my real question, has it ever been
18   used as a chemical warfare agent by a
19   government?
20   A    I don't know.
21   Q    What are the clinical presentations of
22   dehydration?
23   A    Thirst, nausea, dizziness, muscle aches,
24   fatigue. If it's very severe, trouble concentrating,
25   disorientation.

25 (Pages 201 to 204)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ————————————918-583-8600
FAYETTEVILLE ——————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 205

1  Q  Headache?
2  A  Headache.
3  Q  Were any of the persons who were seen at
4  hospitals given treatment for dehydration?
5  A  Not to my knowledge. Some of them had
6  IVs attached, but I don't recall reading that the
7  diagnosis of dehydration was given to anybody in
8  the emergency room.
9  Q  Were they hydrated at the hospitals?
10  A  Well, they were given intravenous fluids,
11  which is called hydration, but it's a medical term
12  of art. It doesn't necessarily mean that they were
13  dehydrated.
14  Q  They received hydration, but that doesn't
15  mean that they had been dehydrated?
16  A  Correct. I know that doesn't make
17  complete sense to the average listener, but none
18  of them, to my knowledge, had a diagnosis of
19  clinical dehydration.
20  Q  Were the symptoms that they presented at
21  the hospital consistent with the ones you have
22  describedfor dehydration?
23  A  Yes.
24  Q  And as I understand, you do not know
25  from your investigation what the weather

Page 206

1  conditions were at the Port of Catoosa on the day
2  of the event?
3  A  That's correct.
4  Q  Do you know whether any of the 13 had
5  been outside long enough that day to get
6  sunburns?
7  A  No. I do not know.
8  Q  Except for the time involved with respect
9  to the hospital to which they reported, do you
10  know whether any of these 13 persons that you
11  have on that list of 13 missed any work as a result
12  of this event?
13  A  I don't know.
14  Q  Did the laboratory work of any of the 13
15  demonstrate -- first of all, what is hematocrit?
16  A  It's a blood count. It's a measure of the
17  amount of red blood cells.
18  Q  And when you have red blood cells
19  destroyed, does that reduce the hematocrit level?
20  A  Yes.
21  Q  Did any of the individuals tested
22  demonstrate a drop in hematocrit?
23  A  Mr. Ingram had a slight drop in his
24  hematocrit, 15.5, that's grams. And that was
25  hishemoglobin count, which is another measure of

Page 207

1  blood count. It's similar to the hematocrit. And
2  his slightly dropped from 15.5 to 13.8.
3  Q  What is the normal range for hemoglobin?
4  A  13.3 to 17.7. So Mr. Ingram's hemoglobin
5  dropped, although was still technically within the
6  normal range, went down, and then it came back
7  up.
8  Q  Is there a direct relationship between a
9  drop in hematocrit or hemoglobin and an increase
10  in the plasma free hemoglobin level?
11  A  I don't know. I'd have to check that.
12  Q  As I understand, no one other than Mr.
13  Ingram demonstrated any drop in the hemoglobin
14  or hematocrit level; is that correct?
15  A  (Witness examines document.)
16  Among those for which the hemoglobin or
17  hematocrit was measured, that's correct. Not
18  everybody had it measured.
19  Q  We're looking at the 13, and we can only
20  evaluate lab results for people who have lab
21  results, right?
22  A  Correct.
23  Q  And now that you -- neither you nor I
24  determined what person should have lab results
25  obtained, do we? That was a physician in

Page 208

1  Tulsa,Oklahoma that was on the spot making the
2  determination whether or not to take blood tests?
3  A  That's correct. There wasn't a standard
4  protocol in place. So everyone who came into the
5  emergency room -- the emergency room doctors
6  didn't have a sheet of paper that said everyone
7  should get this.
8  Q  So going back through the things that we
9  use to diagnose arsine exposure, we have -- as I
10  understand your testimony so far, nobody on that
11  list has hemoglobinuria, correct?
12  A  Nobody on what list?
13  Q  The list with 13.
14  A  Again, nobody for whom hemoglobin --
15  nobody for whom a urinalysis was done with
16  hemoglobinuria. I just want to emphasize that not
17  everybody had everything measured.
18  Q  I know you've evaluated these records and
19  spent a lot of time studying. Are you aware that
20  every person that went to the hospital had a urine
21  test taken?
22  A  Not according to the 13 records that I
23  saw. Not everyone had a urine test.
24  Q  Do you know that all 13 of those people
25  decided to present themselves at the hospital?

26 (Pages 205 to 208)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 209

1    A   It looks to me like not all 13 went to the
2  hospital on that day.
3    Q   So what I'm asking you is did you
4  determine in your evaluation of the records that
5  each of the 13 who went to the hospital had, one,
6  a urine test, and two, a blood test, each of those
7  people who are among the 13 who chose to go to
8  the hospital because they thought they should or
9  for whatever reason they were sent, were sent by
10 their employer, had those tests?
11   A   They either had a blood test or a urine
12 test, but not everyone had the same test.
13   Q   Some had both, some had one, some had
14 the other?
15   A   Correct.
16   Q   So you can only talk to me about test
17 results that you have, right?
18   A   Right.
19   Q   And do you have any test result -- just
20 confirming where we are at this point, as I
21 understand, there is no test result for any one of
22 the 13 plaintiffs that shows hemoglobinuria; is
23 that correct?
24   A   It's correct, as long as we're clear that
25 not all the plaintiffs had a test for

Page 210

1  hemoglobinuria. But among the ones that did,
2  none of them were abnormal, didn't show
3  hemoglobinuria if it was tested. If their urine was
4  tested.
5    Q   And as to those who were tested, you
6  have some people that have what you have
7  described as elevated plasma free hemoglobin?
8    A   Correct.
9    Q   And we really haven't talked about that
10 yet, but you have some described that way.
11       And then of those who had their blood
12 tested, one of the 13 had any demonstrable change
13 in the hematocrit or red blood cell volume,
14 correct?
15   A   Correct.
16   Q   And when the red blood cells are
17 destroyed so that the plasma free hemoglobin level
18 goes up, then at the same time one would expect
19 that the volume of red blood cells or the
20 hematocrit level would go down; is that correct?
21   A   Well, that's what you asked me before,
22 and I said I'm not sure -- I need to check that --
23 as to whether or not if you have an increase in
24 plasma free hemoglobin you would necessarily
25 expect a drop in hemoglobin or hematocrit.

Page 211

1    Q   Well, if you destroy red blood cells -- if
2  you count them now and destroy them and count
3  them an hour from now, you're going to have fewer
4  red bloodcells, aren't you?
5    A   It depends how sensitive the plasma free
6  hemoglobin is. In other words, can the plasma
7  free hemoglobin go up, become elevated, without a
8  drop in hemoglobin or hematocrit.
9    Q   What's the answer to that?
10   A   I think it can.
11   Q   Do you know of any peer-reviewed
12 literature that says so?
13   A   I'll look for you. Not as I sit here today.
14 But clearly -- let me just answer it this way: The
15 peer-reviewed literature states that with arsine
16 exposure, to diagnose poisoning or absorption and
17 exposure that one can use any one of these
18 markers. The literature does not say that a drop
19 in hemoglobin or hematocrit is required.
20   Q   But the literature does say that an
21 increase in plasma free hemoglobin is required,
22 correct?
23   A   Any one of these. So you could use the
24 haptoglobin, the hemoglobinuria, the hemoglobin,
25 hematocrit, or the plasma free hemoglobin. So

Page 212

1  there are basically four ways, four different types
2  of tests that can be done.
3    Q   If you have none of them, if none of those
4  things are out of line, then you have nothing; is
5  thatright?
6    A   Well, you either have nothing, or you
7  have a sign or -- or you have a symptom that may
8  be consistent with exposure but it's not enough to
9  cause any of these measurable abnormalities. It
10 doesn't rule out exposure. It just means that
11 there wasn't enough to cause an effect on any of
12 these blood or urine tests.
13   Q   If a patient walks in to you today and
14 says, Dr. Harrison, a year ago or 18 months ago I
15 was in an area where there was a release of arsine
16 gas and I think I was exposed to it, you ask that
17 patient that comes in, well, do you have blood
18 tests or urine tests at about the time that
19 happened? No, no, no. What makes you think you
20 have the problem? Well, I have headaches and I
21 have nausea and I have numbness. And would you
22 please examine me and tell me if I have these
23 symptoms as a result of my exposure to arsine.
24       Would you as a physician be able to make
25 the diagnosis that those symptoms are caused by

27 (Pages 209 to 212)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 213

1    arsine exposure?
2         A    I'd have to ask you some more questions.
3         Q    What else would you ask?
4         A    When was the release of the gas?
5         Q    18 months ago.
6         A    And what was the date?
7         Q    It was in the summer.
8         A    What was the exact date?
9         Q    July 11th, 2001.
10        A    Do you know what time the release
11   occurred?
12        Q    About noon.
13        A    Do you know for sure?
14        Q    About noon.
15        A    Do you have records that you can give to
16   me that show when the exact time of the release
17   was?
18        Q    Yes.  They'll show about noon.
19        A    And tell me about your symptoms on the
20   day of exposure.  On July 11th how did you feel
21   when you woke up that morning?
22        Q    I don't remember.
23        A    Tell me about your symptoms that
24   occurred that day.
25        Q    I just didn't feel good.

Page 215

1    blood pressure?  Ever gone to a doctor and had
2    your blood pressure taken?
3         Q    Yes.
4         A    Do you remember what it showed?
5         Q    No.
6         A    Do you take any medications?
7         Q    No.
8         A    What kind of work do you do?
9         Q    Labor, welder.
10        A    Work with any chemicals on the job?
11        Q    I'm a welder.
12        A    Do you have any trouble when you're
13   welding?  Do you ever get headaches at work?
14        Q    Yes.  I have a headache today.
15        A    Are your headaches worse when you're at
16   work?
17        Q    No.
18        A    Do they get better when you're off work?
19        Q    No.
20        A    So just constant headaches.
21        Q    Well, except for when I take Tylenol.
22        A    What exactly were you doing on the date
23   of July 11th?
24        Q    Welding.
25        A    Were you indoors or outdoors?

Page 214

1         A    Can you remember more exactly how you
2    felt?
3         Q    No.
4         A    Okay.
5              Did you go to the doctor?
6         Q    No.
7         A    When did you first go to the doctor?
8         Q    Today.
9         A    When did your symptoms first start?
10        Q    Sometime after that event, not very long,
11   seemed like a day or two.
12        A    Do you remember exactly when?
13        Q    No.
14        A    And how did your -- what was the first
15   symptom that you had?
16        Q    Headache, fatigue, nausea.
17        A    How often do you have your headaches?
18        Q    All the time.
19        A    Anything make it better?
20        Q    Tylenol.
21        A    Anything make it worse?
22        Q    No.
23        A    Do you have any other medical problems?
24        Q    Not really.
25        A    Been diagnosed with problems, with high

Page 216

1         Q    Indoors, but the doors are open on the
2    building.
3         A    Were you evacuated?  Did they tell you to
4    leave the area?
5         Q    Yes.
6         A    Where did you go?
7         Q    Across the street.
8         A    And what did you do across the street?
9         Q    Stood there.
10        A    How long did you stand there for?
11        Q    Couple hours.
12        A    And then what did you do?
13        Q    Went home.
14        A    And did you lose any work time?
15        Q    That day.
16        A    Then you went back to work the next day?
17        Q    Mm-hmm.
18        A    And when did you start to have problems
19   with your headaches?
20        Q    A day or two.
21        A    Day or two later?
22        Q    Mm-hmm.
23        A    Did you ever have headaches before?
24        Q    Yeah.
25        A    How often did you have them before?

28 (Pages 213 to 216)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                June 22, 2005

Page 217

1   Q   I don't remember.
2   A   Well, you know, we would keep on going
3   like this, obviously.  And the question that -- I
4   can't remember the original question, but would I
5   diagnose headaches from arsine exposure in this
6   situation?  I think that might have been your
7   original question.
8   Q   My original question was I've given you
9   those symptoms that I'm having, headaches and
10  nausea and numbness.  Would you say that arsine
11  was the cause ofmy headaches and nausea and
12  numbness?
13  A   Well, I would have to gauge your
14  credibility and your memory.  You're not the best
15  historian, because you didn't remember much
16  about what happened that day.  You can't exactly
17  remember when your headaches started, and you
18  didn't go to a doctor to document your headaches.
19  It doesn't sound like you went to doctors much
20  before.  Doesn't sound like there's going to be
21  much in the medical records.
22      So it would depend, really, on my gauge
23  of your credibility and your accuracy as a
24  historian.  And you've -- in the way you role-played
25  that, you're not great.

Page 218

1   Q   Could you ever take it beyond possible?
2   A   It depends.  In this situation where
3   there's no medical records, you never got medical
4   treatment, you're vague in your responses, I might
5   conclude in your case that it's possible, but
6   you're such a crummy historian that I can't date
7   your symptom onset after exposure to arsine,
8   because you said you might have had them earlier,
9   but you don't remember much about them.  I can't
10  get a good history about whether they were
11  triggered by the exposure or they got worse.
12  Q   What if I changed the facts and said the
13  headaches started after the exposure?
14  A   Are you a better historian than your
15  role-play?
16  Q   We're changing that a little bit.  We're
17  changing the script a little bit.
18      My headaches started after the incident,
19  couple days after the incident.  Never particularly
20  noticed headaches before.
21  A   If I thought you were a good historian
22  and your headaches started on the day and shortly
23  after the day of exposure, I would probably relate
24  your headaches to exposure to arsine or to the
25  chemical in question.

Page 219

1   Q   Now, would you be able to say that with a
2   reasonable degree of medical certainty, or are you
3   saying that that's something more than possible?
4   A   I would say it to a degree of reasonable
5   medical certainty.
6   Q   Do you know of any peer-reviewed
7   literature that would support you on that?
8   A   Two papers:  One is published a long time
9   ago by Neal Raskin, who happens to be a professor
10  of neurology here, probably first paper published
11  on headaches.  Dr. Raskin specializes in
12  headaches, and he sees -- he was seeing a number
13  of patients in his practice with headaches that
14  were triggered bychemical exposure.  He wrote a
15  paper about it.
16      Then we had one of our --
17  Q   What is the name of that paper?
18  A   I can't give you --
19  Q   Is it one of your cited references?
20  A   It is not, but it's Raskin, R-a-s-k-i-n,
21  Neal.  It's probably 15 years ago.
22  Q   What's the other paper?
23  A   The other paper was published by one of
24  our former occupational medicine trainees.  He
25  was a physician, and he published it with Charles

Page 220

1   Becker, who is a physician toxicologist who used
2   to be here as well.  He's now in Colorado.  So you
3   could probably get it if you did a search on
4   Charles Becker.  I can't remember the first
5   author, what his name was, but he updated
6   essentially, you know, the literature on headaches
7   that were triggered by chemical exposure.
8       So I'm aware of those two references.  I
9   probably have another 20 to 30 patients that I've
10  evaluated and treated in my practice over the last
11  20 years with headaches that were triggered by
12  one-time exposures that were persistent.
13  Q   What about the numbness I've complained
14  of?
15  A   Well, I need to ask you a bunch of
16  questions about your numbness.
17  Q   Same time.  Started a few months after
18  the -- I can't remember, a few weeks, few months
19  after the event.
20  A   Can you pin it down for me?
21  Q   Between a few weeks and few months
22  after the event.
23  A   Is it constant?
24  Q   I think so.
25  A   Where do you feel numb?



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006
TULSA ————————918-583-8600
FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 221

1    Q   In my extremities.
2    A   Which part?
3    Q   Lower extremities.
4    A   Which part of your lower extremities?
5    Can you show me.
6    Q   Kind of down there.
7    A   Can you point to what feels numb.
8    Q   Yeah, this doesn't feel right. Feels numb.
9    A   You're playing an extremely dumb
10   patient.
11   Q   Well, I have --
12   A   I've never had anybody as dumb as you.
13   I'm sorry. I have to say everybody has always
14   been able to show me what feels numb.
15   Q   Have you read the depositions that were
16   taken in this case?
17   A   I haven't, but, you know, they're
18   answeringquestions from attorneys, not from
19   doctors. I can always get somebody to say what
20   part feels numb. They'll point to their feet. They
21   won't point to someplace below the table.
22   Q   You know where we're headed.
23   Here's my point: A year and a half or so
24   after an event when you have no lab or data
25   whatsoever and we know what the criteria are for

Page 222

1    diagnosing arsine exposure and you're coming in a
2    year and a half later with a possibility of exposure
3    and you have subjective complaints, that's a
4    pretty big crack in the wall to Spackle over, isn't
5    it, to make that leap?
6    MR. WARD: Object to the form of the
7    question.
8    Q   (BY MR. TUCKER) It's an Evel
9    Knievel-type jump, isn't it?
10   MR. WARD: Object to the form of the
11   question.
12   THE WITNESS: I think there are two
13   central questions, and I think you've moved ahead
14   to the second one. Most of your parlance of
15   questions were around was there exposure to
16   arsine, and is the plasma free hemoglobin
17   sufficient evidence to show that there was
18   exposure and absorption into the body of
19   individuals on July 11th, 2001 of arsine.
20   I have concluded that the evidence
21   answers in the affirmative to that.
22   The second question is assuming that
23   that is the case, what are the chronic health
24   effects. And I think your next line of questioning
25   is, you know, what if somebody has a poor history,

Page 223

1    has poorly described symptoms of numbness in
2    their legs.
3    Q   (BY MR. TUCKER) I'm being more
4    specific than that. I'm saying we got -- you've
5    identified for me what you've identified, that
6    laboratory values demonstrate what you have
7    described as exposure to arsine.
8    Now, what I'm asking is when you have
9    somebody that has no evidence of exposure to
10   arsine, they were just in the area where they
11   might have had an opportunity for exposure to
12   arsine, and a year later or more they come to you
13   with subjective complaints, are you willing as a
14   physician to say based on that kind of
15   question-and-answer session you went through
16   with me, yes, in my legal -- or my medical opinion,
17   I would tell anybody and I'd stake my reputation
18   on it that this man has headaches and numbness
19   that is caused by his having been at the Port of
20   Catoosa at the time that arsine was released?
21   MR. WARD: Object. The standard is to a
22   reasonable degree of medical certainty, not
23   staking one's reputation.
24   THE WITNESS: I would have to evaluate
25   several different lines of evidence. I mean, this

Page 224

1    really gets to how I make an opinion about
2    causation in an individual case. I do this ten
3    times a week in my practice. I've done it
4    thousands of times. This is the reason people
5    come to me as a specialist in occupational
6    medicine at UC San Francisco.
7    I typically don't have exposure data.
8    They got exposed to something. Nobody was
9    measuring it in the air. So how do I make that
10   determination? I could go through it with you.
11   Do you want to do it now, or do you want to take a
12   lunch break?
13   Q   (BY MR. TUCKER) However you want to
14   do it. You have a page --
15   A   No. I was looking at the time. It's 12
16   o'clock, and I want to know whether this is --
17   Q   Let's go through and finish it up, and
18   we'll get on to something else after lunch.
19   A   Okay. I take a history, as I was starting
20   to go through with you, which includes details
21   about the exposure, what do we know about the
22   chemical that was used, how was it released into
23   the air, what was somebody doing at the time of
24   exposure, something about the ventilation, if
25   they're directly workingwith a chemical that

30 (Pages 221 to 224)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

---

Page 225

1   applies, probably in this case it's not pertinent.
2   Were there -- was there a respirator or mask or
3   some other protective device that was used that
4   might have decreased the exposure, were they
5   inside or outside, what was the time of the
6   release, and when was their -- when did their
7   symptoms first start.
8        Because I need to understand, depending
9   on the chemical, the toxicology, the intrinsic
10  toxicology of the chemical. So if somebody tells
11  me there was an arsine leak, I immediately know
12  that that's an acute toxin. It causes immediate
13  toxicity within minutes or hours, but it's not
14  going to be a delayed kind of thing. It's not going
15  to be I'm standing here and three weeks later I
16  was nauseated and had a headache and I think it
17  was from exposure three weeks ago. We know
18  arsine causes immediate symptoms.
19       So I'm going to ask, I'm going to focus in
20  on the day that were working there.
21       I want to know something about your
22  previous medical history, because I want to know
23  if there's been a change of your symptoms. I want
24  to know about other medical conditions,
25  medications you take, alcohol you use.

Page 226

1        I want to know, then, did you go to
2   gettreatment. Generally, but not always, a person
3   that goes to the doctor is affected enough so that
4   they're symptomatic enough that they've sought
5   medical attention. So it's a little bit of a marker
6   for severity, although there are lots of people that
7   are pretty sick and never go to the doctor, so it
8   doesn't necessarily rule out the fact that you were
9   exposed.
10  Q   I'm going to listen. I'm just getting some
11  coffee.
12  A   Okay. I'll go through your previous
13  occupational history. I want to know what you did
14  in the past, did you have chemical exposures or
15  some other exposures, you know, that built up
16  that might affect your health now.
17       I will then do a physical examination, see
18  if there's any objective signs of health effects that
19  is often focused on your complaints or what I
20  know about the health effects of the chemical to
21  which you have been exposed.
22       I then might order tests that try to
23  confirm my suspicion. There's a whole host of
24  different kinds of tests depending on what the
25  chemical is.

Page 227

1   Q   In this instance we've been talking about
2   where someone comes in to you months later, what
3   tests would you run?
4   A   Well, for example, you were complaining
5   about numbness and tingling. I would get a nerve
6   conduction test. I would test how well your
7   nerves are working.
8   Q   An EMG?
9   A   An EMG.
10       If you had trouble concentrating, memory
11  loss, you told me ever since this exposure I've
12  never been the same, my wife tells me I'm
13  irritable, I lose my temper, I get angry, I can't
14  remember where I'm going, I can't remember what
15  I read in the paper from one day to the next or
16  from one minute to the next, I can't follow
17  instructions at work, I'm not sleeping well, I'd
18  have you go -- depending on the severity of your
19  symptoms, I might have you go to a psychologist
20  who specializes in brain injury who might be able
21  to tell me are you severely depressed or do you
22  have brain injury from this toxic exposure.
23       I might have you go to the neurologist if
24  you were telling me that you had a tremor or you
25  were losing your balance. I might want to rule out

Page 228

1   some other nervous condition or neurological
2   disorder and get a second opinion from a
3   specialist that might -- specialist, or I might
4   order an MRI, a brain scan of some type.
5        I'd then get your medical records to see
6   whatkind of treatment you had. Not everybody can
7   remember everything for which they had
8   treatment. I'll fill in the gaps by looking at the
9   medical records. And that helps me evaluate the
10  credibility, which is also an important
11  consideration.
12       In my field if somebody has exposure and
13  they're involved in litigation, I always consider
14  whether or not somebody has secondary gain,
15  whether they may be exaggerating their
16  complaints.
17  Q   With respect to the 13 people that you've
18  given opinions about in this case, you have not
19  met any of them; is that correct?
20  A   I have not.
21  Q   And you have not read their depositions?
22  A   I have not.
23  Q   So are you making any effort to judge
24  their credibility?
25  A   I have not. I'm assuming at this point

31 (Pages 225 to 228)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ———————————918-583-8600

FAYETTEVILLE ——————479-587-1006

Page 229

1  that they're credible. If that's an issue, easy
2  enough for me to talk to them on the phone. I
3  have not raised that as an issue.
4      Q  Go ahead.
5      A  I'll then obtain any exposure data that's
6  available. It's important for me to know anything
7  that is known. Did anybody do any measurements
8  in theair? I typically don't have those,
9  particularly if there's an accident or, you know,
10  accidental exposure nobody was around to
11  measure at the time.
12      This is where I will sometimes ask either
13  the insurance company or the employer to -- and
14  in some cases I'll ask my colleagues if they will
15  kindly do a quantitative dose reconstruction, a
16  colleague of mine who's a specialist in doing this
17  at UC Berkeley. I'll sometimes ask him if he has
18  the time to do this for me. He'll come up with a
19  range of exposures, and that helps me.
20      Q  You didn't do that here?
21      A  I did not do that here.
22      I will then review the medical literature
23  or rely on my knowledge of the medical literature.
24  I generally keep up to date, but, of course, there's
25  new articles coming out all the time. So I can't

Page 230

1  admit to knowing everything that's published. So
2  I'll do a Medline or a PubMed search particularly
3  looking at health effects.
4      I will look at unpublished what we would
5  call authoritative publications but they're not in
6  the peer-reviewed literature, they don't turn up on
7  Medline searches. They're documents we looked at
8  from NIOSH or the EPA or OSHA, or the Institute
9  ofMedicine, the National Academy of Sciences and
10  so on.
11      I will look at my textbooks to see if they
12  can supplement any information.
13      So I'll pull all those pieces together, and
14  I'll look at the exposure, the toxicology, what I
15  know about the health effects and the biological
16  mechanism, assess the credibility of the
17  individual, look at the temporal relationship
18  between their symptoms and exposure, try to
19  corroborate that with medical treatment, look for
20  any objective signs, look for any objective signs
21  on medical testing or diagnostic studies. I will
22  pull all those pieces of information together to
23  make a diagnosis and to come up with causation.
24      Q  If you have a possibility of exposure, you
25  have subjective complaints, and you have no

Page 231

1  objective findings, laboratory or by physical
2  examination contemporaneous with the event, do
3  you rule out arsine as a cause of symptoms?
4      A  I would need to ask you a few follow-up
5  questions. What do you mean by possibility of
6  exposure?
7      Q  There was a chemical -- arsine was
8  released in the area where you were, but we don't
9  know the dose or the duration.
10      A  That's a different question, dose and
11  duration.
12      Q  We know how much was released, and we
13  know how far away it was released but we don't
14  know when it came to us, if it came to us, how
15  much it was or how long it was there.
16      A  Again, it's that word possibility of
17  exposure. I make an assessment based on the
18  plausibility using the information that we have.
19  You know, if somebody was 50 miles away from the
20  Port of Catoosa --
21      Q  Look at the map.
22      A  -- they weren't exposed.
23      Q  Look at your map. Can you put your
24  finger on where Solkatronics is.
25      A  39.

Page 232

1      Q  Number 39.
2      So whatever size circle you draw, pick
3  number 5, pick number 56, if arsine is released at
4  number 39, common sense tells us that arsine has
5  to go someplace, so there's a possibility of
6  exposure at number 5 and number 56, isn't there?
7      A  Yes.
8      Q  But we don't know the dose at number 5
9  or 56, or the duration, right?
10      A  Correct. We don't know the exact
11  duration. We don't know the dose. We know that,
12  what was it, 58 pounds was released out of the
13  cylinder. We know the approximate time.
14      Q  Do you know how far it is --
15      A  Let me put it to you this way: If
16  somebody told me that they were in the emergency
17  room the day before, it's not due to arsine,
18  obviously, but if somebody is in the emergency
19  room that afternoon and they have compatible
20  symptoms of arsine exposure and a bunch of them
21  have an elevated plasma hemoglobin and they're at
22  Air Exchangers, which looks to me pretty darn
23  close to Solkatronics --
24      Q  Do you know how close that is?
25      A  I don't have a scale here, but it looks to

32 (Pages 229 to 232)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Case 4:04-cv-00287-CVE-PJC   Document 89-2 Filed in USDC ND/OK on 11/01/05   Page 12 of 64

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 233

1  me like it's within that block bounded by Keystone
2  Brand Name and Skiatook.
3      Q   What did you say?
4      A   I don't know.  I was trying to read that
5  road there.
6      Q   Where?
7      A   To the east of Solkatronics.
8      Q   "Skiatook"?
9      A   "Skiatook."  Thank you.  It looked like an
10  "L" there.
11     Q   I forgot my original question.
12         What was my original question?
13         (Record read by the reporter as follows:
14         "Q.  So whatever size circle you draw,
15         pick number 5, pick number 56, if arsine
16         is released at number 39, common sense
17         tells us that arsine has to go someplace,
18         so there's a possibility of exposure at
19         number 5 and number 56, isn't there?")
20     Q   (BY MR. TUCKER)  Going back to the
21  original question, if you have a possibility of
22  exposure, as we've talked about here, looking at
23  your map, which is Exhibit 8, and if you have
24  symptoms that are compatible with someone who
25  was exposed to arsine, that is to say you're

Page 234

1  complaining of headache, nausea, fatigue, but you
2  have -- but you have no laboratory values of any
3  kind that demonstrate any of the exposures to
4  arsine, and you have no clinical findings on
5  examination that demonstrate exposure to arsine,
6  do you then rule out arsine as a cause of those
7  self-reported symptoms?
8      A   I would have to go case by case.  I might,
9  and I might not.  Because I have to go through the
10  detailed history that I just went through with you.
11         What I would say was that your symptoms
12  areconsistent with the health effects of arsine gas
13  exposure, but I'd need to know all the details,
14  what were you doing that day, and exactly when
15  did your symptoms start, and what has happened
16  to them ever since, and did you ever have them
17  before.  And you were playing your role-playing
18  earlier like a poor historian.  And so if you were
19  truly as poor a historian as you purport to be, I
20  would probably say, not sure.
21     Q   When you were calling me a poor
22  historian, about all you could say is, based on the
23  information I gave you, my symptoms would be
24  consistent with having had an arsine exposure,
25  but you couldn't say whether that was the cause

Page 235

1  of those symptoms or not?
2      A   I couldn't say, if you were as bad a
3  historian as you played, whether it was caused by.
4  Because obviously you couldn't tell me much
5  about what came before, you can't tell me really
6  very much about what came after.  You never went
7  to the doctor.  You were being pretty evasive and
8  vague.
9      Q   Is there peer-reviewed literature that
10  would support making a diagnosis of injury caused
11  by exposure to arsine without any clinical findings
12  or without any laboratory findings that support
13  that diagnosis?
14     A   I didn't understand your question.  Could
15  you rephrase that.
16         MR. TUCKER:  Could you repeat it, and if
17  you still don't understand it, I'll try to rephrase
18  it.
19         (Record read by the reporter as follows:
20         "Q.  Is there peer-reviewed literature
21         that would support making a diagnosis of
22         injury caused by exposure to arsine
23         without any clinical findings or without
24         any laboratory findings that support that
25         diagnosis?")

Page 236

1         THE WITNESS:  I'm not sure as I sit here
2  today.  I would have to go and double-check the
3  literature to be absolutely sure that there's
4  nothing stated in the peer-reviewed literature to
5  that effect.
6      Q   (BY MR. TUCKER)  If you find such
7  peer-reviewed literature, would you supply a copy
8  of it to Counsel to supply to me?
9      A   Yes.
10         MR. TUCKER:  Would you like to have
11  lunch?
12         THE WITNESS:  Yes.
13         MR. TUCKER:  Let's have lunch.
14         (Lunch recess taken at 12:20 p.m.)
15         (Deposition resumed at 1:25 P.M.)
16     Q   (BY MR. TUCKER)  I'd like to ask you to
17  look at Exhibit 8 if you would.  Tell me what that
18  is and how it came to be prepared.
19     A   This was sent to me by plaintiff counsel,
20  and I don't know in what manner they prepared it.
21     Q   What does it purport to show?
22     A   It's a document entitled "Ingram versus
23  Air Products, Clients with Hematuria (Blood in
24  Urine)." There's 16 individuals listed by name,
25  and then laboratory results, and location or



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 237

1   employer.
2       Q   Laboratory results that are shown, can
3   you tell me what those are?
4       A   These look like the results of urine
5   dipsticks.
6       Q   Is there any further explanation of that?
7       A   Not on this chart, but by the
8   nomenclature, it ranges from a trace to 4 plus.
9   That would be the usual way that they would read
10  off a urine dip.
11      Q   The information that is not contained on
12  that chart is whether there was any further
13  evaluationunder the microscope, which you
14  described to us in some detail earlier, correct?
15      A   Correct. This would either be due to
16  hemoglobin in the urine, or it could be in the red
17  blood cells.
18      Q   This is just a preliminary test?
19      A   Well, it's kind of a screening test.
20      Q   A screening test?
21      A   Yeah, that's correct.
22      Q   From that all you can tell is that you
23  need to look further to determine whether you
24  have hemoglobinuria, right?
25      A   Yes.

Page 238

1       Q   What laboratory procedure is used to
2   measure plasma free hemoglobin?
3       A   I don't know. You mean -- by laboratory
4   you mean what is the exact method used in the
5   analytical lab?
6       Q   You told me how you determine whether
7   you have hematuria or hemoglobinuria, right?
8       A   Correct.
9       Q   How do we determine what your plasma
10  free hemoglobin level is?
11      A   I don't know how the labs do it.
12      Q   Do you know whether it's a chemical test,
13  ora mechanical test, or a visual test?
14      A   I simply don't know. I don't want to
15  answer. As I sit here today, I don't know. I could
16  find out for you by looking at a lab manual. We
17  have it, you know, on-line here. I could look up
18  the answer for you by going to our clinical lab site
19  here.
20      Q   What is lipidemia?
21      A   It's an elevated cholesterol or
22  triglycerides.
23      Q   What does it actually mean, lipidemia?
24  Elevated means -- where is it elevated?
25      A   It's elevated in the serum.

Page 239

1       Q   And the serum is contained?
2       A   It's a component of the blood. Blood is
3   composed of the blood components, red/white
4   cells, and platelets, and then you have the serum
5   component.
6       Q   Does lipidemia interfere with the
7   accuracy of a plasma free hemoglobin analysis?
8       A   I don't know. I think in one of the
9   defense expert reports there's an allusion where
10  there's a mention that that is in fact the case, but
11  I haven't verified that.
12      Q   Was there a statement that the presence
13  of -- what is the difference between lipidemia and
14  hyperlipidemia?
15      A   It's the same. I mean, lipidemia is
16  elevation of one of the blood lipids, which is
17  cholesterol.
18      Q   Basically, fat in blood, isn't it?
19      A   It's an elevated fat in blood, that's
20  correct.
21      Q   And does that interfere with the way light
22  would reflect or pass through blood?
23      A   Yes.
24      Q   Did you read that the -- I realize you
25  didn't look it up yourself, but did you read in one

Page 240

1   of the experts that were presented by Solkatronics
2   that the determination of plasma free hemoglobin
3   is a light-refraction test?
4       A   I don't recall.
5       Q   It's a light-sensitive test?
6       A   I don't recall reading that, but I'll take
7   you at your word, that that's what one of the
8   defense experts said.
9       Q   Did you make any effort to determine
10  whether that was correct or not?
11      A   No.
12      Q   Were there any particular plaintiffs for
13  whom -- if it does affect the results of a plasma
14  free hemoglobin test, were there any particular of
15  these 13claimants who had hyperlipidemia or
16  lipidemia?
17      A   I didn't see any results of their blood
18  lipids. I think I commented in my second report
19  that there's no evidence that any of the 13
20  plaintiffs had hyperlipidemia. So if we want to
21  attribute their elevated plasma hemoglobin --
22  elevated free hemoglobins to hyperlipidemia, we
23  would have to have evidence that they had
24  hyperlipidemia that interfered with the result of
25  the plasma free hemoglobin testing.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS            ROBERT HARRISON                    June 22, 2005

Page 241

1    Q   Well --
2    A   I didn't see that.
3    Q   Is hyperlipidemia reflected by your LDH
4    level?
5    A   I'm not sure if you meant LDH or LDL.
6    LDH is one component of your cholesterol. Your
7    LDH is another type of protein that comes from
8    liver and bone, so that wouldn't have anything to
9    do with your lipids.
10   Q   So you did not determine in looking at
11   the records whether a particular person did or did
12   not have hyperlipidemia?
13   A   I think it's speculative at this point
14   without measuring their blood lipids. We just
15   simply don't know. So I think one could not
16   conclude that the elevated plasma hemoglobin was
17   due to interferencedue to blood lipids unless we
18   had a measurement of that.
19   Q   Were any of the 13 people that are on
20   your list not present at the Port of Catoosa when
21   the event occurred?
22   A   Not to my knowledge -- well, let me take
23   that back. Let me verify that, because there . . .
24       (Witness examines documents.)
25       I want to be sure I get that right, because

Page 242

1    there were different people exposed at -- in
2    different areas. No, not to my knowledge. My
3    answer would stand.
4    Q   The medical record summary that you
5    prepared which we previously talked about which
6    was attached to your report, this document?
7    A   Yes.
8    Q   You have a copy of that, don't you?
9    A   I do. I can't locate it right at this
10   instant.
11   Q   Well, I'm not going to ask you about
12   details of it right now. I just want to ask you
13   generally did you prepare this?
14   A   Yes.
15   Q   And from what did you prepare it?
16   A   From their medical records. As I was
17   goingthrough each of their medical records I
18   prepared this summary.
19   Q   Would you see if we can find Exhibit 9.
20   These are yours.
21       THE WITNESS: Are those yours or mine?
22       MS. SMITH: Those are mine.
23       THE WITNESS: Oh, those are yours.
24   Q   (BY MR. TUCKER) How did you review
25   these 13 claimants' medical records?

Page 243

1    A   Logistically? You mean technically how
2    did I review them?
3    Q   Let me rephrase the question.
4        Did you read all of them?
5    A   Oh, yes, I did.
6    Q   Did you actually read them, or did you
7    skim them?
8    A   I read them.
9    Q   Did you look at the laboratory results
10   themselves as reported by the laboratory, or did
11   you look at somebody else's report of those or
12   summary of those?
13   A   I actually found the laboratory results,
14   you know, in the medical records.
15   Q   So when you identified, for example,
16   thegentleman with 111 percent, you took that from
17   the laboratory record itself that was provided to
18   you by plaintiffs' counsel?
19   A   Correct.
20   Q   I want to hand you a letter that was
21   dated February 9, 2005 which was directed to me
22   from plaintiffs' counsel's office. Not from Mr.
23   Ward, who's with you, but from a woman in that
24   office, a Ms. Steinberg, in which she is listing the
25   things that she describes as having been the

Page 244

1    information provided to our experts.
2        Would you look at that list that's set
3    forth in that letter and tell me if there's anything
4    in there that you don't recognize.
5    A   (Witness examines document.)
6        This is it. I recognize all those.
7    Q   I'd like you to look at your file and pull
8    out number 11 for me, please.
9    A   I don't have it -- I'm not sure I know what
10   that is or I have it with me here. I'll look, but
11   that's -- I have a vague recollection.
12   Q   I thought we had your whole file with us
13   here today.
14   A   I think we do, but I don't think I have the
15   client summaries here.
16   Q   What do they look like?
17   A   I don't know. I mean, there must be some
18   kind of summary of --
19       MR. WARD: What number?
20       THE WITNESS: Number 11.
21       Must have summary information about the
22   clients.
23   Q   (BY MR. TUCKER) Well, you see, my
24   problem is that I asked you if you recognized
25   those things and you said yes, I recognize them.

35 (Pages 241 to 244)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————— 405-272-1006
TULSA ————————————— 918-583-8600
FAYETTEVILLE ———————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

---

Page 245

1   And that's why I'd like to have you look in the file
2   and see if you find them, because we looked and
3   can't match up anything that fit that description.
4      A   I'll look again.
5      Q   And you've represented to us, of course,
6   that this is your file.
7      A   (Witness examines documents.)
8         I do apologize.  It looks like I don't have
9   that, or I don't recognize it.  I thought I did, but
10  apparently I don't.
11     Q   Let me show you three pages that are
12  identified as arsine exposure summary.
13        Have you seen that before?
14     A   I think so.
15     Q   Where would those things be?
16     A   I don't know.  I will look in my office or
17  at home.
18     Q   Is there another file that we -- that you
19  haven't presented to us?
20     A   No.
21     Q   That document that's in your hand that
22  you can't now find, is that something that you
23  have any knowledge of how it was prepared?
24     A   No.  It looks like -- I mean, I could
25  speculate, but I don't have any actual knowledge.

---

Page 246

1      Q   Do you know with certainty you've ever
2   even seen it before?
3      A   I think I've seen something like that.
4   And I do apologize if it's gotten misplaced or it's
5   somewhere else in my office.  If you saw my office,
6   you'd probably understand or appreciate --
7      Q   Will you determine whether you have
8   those things; and if so, make copies of them and
9   furnish them to Counsel to give to us?
10     A   Yes.
11     Q   While you're doing that, would you also
12  either get me a copy of or the correct citation
13  sufficient for me to get the article by Dr. Raskin
14  and the article by Dr. Becker?
15     A   Yes.
16     Q   I also would like to hand you your draft
17  letter dated April 30, 2005 addressed to Mr. Fred
18  Stoops, a different attorney for the plaintiffs.
19     A   Okay.
20     Q   And as we looked through your file, I was
21  unable to locate the two affidavits you refer to
22  there, or declarations.  Would you see if you could
23  find those, please.
24     A   (Witness examines documents.)
25        I can't find them either.  They are a page

---

Page 247

1   and a half each, because I looked at them, oh, in
2   the day or two before my deposition started.  So I
3   have a recollection of what they look like, but I
4   don't know where they are.
5      Q   Also in that same paragraph would you
6   notice the reference made to research articles, in
7   that same first paragraph.  I do not find any
8   research articles that were not contained in the
9   original packet.
10        Do you know what research articles that
11  refers to?
12     A   No.  I'm trying to remember whether those
13  research articles -- you know, I think -- I'm pretty
14  sure those research articles were redundancies
15  that were in these binders that were sent to me
16  originally.And I didn't keep them because they
17  were redundant.  I don't think there was anything
18  else.
19     Q   Well, if there was something else, that is
20  also missing; is that correct?
21     A   Yes.
22     Q   There also --
23     A   Missing from the table here.  Whether it's
24  permanently missing is another question.
25     Q   There are also references in that letter to

---

Page 248

1   e-mails received from plaintiffs' counsel.
2         Do you notice that?
3      A   Yeah.  Those were two e-mails, March
4   29th and April 11th.
5      Q   We did not find those in your file either.
6      A   Those I can print out for you.  I don't
7   have those printed out in my file.  That I could
8   probably retrieve.
9      Q   If you have the e-mails, since you got the
10  article as a PDF file, wouldn't the articles be
11  there too?  You've either got the e-mail with the
12  attachment or you don't.
13     A   Depends if the PDF attachment still
14  hangs on to my reply to the e-mail, because I
15  would have deleted the incoming e-mail but
16  probably acknowledged that I received it.  So what
17  I'll do is I'll look tosee whether those attachments
18  are still there.
19     Q   Were there other e-mails back and forth
20  occasionally during the case?
21     A   Probably.
22     Q   Would you look for those too.  I don't find
23  any of those in your file.
24     A   Sure.
25     Q   Doctor, can I ask you if we could just get

---

36 (Pages 245 to 248)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————————479-587-1006

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 249

1  a separate piece of paper —
2     A   Because this is going to be marked?
3     Q   It's already an exhibit.
4     A   Okay.
5     Q   I'm sorry.
6         Are you done?
7     A   Yeah.
8     Q   We were talking about your chart that
9  you prepared, the summary, medical records
10 summary.
11    A   (Witness nods head.)
12    Q   And had you reviewed Dr. Hastings'
13 report before you did that?
14    A   I reviewed all the records in the order on
15 the chart, including their medical file that was on
16 the CD-ROM, where I think in two cases there were
17 some hard copies of the medical records, and then
18 Dr. Hastings' report. So all that was done for
19 each of the plaintiffs.
20    Q   Did you take anything in your chart from
21 Dr. Hastings' report?
22    A   His diagnosis that I listed in the table.
23    Q   Anything else?
24    A   No -- well, when you say did I take
25 anything, clarify what you mean.

Page 250

1     Q   Did you transfer any material from his
2  report to your chart as opposed to finding that
3  material yourself in the individual's medical
4  record, not counting Dr. Hastings' report?
5     A   I'm sorry. I don't understand your
6  question or the intent of your question.
7     Q   Well, Dr. Hastings' report contained, for
8  example, statements about data that was obtained
9  from individual claimants when they presented at
10 the hospital following the event.
11        Did you take material from his report
12 that discussed that, or did you go to the source
13 itself to get that?
14    A   Now I understand, thank you.
15        No. I went to the source.
16    Q   In talking about Dr. Gad's report earlier
17 today, you used the phrase pretty consistently in
18 looking at those individuals that you found that
19 you agreed with Dr. Gad that the symptoms they
20 had were consistent with an exposure to arsine.
21        Do you recall that?
22    A   Yes.
23    Q   Is it your testimony that the symptoms
24 that -- of which they complain were caused by an
25 exposure to arsine gas on July 11th, 2001?

Page 251

1     A   Yes.
2     Q   Not consistent with, but caused by?
3     A   Yes.
4     Q   Would you look at your materials about
5  Josh Hinton, whatever you would like to look at to
6  talk about Josh Hinton.
7     A   All I have to look at without putting the
8  CD-ROM up on the computer would be my summary
9  table. I did not print out the medical records for
10 each of these to look at in hard copy.
11    Q   Would you need to look at the whole
12 medical record necessarily to give an opinion
13 about Josh Hinton?
14    A   It depends what you ask me.
15    Q   Let me ask this: What did you rely on to
16 form your opinion that Josh Hinton has acute
17 arsine intoxication?
18    A   The symptoms reported on July 11th,
19 2001, elevated plasma free hemoglobin.
20    Q   What is the objective data you have to
21 support that opinion?
22    A   Plasma hemoglobin slightly increased,
23 10.5 percent, upper limit of lab normal 10.4
24 percent. Symptoms reported of headache, fatigue,
25 shortness of breath and chest tightness. Those

Page 252

1  symptoms are consistent with arsine exposure.
2     Q   So the objective finding that you have is
3  the one-tenth of one percent elevation in plasma
4  free hemoglobin; is that correct?
5     A   Yes.
6     Q   Was the medical facility that took the
7  blood level from Josh Hinton concerned enough to
8  take a follow-up blood level the next day, next
9  week, or is that the only blood level you had?
10    A   It's the only blood level we have for
11 plasma free hemoglobin.
12    Q   If a physician is concerned about
13 exposure to something such as arsine and they
14 find a one-tenth of one percent increase, that is to
15 say that the report is 105 versus 104, if that were
16 significant, would you not expect a retest?
17        MR. WARD: Object to the form.
18        THE WITNESS: If the elevation is mild
19 and the doctor thinks that the person may be
20 symptomatic but is not severe, a repeat -- the
21 person would be observed in the emergency
22 department or in the clinic, wherever they showed
23 up. And if it appeared to the doctor that the
24 person wasn't getting worse, they didn't have any
25 more severe signs or symptoms, that person would

37 (Pages 249 to 252)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                          June 22, 2005

Page 253

1  be discharged, and a repeat plasma free
2  hemoglobin wouldn't be done.
3      Q   (BY MR. TUCKER) If, for example, a
4  patient such as Josh Hinton were to have reported
5  to the doctor the symptoms that you've
6  described -- one of which was I think headache,
7  wasn't it?
8      A   Yes.
9      Q   Just generally feeling lousy, not any more
10  descriptive than that.
11      A   Well, that's a little different than a
12  headache.
13      Q   What else did he describe, you felt?
14      A   Fatigue, shortness of breath, chest
15  tightness.
16      Q   If that patient had reported that his -- he
17  had actually awakened with a headache that
18  morning, would that have any effect on your
19  evaluation of that patient?
20      A   Well, if he woke up that morning with the
21  headache, that would be before the arsine release.
22      Q   Yes.
23      A   That might affect my evaluation.  I'd want
24  to know how long that headache lasted, did the
25  headache he reported after the arsine release at

Page 254

1  Solkatronics differ from the headache that he
2  woke up with, was it different in character or
3  different in severity, what happened to the
4  headache.
5      Q   If all those answers were that he woke up
6  with a headache and he had a headache, would
7  that tend to diminish your confidence in finding
8  that this man was suffering from an
9  arsine-exposure-related injury?
10      A   When you say he woke up with a headache
11  and had a headache, you're posing a hypothetical
12  that he had no change in the quality, the location,
13  the severity or the frequency of his headache?
14      Q   Reported to be the same.
15      A   Well, I would need to know the answer to
16  those four characteristics, because they're all
17  important medically.
18      Q   If it was reported in the records to be the
19  same --
20      A   Well, I want to know what you mean by
21  the same.  I'd have to know -- just give me
22  thehypothetical.
23      Q   Never mind.
24      A   Severity, quality, frequency, location.
25      Q   Let's add something else.

Page 255

1      Do you know where Josh Hinton worked?
2  Is that on one of your maps?
3      A   Yes.
4      Okay.  One of these maps has him located
5  between Solkatronics and Air Exchangers.  To the
6  northwest of Solkatronics.
7      Q   Do you know whether he was working,
8  whether his job there was indoors or outdoors?
9      A   I don't know.
10      Q   Do you know where Josh Hinton was when
11  the release occurred, when the accident occurred?
12      A   I'm assuming that he was -- you mean at
13  the exact time the release occurred?
14      I know on July 11th, 2001 he was
15  located -- on one of the maps it's between Air
16  Exchangers and Solkatronics, on another map it
17  looks like he's at Air Exchangers, but I don't know
18  his exact location, indoors, outdoors or precisely
19  over the course of that day.
20      Q   Now, you didn't read Mr. Hinton's
21  deposition; is that correct?
22      A   Correct.
23      Q   If the testimony in this case is -- I ask
24  you to assume that Josh Hinton's job was he was
25  helping his father lay carpet in the offices of Air

Page 256

1  Exchangers, which is item number 5 on the map,
2  and that he had awakened feeling ill on the
3  morning of July 11th and had gone to work, as had
4  his father awakened feeling ill on July 11th, both
5  of them, and if they had both left the Port of
6  Catoosa before the accident occurred, would that
7  have any --
8      MR. WARD:  Object.  That's totally
9  inconsistent with the affidavit he and his father
10  gave; and it assumes facts not even close to
11  correct in this case.
12      Q   (BY MR. TUCKER)  Assuming that to be
13  correct, would that influence your thought?
14      A   Yes.
15      Q   And how would it influence it?
16      A   Well, if he wasn't anywhere close to
17  Solkatronics on the day of the arsine release, then
18  he couldn't have been exposed to arsine.
19      Q   Can exposure to carpet adhesive cause
20  illness?
21      A   It may.  It can cause illness.
22      Q   Can exposure to carpet adhesive cause
23  CNSproblems?
24      A   Central nervous system problems?
25      Q   Yes.

38 (Pages 253 to 256)



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY  ———————— 405-272-1006
TULSA  ———————————— 918-583-8600
FAYETTEVILLE  ———————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 257

1    A   Can cause headache or dizziness.
2    Q   In fact, you've testified to that before in
3  other cases, haven't you?
4    A   Correct. Carpet adhesive contains
5  solvents that can become airborne and cause
6  central nervous system symptoms.
7    Q   Did you make a comparison between the
8  symptoms reported by these 13 plaintiffs to their
9  own family doctors as to what they did or didn't
10  have wrong with them as opposed to what they told
11  Dr. Hastings, the lawsuit doctor?
12    A   For many of them I had the emergency
13  room records, and I had other records after the
14  July 11th, 2001 arsine release. So to that extent
15  where those records were available for me, yes.
16    Q   Were the descriptions of how they felt
17  and their symptoms different when they talked to
18  Dr. Hastings as opposed to when they talked to
19  their own treating doctors?
20    A   Not that I could see. It's one of the
21  things that I looked at specifically, recognizing
22  that Dr. Hastings examines the person once.
23  There is, youknow, an issue because these folks
24  are in litigation, will they be exaggerating or
25  magnifying or changing their history of symptoms.

Page 258

1  So it's important to look back at the medical
2  records for precisely the reason that you ask.
3    Q   And did you do that?
4    A   I did.
5    Q   And --
6    A   In fact, I looked at the medical records,
7  and then I looked at Dr. Hastings' report.
8    Q   Did you find any inconsistency in what
9  these folks told Dr. Hastings or what he reported
10  they told him and what they told their own
11  doctors?
12    A   No. I thought they were pretty
13  consistent. I didn't see much in the way of
14  amplification or exaggeration, at least as reflected
15  in Dr. Hastings' report.
16    Q   In Josh Hinton's medical record did you
17  determine that historically he had had a trace of
18  blood in his urine from time to time?
19    A   (Witness examines document.)
20      Yes. I have a trace blood on January
21  13th, 2003, which, of course, is about a year and
22  a half later, but I do believe this has been a
23  problem off and on over the years.
24    Q   Do you know what his avocation is, what
25  his hobby is, or what he does at school other than

Page 259

1  be a student?
2    A   No.
3    Q   Did you know that he was a wrestling
4  star?
5    A   No.
6    Q   Is wrestling the kind of sport, together
7  with the kind of training you do for wrestling, that
8  can periodically cause you to have blood in your
9  urine?
10    A   Yes.
11    Q   Did you know he was a football star?
12    A   No.
13    Q   Is football one of those sports that
14  occasionally, along with exercise and training, you
15  could have blood in your urine?
16    A   It's possible. I mean, it depends on the
17  degree of exertion and physical contact, when that
18  trace blood is picked up in relationship to the
19  physical activity. But, in general, what you're
20  saying is that strenuous physical activity can
21  cause some small amount of blood in the urine,
22  and that's correct.
23    Q   Do you believe that Mr. Hinton has any
24  continuing injury as a result of what you've
25  described as exposure to arsine?

Page 260

1    A   (Witness examines document.)
2      I don't have enough information to offer
3  an opinion.
4    Q   Is one of Josh Hinton's symptoms memory
5  loss?
6    A   Yes.
7    Q   Would you be surprised to find that Josh
8  Hinton graduated from high school this year as a
9  straight-A student in the honors section?
10    A   I'm not surprised one way or the other.
11    Q   With respect to his physical condition
12  and the effect that something may have had on
13  him on July 11th, 2001, would it affect your
14  evaluation of his condition if you had learned that
15  he is going to attend Oklahoma State University
16  on a full football scholarship?
17    A   You're suggesting that there's something
18  important or relevant about his football
19  scholarship. I'm happy for him.
20    Q   They don't just hand those out to people
21  that are hurt, do they?
22    A   Well, the type of injury I would be
23  concerned about would be whether or not he has
24  any central nervous system damage; and that
25  would be manifested by headache or problems with

39 (Pages 257 to 260)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 261

1   his memory or trouble concentrating.  It may or
2   may not be reflected in hisgrades or his ability to
3   get a football scholarship.
4          Q   But you haven't read his deposition,
5   right?
6          A   Correct.
7          Q   Are you basing your opinion that Josh
8   Hinton suffered acute arsine intoxication on that
9   10.5 plasma hemoglobin level report?
10         A   And his symptoms at the time.
11         Q   Self-reported symptoms?
12         A   Well, symptoms are by definition reported
13  by the patient.  There's nothing wrong with
14  symptoms.  So self-report relies on the validity
15  and the reliability of the individual.
16         Q   Let's look at Charles Biddle.  Take a
17  second to refresh your memory as to Charles
18  Biddle.
19         A   Okay.  For Mr. Biddle I have some of his
20  medical records here.  The rest is on the CD-ROM.
21         Q   Correct me if I'm wrong, but isn't one
22  of -- isn't Mr. Biddle one of the people that you
23  listed in connection with Dr. Gad's report that you
24  believe you didn't have sufficient information to
25  make a diagnosis?

Page 262

1          A   (Witness examines documents.)
2          That's correct.
3          Q   No more with Mr. Biddle, then.  Let's look
4   at Javier Cardenas.
5          A   Okay.
6          Q   Can you tell me where Mr. Cardenas was
7   employed.
8          A   (Witness examines documents.)
9          Air Exchangers.
10         Q   The lab data that you selected to write
11  down on Mr. Cardenas was that his haptoglobin
12  was in the normal range; is that right?
13         A   Yes.
14         Q   So his haptoglobin was not diminished?
15         A   Correct.
16         Q   You did not write down his hemoglobin.
17         His hemoglobin, or rather, his plasma
18  free hemoglobin level, was that not reported?
19         A   I don't think it was done.
20         Q   But, as you said, you can use haptoglobin
21  to reach the same conclusion, can't you?
22         A   It's one of those tests that can be used to
23  look to see if there's intravascular hemolysis.
24         Q   And your chart shows urinalysis plus
25  blood, but it does not show hemoglobinuria, it

Page 263

1   just shows blood.
2          Are we talking about hematuria or
3   hemoglobinuria?
4          A   His urine microscopic showed blood cells.
5   Sowe're talking about hematuria in his case.
6          Q   Which is different than what you'd expect
7   to find as a consequence of red blood cell
8   destruction at the hands of arsine?
9          A   Correct.
10         Q   Do you know what Mr. Cardenas'
11  complaints were when he was admitted to the
12  hospital or when he went to the hospital?
13         (Ms. Smith exits the proceedings)
14         THE WITNESS:  Headache, fatigue,
15  weakness, shortness of breath, memory loss.
16         Q   (BY MR. TUCKER)  What were his
17  complaints when he was released?
18         A   I'd have to look at his medical records.
19         Q   You did not note a follow-up blood test on
20  Mr. Cardenas a week later.
21         Do you recall reviewing that in his
22  records?
23         A   I don't.  If he had one, perhaps I missed
24  it and didn't see it in the medical records.
25         Q   If he had one and it was -- everything was

Page 264

1   perfectly normal, would you have included it in
2   the records?
3          A   If it was one of the four types of tests for
4   the analysis of hemolysis, yes, I would have noted
5   itin my summary of the medical records, because
6   that's what I was looking for.
7          Q   So if he had a complete blood count one
8   week later, you didn't --
9          A   I might have missed it.
10         Q   You missed it?
11         MR. WARD:  He didn't say he missed it.
12  He said he might have missed it.
13         Q   (BY MR. TUCKER)  Well, if he had it and
14  if it's not there, you're telling me you would not
15  have chosen to exclude it.  Therefore, either you
16  didn't see it --
17         A   I didn't see it or it wasn't done.
18         Q   -- or it wasn't there?
19         A   Right.
20         (Ms. Smith re-enters the proceedings.)
21         Q   (BY MR. TUCKER)  Do you know whether
22  Mr. Cardenas smokes?
23         A   I do not.
24         Q   Do you know if --
25         (Proceedings interrupted.)

40 (Pages 261 to 264)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006

TULSA ————————————918-583-8600

FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 265

1     MR. TUCKER: Go ahead.
2     THE WITNESS: Would you mind if I
3  answered this?
4     MR. TUCKER: Please.
5     (Recess taken.)
6  Q   (BY MR. TUCKER) We were talking about
7  Mr. Cardenas.
8     A   (Witness nods head.)
9  Q   If you were a long-term heavy smoker,
10 can that cause CNS damage?
11    A   No.
12 Q   If you're a drinker, can that cause CNS
13 damage?
14    A   If you're a heavy drinker over a long
15 period of time, yes.
16 Q   Is that something you need to know in
17 making a differential diagnosis of someone you
18 think might have been exposed to something that
19 would cause central nervous system symptoms?
20    A   Yes. I would need to know not for the
21 acute symptoms but for long-term health effects if
22 it involved the central nervous system.
23 Q   And with Mr. Cardenas, we know that the
24 only laboratory records we have for him are that
25 he was fine, right?

Page 266

1     MR. WARD: Object to the form.
2     THE WITNESS: If by what you mean fine,
3  he had normal haptoglobin —
4  Q   (BY MR. TUCKER) There's nothing in his
5  records that indicates any exposure to arsine gas
6  as far as any clinical findings or objective
7  findings or laboratory findings.
8     A   He had symptoms consistent with known
9  acute effects of arsine.
10 Q   You've told me that.
11    But circling back around to the other side
12 of the circle, as far as the laboratory data is
13 concerned, that was which an independent person
14 would look at and make a judgment from, there's
15 nothing there that reflects any exposure to arsine,
16 is there?
17    A   Haptoglobin was normal. Laboratory data
18 is one element, one piece of the history
19 information that I use in establishing causation.
20 Q   But just answer the question I asked you,
21 Doctor. There's nothing in his laboratory data
22 that indicates any exposure to arsine; is that
23 correct?
24    A   Let me repeat that back and make sure I
25 understand. There's nothing in —

Page 267

1  Q   I'll rephrase it.
2     Is there anything in his laboratory data
3  that indicates an exposure to arsine?
4     A   The haptoglobin is normal.
5  Q   Well, I want you to answer the question I
6  asked.
7     A   Okay. Whether or not he was exposed
8  to arsine may depend on a combination of his
9  symptoms, physical exam, laboratory data, and the
10 other kinds of information that I outlined earlier.
11 In this case the laboratory data is normal.
12 Q   Would you agree that nothing in Mr.
13 Cardenas' laboratory data supports a diagnosis of
14 exposure to arsine?
15    A   Again, no, I would not agree in the way
16 that you phrased the question.
17 Q   Then tell me this: Point out to me what
18 it is in the laboratory data for Javier Cardenas
19 that supports a diagnosis of exposure to arsine.
20    A   The one test that was done, haptoglobin,
21 is normal. That basically — right. A normal
22 haptoglobin does not support the diagnosis of
23 absorption of arsine into the body, which is
24 different from exposure. It just means that there
25 wasn't sufficient arsine at the time the test was

Page 268

1  taken in his body to affect the haptoglobin level.
2  That's all it means.
3  Q   Does arsine have to be there at the time
4  the test is taken? I thought the tests were a
5  reaction to arsine you previously were exposed to.
6     A   Yeah. We just have to assume that the
7  haptoglobin was taken at the appropriate time and
8  that there wasn't sufficient enough arsine in his
9  body to affect the haptoglobin.
10 Q   I'm trying to —
11    A   That's all it means.
12 Q   I'm trying to ask a real simple question.
13 I'm not asking you to diagnose this man. I'm just
14 asking you one piece of what you described as a
15 puzzle with several parts.
16    As to the one piece as to the laboratory
17 data, does any laboratory data reported on Mr.
18 Cardenas support a diagnosis of exposure to or
19 response to arsine?
20    MR. WARD: Object. Asked and
21 answered.
22    THE WITNESS: Okay. When you say --
23 Q   (BY MR. TUCKER) It's a yes or no
24 question, Doctor.
25    MR. WARD: You want it to be, but it

41 (Pages 265 to 268)


PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 269

1   doesn't have to be.
2         THE WITNESS: I'm not able to answer it
3   yes or no.
4      Q   (BY MR. TUCKER)  Why not?
5      A   Because any laboratory data suggests
6   that any and all of the laboratory data you have
7   was even intended to diagnose arsine toxicity.
8      Q   It doesn't matter if it was.  The question
9   is does it?
10     A   Okay.  So if he had a -- if you have a
11  liver function test, which is an irrelevant test,
12  then the answer would be no, of course.
13        The only test he had was -- two tests he
14  had that were relevant was haptoglobin and a
15  urinalysis. Either of those tests indicate that he
16  had arsine in his body sufficient to cause
17  intravascular hemolysis and make that test
18  abnormal. That's as far as I can go. That's the
19  correct medical answer to your question.
20     Q   That's fine.
21        Now, you have a listing of complaints
22  here for Mr. Cardenas under symptoms, correct?
23     A   Yes.
24     Q   Were you furnished a summary of his
25  wife's deposition or his wife's deposition?

Page 270

1      A   No.
2      Q   Would you expect a person to make the
3   same complaints if they really truly had
4   symptoms, to make the same complaints someplace
5   other than to their litigation doctor?
6      A   It depends. We all vary. Some of us
7   complain vociferously to our wives, friends
8   orpartners, and some of us don't. So it really -- I
9   think in that case it really varies.
10     Q   What is RAD?
11     A   Reactive airways disease.
12     Q   That means breathing difficulties?
13     A   It's a particular kind of breathing
14  difficulty. It's similar to asthma.
15     Q   Would it surprise you that the only
16  complaint that Mr. Cardenas made at home was
17  that he had shoulder pain?
18     A   I don't know how to answer the question
19  when you say "surprised." I am not surprised.
20  It's just a fact. I would ask you to assume that
21  that's what he complained of, but I am not
22  surprised one way or the other.
23     Q   If he reported symptoms to the lawsuit
24  doctor of headache, wouldn't you have expected
25  that he would report headache at home as well?

Page 271

1         MR. WARD: Object to the form of the
2   question. Are you talking about Dr. Hastings or
3   independent medical examiner --
4         MR. TUCKER: Yes.
5         MR. WARD: -- as being the lawsuit
6   doctor?
7         MR. TUCKER: That's what he is.
8         MR. WARD: No. He's an independent
9   medicalexaminer. All right?
10        MR. TUCKER: Okay.
11        MR. WARD: So object to the form of the
12  question.
13        MR. TUCKER: Independent medical
14  lawsuit examiner.
15     Q   Wouldn't you expect he would have
16  complained of a headache at home too?
17     A   You have to repeat the question. I lost it
18  in the translation.
19     Q   Well, you've got down here symptoms for
20  Cardenas as headache, right?
21     A   Yes.
22     Q   And you got that from someplace.
23        Where did you get that?
24     A   From his medical records.
25     Q   And would it surprise you that he never

Page 272

1   complains about headache at home?
2      A   It would not surprise me. Again, people
3   vary in what they complain at home about. I look
4   at the medical records, the history offered either
5   to me or to the other doctors in the case; and
6   where it might be confirmed by family members or
7   friends or affidavits from other witnesses, that's
8   helpful, but if it's absent I don't make a great
9   deal about it.
10     Q   I understand that you have had an
11  opportunityto review the minutes of the meeting at
12  the port held shortly after the July 11th release;
13  is that correct?
14     A   That I have not?
15     Q   You have.
16     A   Can you be more specific and refresh my
17  memory as to exactly what you're referring to.
18        MS. SMITH: Exhibit 28. And I think it's
19  in here.
20        THE WITNESS: Okay.
21     Q   (BY MR. TUCKER)  28.
22     A   Oh, yes. Thank you. I have.
23     Q   Did you read that as a part of your work
24  in this case?
25     A   Yes.

42 (Pages 269 to 272)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS                ROBERT HARRISON                June 22, 2005

Page 273

1    Q    Was that a meeting that was attended by
2    people who had been at the scene on July 11th of
3    2001?
4    A    Yes.
5    Q    Was this a meeting with people who had
6    employees that they either sent to the hospital or
7    were otherwise examined and tested following the
8    accident?
9    A    (Witness examines document.)
10        Looks like there were some
11   representatives from some surrounding
12   businesses.
13   Q    Is there any notation of any employees
14   that were not back to work?
15       MR. WARD: What kind of question was
16   that? If they weren't there, how would he know?
17   How would he know whether --
18       MR. TUCKER: Let me rephrase the
19   question.
20   Q    Did anybody report whether or not their
21   employees who had been working on July 11th
22   were back to work following the incident? The
23   next day?
24       MR. WARD: I'm going to object. The
25   document speaks for itself.

Page 274

1        THE WITNESS: (Examines document.)
2        Okay. There are -- excuse me. There is
3    almost no discussion of the medical or health
4    effects and plans for follow-up treatment and/or
5    determining who is off and who is going back to
6    work.
7        The only statement in that regard is made
8    by Dan Regaby, who is a safety engineer at Air
9    Exchangers. And I'm quoting: "I would like to say
10   one thing. When it was all -- when it is all said
11   and done, we had 128 employees affected by this.
12   They are all home, healthy and planning on
13   coming back to work tomorrow." That's it.
14   Q    (BY MR. TUCKER) Would you look at
15   page 2 of the report.
16   A    Okay.
17   Q    Do you note whether or not there's any
18   statement made about whether or not anybody had
19   been treated for arsine injury?
20   A    It looks like Jaques Joseph, plant
21   manager at Solkatronics says -- and I'll quote --
22   "As you know, we had an arsine release which
23   went off site, and as a result of the incident a
24   number of our employees and neighbors went to
25   the hospital. They were admitted and examined,

Page 275

1    but fortunately no one had to be treated for arsine
2    exposure."
3    Q    Is there anything you found in any of the
4    medical records you reviewed that indicated that
5    any hospital gave any treatment for arsine
6    exposure?
7    A    Clarify what you mean by treatment. The
8    treatment for arsine exposure is blood
9    transfusion. So if that's what you mean, there
10   were no blood transfusions that were needed.
11   Q    Okay.
12       May I see that, please.
13   A    Yes.
14   Q    Have you testified in the past that
15   litigation tends to make individuals less honest?
16   A    I may have testified that it potentially
17   can, as I discussed here today. It's one of the
18   things that I consider, that there may be
19   exaggeration or magnification or frank dishonesty,
20   if you will. That's one of the things I always
21   consider.
22   Q    To put it politely, would it be fair to say
23   that perceived opportunity for personal gain can
24   influence testimony?
25   A    It may. That's correct.

Page 276

1    Q    Is that one of the reasons that
2    particularly when you're trying to evaluate things
3    in a workers' compensation setting or any kind of
4    an industrial setting where you know
5    compensation will follow according to the law and
6    not because of any kind of negligence or anything
7    of that nature, is that one of the reasons that
8    particular emphasis is given in industrial
9    medicine to evaluation of the objective findings of
10   a person's complaints?
11   A    Yes. But, you know, I have to add just,
12   you know, out of maybe your interest or potential
13   jury interest that when studies have been done of
14   the effect of litigation or workers' compensation
15   on disability or cost after an injury, the effects
16   are relatively minor and are generally pretty far
17   outweighed by the actual injury itself. It's not to
18   say there's not an effect, but it's typically not a
19   major one.
20   Q    Let me ask you to look back at this
21   Exhibit No. 28, and I'll ask you to look at the list
22   of attendees at the meeting, see if you can identify
23   Mr. Tilly.
24   A    Yes.
25   Q    Who is Mr. Tilly?

43 (Pages 273 to 276)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————405-272-1006
TULSA ————————918-583-8600
FAYETTEVILLE ————479-587-1006

Page 277

1  A  He's identified as the director of the
2  Claremore, C-l-a-r-e-m-o-r-e, slash, Rogers
3  County Emergency Management Agency, I presume.
4  Q  And he was in attendance at that meeting
5  on July 17th; is that correct?
6  A  Yes.
7  Q  I'll show you on page 7 here is Mr. Tilly.
8  And you've read this report; is that right?
9  A  Yes.
10  Q  And Mr. Tilly on page 7 is making kind of
11  a statement to the group; is that right?
12  A  Yes.
13  Q  Would you read for the record the
14  next-to-last paragraph of Mr. Tilly's report to the
15  group.  Read that out loud.
16  A  I just want to make sure I got the right
17  paragraph.  The one that starts, "There was 101"?
18  Q  Yes, sir.
19  A  Quote, "There was 101 people in the
20  hospital at 10:00 to 11:00 p.m., and there were
21  probably 400 lawyers standing outside the door.
22  What does that tell you?  And that is not fair to
23  Solkatronics and that is not fair to the port,"
24  unquote.
25  Q  Is that just kind of a problem we have

Page 278

1  with society, Dr. Harrison?
2  A  I don't think so.
3  Q  You think that's unique to Tulsa,
4  Oklahoma?
5  A  It's not unique, but I don't think it's a
6  problem in society.
7  Q  Would you look back at Mr. Cardenas
8  again for me for a minute.
9  A  Yes.
10  Q  When you have symptoms written down
11  there, can you tell me as to what time those
12  symptoms are?
13  A  I have to look back in his medical records
14  to look at the exact timing of his hospital visit.
15  Q  Let me phrase it another way:  Are these
16  symptoms from the hospital records or from
17  something else?
18  A  These are a combination from the hospital
19  records and reported to other physicians or
20  reported to Dr. Hastings.
21  Q  And from your summary, I gather you
22  can't identify which of those three possible
23  sources of complaint record it might be for any
24  given claimant without going back to their
25  records; is that right?

Page 279

1  A  Correct.
2  Q  So would it be fair to say that you would
3  not have sufficient information to give any opinion
4  as to Mr. Cardenas' current condition?
5  A  He currently complains of central nervous
6  system symptoms.
7  Q  And current means what?
8  A  At the time of the last medical record, or
9  Dr. Hastings' evaluation.
10  Q  Can you tell me approximately when those
11  were?
12  A  Not without looking at the medical
13  records.
14  Q  So when I say current, I mean today, or
15  this month.
16  A  Okay.  None of these are today.  I looked
17  at the medical records in -- I got the disk or the
18  CD-ROM in November or December of 2004.  We're
19  now in June of 2005.  So it goes without saying
20  that none of these are current absolutely as of
21  June 21st, 2005.
22  Q  And as I understand, you do not have for
23  any of these people on this list of 13, other than
24  the maps that you shared with us today, where
25  these people were actually located at the time; is

Page 280

1  that correct?
2  A  Give me your definition of actually
3  located.  I want to understand the question.
4  Q  Well, they're identified specific to a
5  particular spot on that map, plant number 5,
6  plant number 22, plant number whatever.
7  A  Correct.
8  Q  But as to whether they were indoors or
9  outdoors, you have no knowledge as to that?
10  A  Correct.
11  Q  As to what activity they were involved in
12  doing, you have no idea as to that?
13  A  That's in the medical record.  I could tell
14  you that if I looked in the medical record.
15  Q  As to what they did when they left their
16  place of work, you don't have that?
17  A  What they did?  I don't understand.
18  Q  That is to say did they walk east?  Did
19  they walk north?  Did they walk south?  How long
20  did they stay at the port?  What did they do?
21  What are their opportunities for exposure or no
22  exposure?
23  A  That's correct.  I don't have that detailed
24  information.
25  Q  You don't have the information about



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY  ————————405-272-1006
TULSA ————————————918-583-8600
FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 281

1   their personal habits?
2   A   That's by and large in the medical
3   records.So I have that.
4   Q   And you have some limited preexisting
5   medical records, but not extensive?
6   A   We have to go case by case before I would
7   agree with that term.
8   Q   You have for some, but not for others?
9   A   You know, we could pull up the CD-ROM
10   and take a look and see exactly what I have. I
11   don't want to make a generalization. That
12   wouldn't be fair.
13   Q   Let's talk about Jennifer Shavers.
14   As to Jennifer Shavers, you note that she
15   was exposed prior to July 11, 2001.
16   A   Yes.
17   Q   And you also said in your report that her
18   exposure was acute.
19   On what facts do you base that
20   statement?
21   A   What are you referring to?
22   Q   In your report with regard to Jennifer
23   Shavers.
24   A   (Witness examines document.)
25   I don't think I said that on Ms. Shavers.

Page 282

1   Q   What did you say on Ms. Shavers?
2   A   That her central nervous system
3   symptoms, headache, fatigue and memory loss, are
4   consistent with the effects of arsine exposure.
5   She was not exposedto arsine on the day of the
6   release, July 11, 2001. She states that she was
7   exposed prior to that time. And I don't have an
8   opinion one way or the other about that issue at
9   the moment.
10   Q   All right.
11   Do you know where Ms. Shavers was
12   employed at Solkatronics?
13   A   It's in her records. I don't recall as I sit
14   here today.
15   Q   If I suggested to you it was in the office,
16   would that refresh your recollection?
17   A   Yes.
18   Q   Would you expect that other persons
19   would be located in the production areas of the
20   facility?
21   A   You mean are there other employees in
22   the production area?
23   Q   Yes.
24   A   Oh, yes, I'm sure there are.
25   Q   If Ms. Shavers had been exposed to

Page 283

1   anything prior to July 11th, 2001, wouldn't you
2   expect others at Solkatronics to have had similar
3   exposures?
4   A   It depends on what they did and where
5   they were. I don't think I could make a
6   generalization without more facts.
7   Q   If other releases occurred, they
8   certainlywouldn't have originated in the office
9   area, would they?
10   A   I would not expect exposures to originate
11   in the office area. So her route of exposure would
12   have to be through the general ventilation system
13   or directly on the production floor or a release to
14   which she was exposed out of doors, variety of
15   different mechanisms are possible.
16   Q   And if the offices are in one building and
17   the production is in another building, wouldn't
18   you expect the people that would be in the area
19   where the release occurred to have the most
20   opportunity for response to arsine?
21   A   Depends on a great deal of other facts
22   about the particular circumstances of exposure. I
23   don't want to make a generalization without
24   knowing more information.
25   Q   Are you willing to go as far as saying all

Page 284

1   things otherwise equal, the person around where
2   the gas is being worked with is more likely to have
3   an exposure in the event of an event than someone
4   who is located in another building in an office?
5   A   I don't want to say one way or the other.
6   Production workers, for example, may take
7   precautions. They may wear respirators, they may
8   have evacuationprocedures, they may be more
9   knowledgeable because they've been trained. They
10   may not be as inclined to report the same set of
11   symptoms. There's a lot of variables.
12   Q   With respect to Ms. Shavers, we have
13   absolutely no medical of any kind as far as blood
14   work, do we, sir?
15   A   Correct. It wasn't done.
16   Q   Look at page 4 of your report, sir.
17   A   Page? What page did you say?
18   Q   4.
19   A   Okay.
20   Q   I'm just trying to clarify something that's
21   a little bit puzzling to me. Paragraph 3 of page 4,
22   you state that the medical records show that all
23   13 individuals, referring to these 13, had
24   symptoms of acute arsine intoxication immediately
25   following the July 11, 2001 incident. And you've

45 (Pages 281 to 284)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ———————918-583-8600

FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.prorcporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS        ROBERT HARRISON                    June 22, 2005

Page 285

1   told me just a few minutes ago that you're not in a
2   position to say with respect to Mr. Biddle, who's
3   one of the 13, or now with respect to the lady that
4   was working in the office.  Then if you recall
5   earlier today you told me that Mr. Schnitzer and
6   Mr. Guerra, you more or less agreed with Dr. Gad
7   there because they didn't go to the doctor and
8   there wasn't anything about them at thetime.
9       A   Well, I think I should, for clarity's
10  sake --
11      Q   Do you see why I'm puzzled?
12      A   I can understand why you're puzzled.  I
13  think for clarity's sake I should insert "consistent
14  with" in the first sentence of number 3 on page 4
15  of my report.
16          So the medical records show that all 13
17  individuals had symptoms consistent with acute
18  arsine intoxication immediately following the July
19  11, 2001 incident.  That I believe to be true.
20      Q   That doesn't mean they had it, it just
21  means that the symptoms that they reported would
22  be the symptoms you'd expect if someone had been
23  exposed?
24      A   Correct.  Correct.
25      Q   Then you go on in that paragraph to

Page 286

1   identify that only five had elevated plasma
2   hemoglobin.
3       A   Yes.  Well, I think five is highly
4   significant.  Your use of the word only suggests
5   that it's minor.
6       Q   How many people were tested?
7           MR. WARD:  Of this 13, or of the 192?
8       Q   (BY MR. TUCKER)  Of the universe of
9   people who were treated at hospitals?  Do you
10  know how many people were tested athospitals or
11  at clinics as a consequence of that
12  contemporaneous with the event?
13          MR. WARD:  Wait.  I object to the term
14  contemporaneous with the event unless you define
15  it.
16          THE WITNESS:  I don't know.  And nor
17  would that make a difference.  And the reason is
18  this:  We know, first of all, that 19 had elevated
19  plasma hemoglobins.  I'm assuming that the
20  summary table provided by the plaintiff attorney
21  is correct.  Assuming that it is correct, there are
22  19 who have elevated plasma hemoglobins.
23      Q   (BY MR. TUCKER)  That's that sheet we
24  looked at that's tied to one of the maps?
25      A   Yes.

Page 287

1           And no matter what the denominator is,
2   now, I suppose you could posit that there were 10
3   million people who were tested, and that would be
4   ludicrous, but, you know, I'm assuming that we're
5   on the order of three digits in terms of the number
6   of people that were examined.  19 is highly
7   significant.
8       Q   You talk about —
9       A   I would not expect any or but a few to
10  have elevated plasma hemoglobins due to
11  laboratory error.
12      Q   Let me ask you a distinguishing question
13  herebecause you just used a term interchangeably
14  that I want to make certain can medically fairly be
15  used interchangeably.
16          Once you said high hemoglobin levels or
17  plasma free hemoglobin levels, and then you said
18  elevated plasma free hemoglobin levels.
19      A   (Witness nods head.)
20      Q   Are those terms -- is it correct to use
21  those interchangeably?
22      A   I'm using them interchangeably.
23      Q   Is it medically correct to do so?
24      A   Yes.  It's above the laboratory normal.
25  It's high.

Page 288

1       Q   Is it medically correct to say that if
2   arsine is released in your vicinity and you have an
3   elevation of plasma free hemoglobin beyond the
4   normal laboratory range, just an elevation, for
5   example, one-tenth of a point, and you complain of
6   the self-reported symptoms that are consistent
7   with arsine exposure, is your testimony that that's
8   sufficient to make the diagnosis of arsine causing
9   injury to you?
10      A   Let me ask if you can clarify your
11  question for me.  Are you including in your
12  hypothetical that you only know of that one
13  person?  Because that makes some difference.
14      Q   Let's say that you have —
15      A   Are you —
16      Q   Let's say you have five out of 13.
17      A   No, no.  John Doe comes into the ER, has
18  a plasma free hemoglobin of 10.5, has
19  symptoms consistent with the known effects of
20  arsine poisoning?
21      Q   When you say has symptoms, you mean
22  reports symptoms.
23      A   I don't want to quibble with your
24  nomenclature.
25          Symptoms are as reported by the patient.

46 (Pages 285 to 288)


PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————— 405-272-1006
TULSA ————————— 918-583-8600
FAYETTEVILLE ————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 289

1    Q   Please help me because when you say
2  have symptoms, that implies that a doctor -- and
3  people give extra credit to the doctor when the
4  doctor says somebody has something, they say,
5  really, but what you're saying when you say
6  symptoms is that the person is reporting that they
7  have something, and you're taking their word for
8  it for the purposes of your evaluation?
9          MR. WARD: Object to the form of the
10 question.
11         THE WITNESS: Okay. We're off on a
12 tangent here about the relevance or the
13 importance of symptoms.
14   Q   (BY MR. TUCKER) They're very
15 important. I don't dispute that.
16   A   They're critical.
17   Q   Absolutely.
18   A   They're essential, and they can be as
19 reliable as a physical finding or an objective
20 laboratory test.
21   Q   Let's get back to where we were.
22   A   Okay. So are you assuming in your
23 hypothetical that all I know is that John Doe came
24 in with a plasma free hemoglobin of 10.5 and
25 reports symptoms consistent with arsine, and I

Page 290

1  know of no one else who showed up in the
2  emergency room or elsewhere in the vicinity?
3    Q   And you know there was arsine in the
4  area.
5    A   Yes. Is that your hypothetical, that there
6  was only one person?
7    Q   Yes.
8    A   If there was only one person and that's
9  all I knew, I may have a little bit less confidence
10 in that plasma free hemoglobin of 10.5 which is
11 only 0.1 percent over the lab upper limit of
12 normal, because it's so close, there's some
13 laboratory variability, there are some people who
14 have laboratory tests in the normal range when
15 their lab tests are at or very close to the upper
16 limit of normal. That's the hypothetical if I only
17 knew about one person.
18   Q   Now --
19   A   If I know about 18 other people who have
20 the same symptoms who also have elevated plasma
21 hemoglobins who are working in the same area as
22 John Doe, then my interpretation of John Doe's
23 plasma free hemoglobin is different.
24   Q   Let me just make sure. Here's what I
25 want you to answer for me: 10.5 is a very small

Page 291

1  elevation over 10.4, isn't it?
2    A   Yes.
3    Q   And particularly when contrasted with
4  your 1.5, one and a half percent grams per
5  dekaliter, it's a very small number, isn't it?
6    A   We have to clarify the -- we'll work on
7  clarifying the numbers.
8    Q   The 1.5 grams per dekaliter is nowhere
9  near the normal range, is it, for plasma free
10 hemoglobin?
11   A   Yeah. Let's -- we have to clarify the
12 units there.
13   Q   1.5 percent grams per dekaliter, is that
14 anywhere near a normal range of grams per
15 dekaliter for plasma free hemoglobin?
16   A   You know, I don't want to answer that,
17 because I want to clarify the units. The 1.5
18 percent is what was published in the textbook;
19 and this lab isreporting 10.5 percent, which
20 doesn't make sense.
21   Q   Why don't we get back to that in a little
22 bit, then. We'll save that.
23   A   Okay, but in terms of a lab normal, 10.5
24 is only marginally above the 10.4.
25   Q   So here's my question: Earlier I tried to

Page 292

1  get you to give an answer with this, and you had
2  trouble with it. I wanted to see if you can do it
3  now that you've had time to think about it.
4        At what point above 10.5 that you begin
5  to think this is no longer -- I appreciate you use
6  the term interchangeably, but I submit to you I
7  don't think most people would, but at what point
8  does elevated reach the point that it's high enough
9  that it would make you think this person is having
10 a significant arsine reaction?
11        MR. WARD: Object to the form of the
12 question.
13        THE WITNESS: By significant do you
14 mean what -- at what point do I call the blood
15 bank and ask for packed red blood cells?
16   Q   (BY MR. TUCKER) At what point do you
17 put down in the diagnosis that this man has a
18 response to an exposure of arsine?
19   A   If I'm the doctor in the emergency room?
20   Q   Yeah.
21   A   I put down arsine intoxication when they
22 have signs or symptoms and/or a laboratory
23 abnormality.
24   Q   So with a symptom reported of -- as
25 reported by, for example, Mr. Cardenas, okay,

47 (Pages 289 to 292)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 293

1  with --
2  　　A  He shows up in my emergency department
3  with headache, shortness of breath?
4  　　Q  Headache and shortness of breath.
5  　　A  And he said he didn't have it that
6  morning, and he's working at Air Exchangers?
7  　　Q  And there was arsine released down the
8  road.
9  　　A  And he has a plasma free hemoglobin of
10  10.5?
11  　　Q  Yes.
12  　　A  And I would put down on my emergency
13  room record arsine toxicity. I might put it down
14  arsine toxicity. I have now watched him for three
15  hours. He's feeling better. And I'd write, follow
16  up, you know, two weeks, see how he's doing.
17  　　Q  But your original note would have been
18  arsine toxicity or arsine intoxication I believe you
19  used the phrase earlier?
20  　　A  Correct.
21  　　Q  Did you find that in the medical records
22  for any of the persons that were evaluated at the
23  hospitals in Tulsa?
24  　　A  You know, I don't know what the
25  diagnoses were that they used. I don't know what

Page 294

1  the terminology was in the emergency
2  departments.
3  　　Q  Do you recall reviewing any that said
4  that?
5  　　A  You know, I don't want to say one way or
6  the other, because I don't recall.
7  　　Q  Let's talk about Mr. Guerra, Obdulio
8  Guerra.
9  　　A  "Guerra," I think it is, G-u-e-r-r-a.
10  　　Q  He pronounced it "Guerra," I think. I
11  could be wrong.
12  　　A  Okay.
13  　　Q  And there you said you agreed with Dr.
14  Gad.
15  　　　　What did you agree with Dr. Gad about?
16  　　A  Acute symptoms are consistent with the
17  known effects of arsine. No laboratory data was
18  done on July 11, 2001.
19  　　Q  And so based upon that, Dr. Gad declined
20  to opine about Obdulio Guerra; is that right?
21  　　A  Yes.
22  　　Q  And you concur with him?
23  　　A  I would need more information.
24  　　Q  Let's move to Doug Ingram.
25  　　A  Yes.

Page 295

1  　　Q  Is there anything about Doug Ingram's
2  laboratory results that would be consistent
3  withexposure to arsine?
4  　　A  Mr. Ingram had a plasma free hemoglobin
5  of 33 percent.
6  　　Q  Anything else?
7  　　A  He, as we mentioned earlier, had the drop
8  in hemoglobin and then returned back. Although
9  the hemoglobin was within the normal range
10  throughout, there was a decrease.
11  　　Q  Look back for just a second to Mr.
12  Cardenas and Mr. Guerra.
13  　　A  Okay.
14  　　Q  You tell me you didn't have enough to
15  opine about Mr. Guerra, but about Mr. Cardenas
16  you said you had enough to opine. As I look at
17  his lab data, the only lab data you have is normal.
18  　　A  He had symptoms. He went and got
19  treatment at the time, on the date of the incident.
20  So we have information about his symptoms. On
21  Guerra there's no medical there on the date of
22  exposure.
23  　　Q  Okay.
24  　　A  As I recall, there wasn't much further
25  medical.

Page 296

1  　　Q  Go ahead and take Mr. Ingram.
2  　　　　Do you know what Mr. Ingram's job duties
3  were or where he worked?
4  　　A  Yes.
5  　　　　(Witness examines documents.)
6  　　　　He's an employee at Air Exchangers.
7  　　Q  Do you know what he did or what his
8  duties were?
9  　　A  No.
10  　　Q  Do you know how big the Air Exchangers
11  facility is?
12  　　A  No.
13  　　Q  Do you have any idea of the configuration
14  of the buildings?
15  　　A  No.
16  　　Q  Do you know whether he worked in an
17  office or on the production floor?
18  　　A  I do not.
19  　　Q  Do you know anything about what a
20  welder does?
21  　　A  In general, yes. I don't know specifically
22  what type of welding Mr. Ingram might have done,
23  but I certainly know what a welder does.
24  　　Q  Does it matter what kind he does?
25  　　A  Not for this case.

48 (Pages 293 to 296)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————— 405-272-1006
TULSA ———————————— 918-583-8600
FAYETTEVILLE ———————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS                ROBERT HARRISON                June 22, 2005

Page 297

1    Q    If you work in an unair-conditioned
2  facility where the temperatures are in excess of a
3  hundred degrees and you're working in a large
4  metal building, and you're welding using customary
5  welding equipment and that's the person's job,
6  would it surprise you that that person reported
7  from time to time that they had a headache at
8  work?
9    A    It's possible. I mean, the issue is is
10 there a change in the headache or other symptoms
11 that Mr. Ingram experienced after the arsine
12 exposure.
13   Q    When you were asking me questions not
14 too long ago, you asked me a lot of questions
15 about my history.
16        Did you know the medical history for Mr.
17 Ingram?
18   A    I'd have to pull up his medical records to
19 see how much I have before July 11th, 2001.
20   Q    Would it be important to you if his
21 history of headaches began in 1997?
22   A    That would depend on the frequency, the
23 intensity, the character, the duration of his
24 headaches, and how that might have changed after
25 July 11, 2001.

Page 298

1    Q    Would it be important to you that in 1999
2  he reported to his physician and was treated for
3  headaches three-week duration?
4    A    I would need to know whether that was a
5  self-limited episode and whether the character,
6  the quality, the duration, the frequency, intensity
7  of his headaches changed.
8    Q    And, again, May of 1999, same thing,
9  treated for headaches.
10   A    Same answer. It's not unusual for
11 individuals to have headaches off and on
12 throughout their life. It's a very common
13 condition. The question is is it substantially
14 different as a result of exposure.
15   Q    Again, if the records show in December of
16 2005 [sic] he was treated once again by a
17 physician, this time for headaches for six months'
18 duration --
19   A    What was the time frame for that? I'm
20 sorry.
21   Q    It's December of 2000.
22   A    Okay. That would be the same answer.
23   Q    And March of '01 he was treated again,
24 this time for headaches of three weeks.
25   A    It would be the same answer.

Page 299

1    Q    What about if you add in previous
2  complaints of fatigue and inability to sleep?
3    A    You know, again, same answer. Are
4  those --
5    Q    Same kind of fatigue. Fatigue is fatigue,
6  isn't it?
7    A    It's the intensity and it's the duration.
8  Was that a self-limited problem for which he
9  was treated and that got completely better and is
10 now -- is there something different about the
11 quality or the character or the intensity of his
12 fatigue.
13   Q    Do you know the extent to which Mr.
14 Ingram may or may not be overweight?
15   A    I don't know.
16   Q    Did you notice that in his medical
17 records?
18   A    I did not.
19   Q    Do you know the extent to which he has a
20 history of elevated blood pressure?
21   A    I do not.
22   Q    Can that be a factor in having headaches?
23
24   A    It may be. It depends on the degree of
25 elevation.

Page 300

1    Q    I notice a complaint made here of
2  shortness of breath.
3        Can overweight and high blood pressure
4  be involved in shortness of breath?
5    A    Depends on the extent of the overweight.
6  Hypertension would not cause shortness of breath
7  unless it caused severe heart failure.
8    Q    And the overweight, you didn't look at
9  that in his history, as I understand it?
10   A    That's correct.
11   Q    Did you determine that in 1999 he
12 actually had a medical sleep study to determine
13 why he couldn't sleep?
14   A    Yes. That would be a sleep apnea study.
15   Q    Did you know that?
16   A    I think I saw that in his records.
17   Q    And does a person that has a sleep apnea
18 problem often complain of fatigue?
19   A    That is maybe one cause of fatigue, that's
20 correct.
21   Q    Do you have any information that would
22 indicate that the headaches he complains of in
23 your summary, or the fatigue he complains of in
24 your summary is any different than the headaches
25 or fatigue of which he has previously complained

49 (Pages 297 to 300)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 301

1  before this incident?
2      A   You know, if there's more information and
3  more detail about his previous medical condition
4  that indicates that there hasn't been any change,
5  my opinion would be altered.  I don't have that
6  information.
7      Q   Let me ask it another way:  Let's assume
8  that his medical records show that going back at
9  least as far as 1999 he's complained of headache,
10 headaches and fatigue.
11         Do you have any information that would
12 tellyou that the headache and fatigue that he
13 complained of that's reflected on your chart is a
14 different headache or different fatigue than the
15 one he's always complained about?
16     A   According to what he's told his doctors
17 and Dr. Hastings, it's different, but if there is
18 medical information to the contrary in the
19 records, my opinion may change.
20     Q   How did he say it was different?
21     A   He dated it from the exposure to arsine,
22 or he dated it from July 11, 2001.  If it's
23 changed -- if it's incorrect, if there's medical
24 evidence in the records that the frequency,
25 intensity, duration of any of these symptoms are

Page 302

1  the same, then my opinion would change.
2      Q   Did he date it from that, or is that simply
3  what was put down as when his symptoms were
4  reported?
5      A   That's what he told his doctors.
6      Q   That he was fatigued and he had
7  headaches; is that correct?
8      A   Correct.  These are symptoms -- these are
9  the reports from Mr. Ingram.
10     Q   Why do you note with respect to Mr.
11 Ingram that he was given an arsenic test?  Why is
12 that significant to you?
13     A   I noted all the tests that were performed
14 that were relevant to intravascular hemolysis.  As
15 I said earlier, varying tests were done on these
16 individuals.  So wherever there was one that was
17 relevant, I noted it.
18     Q   And arsenic was not found; is that
19 correct?
20     A   Correct.
21     Q   And what are you referring to when you
22 have an LDH of 273?
23     A   Well, it was noted in the record as
24 potentially significant by his treating doctor.  So I
25 put it here.

Page 303

1      Q   What would it be significant for?
2      A   Well, LDH is pretty nonspecific.  So I
3  don't actually put much stock.  It can come from
4  liver, blood, bone.  There is a way of
5  differentiating that, but it wasn't done.  So it's
6  potentially associated with exposure, but it's not
7  one of the important tests to look at.
8      Q   Let's look at Dr. Kharas -- or not Dr.
9  Kharas, Mr. Kharas.
10         MR. WARD:  Dr. Kharas.
11         MR. TUCKER:  Ph.D. Kharas.
12         THE WITNESS:  Would you mind if we
13 took a five-minute break?
14         MR. TUCKER:  Not at all.
15         (Recess taken.)
16     Q   (BY MR. TUCKER)  Where did Karl Kharas
17 work?
18     A   ASEC.
19     Q   Do you know where that is?
20     A   I could tell you.
21         (Witness examines document.)
22         To the northwest of Solkatronics, across
23 Main Parkway.
24     Q   How far is that?  Do you have any idea?
25     A   I don't.  I don't have a scale to this map.

Page 304

1      Q   Do you know what he did at ASEC?
2      A   I don't remember.  It's in the records.
3      Q   Do you know what chemicals he works
4  with?
5      A   I don't.
6      Q   Do you know where he was in that facility
7  at the time this incident occurred on July 11th,
8  2001?
9      A   According to the map and key, he was at
10 the main gate.
11     Q   Main gate of the plant?
12     A   I don't know.
13     Q   Do you know what main gate we're talking
14 about?
15     A   No.
16     Q   Do you know whether Mr. Kharas travels
17 out of the country quite a bit?
18     A   I do not.
19     Q   And you haven't read his deposition
20 either?
21     A   I have not.
22     Q   As I look at your summary of Mr. Kharas,
23 I see a haptoglobin level which is reported as
24 normal.
25     A   Correct.

50 (Pages 301 to 304)



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 305

1    Q   And haptoglobin is the thing that goes
2  down when you have something happen within the
3  body that destroys the red blood cell; is that
4  right?
5    A   Correct.
6    Q   Does haptoglobin go down if your plasma
7  hemoglobin elevation is as a consequence of an
8  artifact?
9    A   No.
10   Q   So if Mr. Kharas' plasma hemoglobin
11  being elevated to 21.1 percent as opposed to 10.4
12  percent were from an artifact, then it would not be
13  unexpected for his haptoglobin to be in the normal
14  range, would it?
15   A   Correct.
16   Q   And is there any way that you can tell
17  whether or not Mr. Kharas' plasma free
18  hemoglobin count was an artifact?
19   A   Yes.  I think we can tell.  I think we can
20  tell, because the plasma free hemoglobin is
21  elevated on multiple individuals in this case.  So
22  we have to hypothesize that there's some common
23  artifactual problem in all 19.
24   Q   Did that appear to be a level of plasma
25  free hemoglobin that concerned the treating

Page 306

1  physician in Tulsa, Oklahoma?
2    A   It did not concern the treating physician
3  enough to treat with blood transfusions.
4    Q   Did it concern the treating physician
5  enough to go back and retest the next day or later
6  that day or at some later time?
7    A   It did not.  The complete blood count was
8  normal.  And I would have made the same
9  decision.  So there's evidence of hemolysis, but
10  not enough to drop the hemoglobin or hematocrit.
11  I think it's a marker of exposure, but it's not
12  enough to institute treatment.
13   Q   Is it enough to determine whether or not
14  that was an artifact or a true number by making a
15  second confirming test at a later time?
16   A   Probably not.  There would be no reason
17  to with a normal hematocrit and hemoglobin.  If
18  the patient was observed and reported some
19  improvement,the patient could be discharged.
20   Q   Do you have any information that anyone
21  else at the ASEC location had an elevated plasma
22  hemoglobin?
23   A   I do not.  To my knowledge, he's the only
24  one.  I don't know if the information I have is
25  complete, but as far as it goes on Exhibit 4, he's

Page 307

1  the only employee at ASEC.
2    Q   Do you know how many people work at
3  ASEC?
4    A   I do not.
5    Q   Is the level that's reported on Mr. Kharas
6  of 21.1 percent -- and I appreciate the fact that
7  we haven't really settled on what 21.1 percent
8  means, but is that level of 21.1 percent --
9    A   Excuse me.  We know it's above the
10  laboratory normal.
11   Q   Okay.
12     Do we know whether that is sufficient
13  elevation of plasma hemoglobin to demonstrate
14  injury?
15   A   Can you clarify what you mean by injury.
16   Q   Injury enough to cause injury.
17     Does that indicate enough exposure to
18  arsine to cause injury to Mr. Kharas?
19   A   It means that there has been some
20  toxicity to the -- to the body, to one of the organs
21  of the body.In this case it's the blood-forming
22  elements, what we call the hematopoietic system.
23  So if we wanted to define injury as an end-organ
24  effect, yes, there's injury.
25   Q   How about permanent injury?

Page 308

1    A   So now if we want to move on to the
2  question of is there permanent injury as a result
3  of this acute exposure, that is does Mr. Kharas
4  have ongoing health problems as a result of the
5  acute exposure, he has headache, paresthesias,
6  which is numbness and tingling, and fatigue.
7  Those are central, and the paresthesias are
8  peripheral nervous system symptoms that is
9  consistent with toxicity or the effects from arsine
10  gas.
11     To confirm that, further diagnostic tests
12  would be useful, psychological tests to look at
13  brain injury, an EMG or nerve conduction studies
14  to look at peripheral nerve damage.
15   Q   I'd like to go back to my real question,
16  which was is the elevation of plasma hemoglobin
17  21.1 percent when normal is reported as less than
18  10.4 percent, is that elevation sufficient to
19  demonstrate -- is that elevation sufficient to
20  demonstrate to you that this person was exposed
21  to enough arsine to cause permanent injury?
22   A   Yes.
23     MR. WARD:  Objection.  It's asked and
24  answered, but he's already answered the second
25  time.

51 (Pages 305 to 308)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.prorreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 309

1      THE WITNESS: Yes. That elevation in
2   my opinion is sufficient to result in permanent
3   injury.
4      Q    (BY MR. TUCKER) And the elevation that
5   we're talking about is an elevation of
6   approximately two times the upper range of
7   normal?
8      A   Yes.
9      I believe that there's a variability in
10   response. If you have several hundred people who
11   are potentially exposed, there's going to be some
12   who are normal. Some will have some more severe
13   problems, and some may have intermediate or
14   minor problems.
15      Q   Can you identify any peer-reviewed
16   literature that supports a conclusion that a
17   person who has been in the area of an arsine
18   release who has a single plasma hemoglobin report
19   approximately double the normal range, that that
20   is evidence of sufficient exposure to cause
21   permanent injury?
22      A   I'm not aware, as I sit here today, of any
23   literature that specifically answers that question.
24   I'd be happy to take a look and see if I can dig up
25   something in the peer-reviewed literature that

Page 310

1   answersthat particular question.
2      Q   Other than the one and a half percent,
3   which is a measurement of grams per dekaliter,
4   which is in your text and in your colleague's text,
5   is there any peer-reviewed literature
6   that gives a threshold level of a plasma
7   hemoglobin elevation that says this demonstrates
8   arsine exposure or arsine injury?
9      A   I can give you the same answer, and that
10   is that as I sit here today I cannot cite you a
11   specific reference that answers that particular
12   question, but I'd be happy to take a look to see if
13   there's, you know, a specific number or threshold
14   value of plasma free hemoglobin below which one
15   does not find permanent health effects and above
16   which one does.
17      Q   Or is there peer-reviewed literature that
18   shows a threshold value that is a response to an
19   arsine exposure that causes injury to something
20   more than the red blood cells whose response was
21   just measured with the elevated level?
22      A   It's the same answer. I mean, I think it's
23   a corollary to your question. There are --
24      Q   If --
25      A   There are studies that have found

Page 311

1   peripheral and central nervous system effects
2   following acutearsine intoxication.
3      Q   Out of those studies, how do you define
4   acute arsine intoxication?
5      A   As I sit here today, I don't know enough
6   to cite you the diagnostic studies from those
7   articles in terms of how they defined acute arsine
8   intoxication.
9      You'd want to know, I think, was it a
10   plasma free hemoglobin or a hematocrit or
11   hemoglobin drop or haptoglobin drop or
12   hemoglobinuria, how do they define that. And
13   that would help in part to answer your question,
14   but there might be some other studies in the
15   case -- in the -- among the case reports of arsine
16   intoxication that have done longer-term follow-up
17   and tried to correlate them with the lab studies at
18   the beginning on the date of acute onset.
19      Q   Paragraph 3, page 4 of your report, all 13
20   individuals, which I realize you qualified that
21   now, had symptoms of acute arsine intoxication.
22      What is your threshold level for acute
23   arsine intoxication with regard to plasma free
24   hemoglobin?
25      A   Elevated above the lab, upper range of

Page 312

1   lab normal.
2      Q   One hundredth of a percent is plenty?
3      A   With signs or symptoms consistent with
4   exposure, and fitting the pattern of symptoms
5   andsigns, and laboratory abnormalities among the
6   population that were tested on that date.
7      Q   Can you cite --
8      A   So basically -- excuse me -- we could
9   come up with a case definition on July 11th, 2001,
10   if I were a public health official, if I were the
11   county health officer and I was going to do a
12   survey to determine how many people had arsine
13   poisoning on July 11, 2001, and I collect all their
14   medical records, go around to the emergency
15   departments or give these people a questionnaire
16   and medical tests, I would have a case definition.
17   My case definition would be symptoms consistent
18   with acute arsine intoxication, or physical
19   examination findings, or laboratory abnormalities
20   among people who live within a certain area
21   around the site of the release.
22      All 13 of these people would meet a
23   minimum case definition in that they had
24   symptoms consistent with exposure, or they had
25   laboratory abnormalities.

52 (Pages 309 to 312)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 313

1    Q   If your threshold is any elevation above
2  laboratory values, can you cite one peer-reviewed
3  literature, report or text that makes that
4  statement?
5        MR. WARD:  Object to the form of the
6  question. His criteria for what?
7        THE WITNESS:  Yes.  If you could clarify
8  yourquestion.  That makes a statement regarding
9  long-term health effects or the diagnosis of arsine
10 poisoning?
11   Q   (BY MR. TUCKER)  Diagnosis of arsine
12 poisoning.
13   A   The diagnosis of arsine poisoning is made
14 on the basis of symptoms, signs and laboratory
15 abnormalities, and the laboratory abnormalities
16 include elevated plasma free hemoglobin.  And one
17 can make that diagnosis on the basis of an
18 elevated plasma free hemoglobin alone.
19   Q   Do you know —
20   A   In the presence of normal values for
21 hemoglobinuria, hemoglobin, and haptoglobin.
22   Q   As I understand what you're saying
23 previously, is that you are unaware of any medical
24 literature that's peer reviewed that states that any
25 elevation of plasma free hemoglobin, regardless of

Page 314

1  the extent of it, and the presence of a complaint
2  by the patient, and an arsine event is sufficient to
3  have arsine poisoning?
4    A   I didn't say that.  Okay.  I want to be
5  sure, because I really do think you're asking or
6  you're addressing two different issues.
7    Q   Let me put —
8    A   One issue is the diagnosis -- if I
9  mayfinish?
10   Q   Go ahead.
11   A   Because one issue is the diagnosis of
12 acute arsine poisoning, and what does the
13 peer-reviewed literature say about how to make
14 that diagnosis.
15       The other is chronic health effects from
16 any given degree of arsine poisoning or correlated
17 with a laboratory abnormality.
18       I was responding to the second issue in
19 terms of the peer-reviewed literature, specifically
20 regarding plasma free hemoglobin.
21       In regards to the first issue, how do you
22 diagnose arsine poisoning, there are peer-reviewed
23 articles on how to do that, which include the use
24 of the plasma free hemoglobin and elevated plasma
25 free hemoglobin alone in the absence of other

Page 315

1  abnormalities.
2        And, in fact, I would argue that the
3  experts retained by the defendant in this case
4  have acknowledged as much.
5    Q   Was your chapter on chemicals and gases
6  in which you made the statement that we
7  previously talked about that a history of arsine
8  exposure with a plasma hemoglobin level of
9  greater than 1.5 percent confirms the diagnosis of
10 arsine poisoning peer reviewed?
11   A   It was reviewed by outside physicians,
12 but this is not a peer-reviewed medical journal in
13 the sense this is a periodic publication with an
14 editor. It's more -- it's similar more to a textbook.
15   Q   But did it go through a process similar to
16 peer review?  Was it reviewed by outside
17 physicians?
18   A   It was reviewed by some outside
19 physicians to check for, you know, technical
20 accuracy, error and so forth.
21   Q   I see.
22       We may quibble about the extent to which
23 it was reviewed, but this is reviewed by an outside
24 source prior to publication?
25   A   Yes.

Page 316

1    Q   Outside professionals who evaluated it to
2  determine if it was appropriate?
3    A   Correct.
4    Q   Did you have an opportunity to review Mr.
5  Kharas' deposition?
6    A   No.
7    Q   Do you know if he had a medical history
8  of headaches sufficient that a doctor prescribed
9  an MRI for him to try to evaluate his complaints of
10 headaches prior to July of 2001?
11   A   I don't know.
12   Q   It a man had headaches to the extent that
13 his physician prescribed an MRI, would you
14 consider that to be a fact you would have liked to
15 have had when you worked on this case?
16   A   It would indicate potentially more severe
17 headaches, such that an MRI would be performed.
18   Q   Did the records indicate that he had any
19 MRI performed as a result of any headaches of
20 which he complained after July 11th, 2001?
21   A   Not to my knowledge.
22   Q   Did the records reflect an MRI performed
23 on any of these 13 plaintiffs to evaluate their
24 headaches?
25   A   Not to my knowledge.

53 (Pages 313 to 316)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 317

1    Q   Do you know whether or not Mr. Kharas
2    was diagnosed prior to this event with
3    hypothyroidism?
4        A   I don't know.
5        Q   If a person has hypothyroidism, is fatigue
6    a symptom of that?
7        A   If the hypothyroidism is not treated,
8    fatigue may be a symptom.
9        Q   Memory loss?
10       A   No.
11       Q   Increased irritability?
12       A   I don't think so.
13       Q   Do you know whether in 1996 Mr. Kharas
14   was diagnosed with neuropathy of the hands and
15   wrists?
16       A   I don't know.
17       Q   If he's complaining of neuropathy after
18   the event and was evaluated and treated in August
19   of 1996 or evaluated for neuropathy in 1996,
20   that's not a new complaint, is it?
21       A   If it was prior to July of 2001, that would
22   be a preexisting problem.
23       Q   And he complained -- didn't you find one
24   of his complaints here was fatigue?
25       A   Yes.

Page 318

1        Q   I have talked about headache.  We've
2    talked about paresthesias.  Let's talk about
3    fatigue.
4            Are you aware that in January of 2000 he
5    complained to his physician about decreased
6    energy?
7        A   I don't know.
8        Q   Would that be the same thing he's
9    complaining about on this form?
10       A   Fatigue and decreased energy are similar.
11
12       Q   And in September of 2000 -- this is less
13   than a year before this accident -- he complains to
14   his physician of continued fatigue and that he
15   works 12 hours a day.
16           Working 12 hours a day would probably
17   make you fatigued, wouldn't it?
18       A   Possibly.
19       Q   And at the same time he tells his doctor
20   he's working harder than he ever has in his life.
21           Would that have been good information
22   for you to have when you determined that Mr.
23   Kharas was suffering from symptoms caused by an
24   acute arsine exposure or acute arsine injury?
25       A   These are issues that may or may not be

Page 319

1    important in terms of evaluating whether he was
2    injured by exposure.  If these are preexisting
3    problems, I'd want to know if they were worse.
4        Q   Anyway, you didn't even know he had
5    them, did you?
6        A   I was not aware of these.
7        Q   And if he told his doctor that he had been
8    to Russia five times since 2000 and his irritability
9    has continued to increase since he continued
10   making all these trips to Russia?
11       A   I don't know.  I don't know what that
12   means.
13       Q   Can an exposure to lead or platinum
14   cause paresthesias?
15       A   Lead if it's severe; exposure has to be
16   high.
17       Q   What about platinum?
18       A   Platinum does not cause
19   peripheral neuropathy.
20       Q   Are you familiar with the components of
21   automotive catalysts?
22       A   I know they're rare and expensive metals.
23       Q   Do you know whether the materials that
24   are in automotive catalysts can cause
25   paresthesias?

Page 320

1        A   If you told me what they were, I could tell
2    you whether they cause peripheral neuropathy.
3        Q   Do you know that Mr. Kharas' work puts
4    him in daily contact with the laboratory work
5    consistent with the manufacture of automotive
6    catalysts here and in Russia?
7        A   I don't know; but, again, it would depend
8    on exactly what the metals were.
9        Q   That would have been something that
10   would have been nice for you to know, wouldn't it?
11
12       A   It may be important in terms of the
13   degree of exposure, how much potential he has to
14   absorb these metals and whether they can cause
15   nerve damage.
16       Q   So it would have been nice to know as
17   you're trying to make a diagnosis as to whether
18   this man in fact was suffering from some exposure
19   to arsine or not?
20       A   You know, again, as I indicated earlier
21   today, I asked about an occupational history and
22   other chemicals to which a person has been
23   exposed exactly for this reason.
24       Q   If you assume a person has been exposed
25   to arsine and they remove their clothes and are

54 (Pages 317 to 320)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

Case 4:04-cv-00287-CVE-PJC   Document 89-2 Filed in USDC ND/OK on 11/01/05   Page 34 of 64

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 321

1    rinsed off, rinsed down, placed in a hospital gown,
2    then would you expect someone that came in
3    contact with that person to receive exposure to
4    sufficient arsine to receive any injury?
5        MR. WARD: Object to the form.
6        THE WITNESS: Are you saying that the
7    person has been washed down and is now in their
8    hospital gown and then somebody comes in contact
9    with them?
10       Q    (BY MR. TUCKER) Yes.
11       A    It would be unlikely that they would have
12   exposure to arsine at that point in time.
13       Q    Would you look at Theresa Haggard,
14   please.
15       A    Okay.
16       Q    She complained of headache and fatigue.
17       Would that be the complaint she made at
18   the hospital?
19       A    Yes.
20       Q    And that she complained to the doctor
21   that saw her at the request of plaintiffs' attorneys
22   of fatigue and cephalgia?
23       A    Correct.
24       Q    Which is, what's that, headache?
25       A    Another word for headache.

Page 322

1        Q    And she got some — the comments, these
2    are CNS symptoms c with the effects of arsine.
3        What is that?
4        A    Consistent with.
5        Q    That's because fatigue and headache goes
6    along with arsine?
7        A    Correct.
8        Q    Does it also go along with being 14 weeks
9    pregnant?
10       A    It may.
11       Q    Are we fortunate enough to have any
12   laboratory data contemporaneous with the event?
13       A    She had a hemoglobin and haptoglobin
14   level.
15       Q    What do those numbers tell us?
16       A    The haptoglobin was normal. The
17   hemoglobin was slightly low, but was still within
18   the normal range.
19       Q    So the haptoglobin and hemoglobin were
20   both normal?
21       A    Within the normal range, that's correct.
22       Q    So we have no laboratory indication of
23   any abnormality for Ms. Haggard; is that right?
24       A    In terms of the two tests that were done,
25   that's correct.

Page 323

1        Q    Those are the tests that you wrote down.
2        A    Those were the only tests that were done.
3    If a hemoglobin — if a urine test was done or a
4    plasma free hemoglobin was done, I would have
5    noted it; and they were not.
6        Q    And just so we're clear, the only tests
7    that were taken were tests that simply reflect Ms.
8    Haggard was normal?
9        A    Well, it doesn't necessarily mean Ms.
10   Haggard was normal, but it means that the tests
11   were within the normal range.
12       Q    The haptoglobin is the marker that shows
13   you that plasma free hemoglobin exists in excess,
14   isn't it? Haptoglobin goes down when the plasma
15   free hemoglobin goes up?
16       A    Well, that's interesting, and I don't want
17   to answer that one way or the other, because, as I
18   think you asked me earlier, is there a direct
19   correlation between the two, and I reserve
20   judgment on that until I look at the literature.
21       Q    Let's look at specifically what we have.
22   The only lab data we have specifically on Ms.
23   Haggard is lab data that reports — it's the data
24   that thehospital felt was sufficient enough to test
25   for.

Page 324

1        Their tests all come back normal; is that
2    right?
3        A    The two tests that they did came back
4    normal.
5        Every hospital did something different.
6    There wasn't a standard protocol. In other words,
7    everyone didn't come in and everybody didn't get a
8    plasma free hemoglobin and a haptoglobin and a
9    hemoglobin and a urine dip. Everybody got
10   something a little different.
11       Q    Did Ms. Haggard have a urine dip?
12       A    No.
13       Q    She did not, or did not have any
14   abnormality in her urine dip?
15       A    I could not find a urine dip. If it was
16   normal — if it was done and normal, I noted it.
17       Q    Did you receive the records from an
18   organization called Work-Med?
19       A    I don't remember.
20       Q    Do you know what Work-Med is?
21       A    No.
22       Q    Let me represent to you, Doctor, that
23   Work-Med is a facility there at the Port of
24   Catoosa. It's kind of an on-site medical station.
25   Let me represent to you that before presenting for

55 (Pages 321 to 324)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 325

1   her bloodtest, Ms. Haggard presented herself at
2   Work-Med and received a urine test, and that she
3   did in fact have a urine test -- it would have been
4   in her medical records that you should have -- and
5   that that urine dip was negative.
6          Is that something you would normally
7   have noted but just didn't?
8      A   If I had the records from Work-Med and
9   they did a urine dip and it was negative and I saw
10  it, I would have put it down here.
11     Q   It's possible you missed it?
12     A   I either missed it or I didn't have the
13  records.
14     Q   Okay.
15     A   Let me be clear, I wasn't selectively
16  putting down lab tests. I put down everything I
17  could find.
18     Q   With respect to Ms. Haggard, you have
19  diagnosed that she had acute arsine intoxication.
20     A   Correct.
21     Q   Or are you saying that? Are you just
22  simply saying that she's reporting symptoms of
23  acute arsine intoxication?
24     A   She had symptoms consistent with acute
25  arsine intoxication.

Page 326

1      Q   But didn't she also have symptoms --
2          MR. WARD: He hasn't finished his
3   answer.
4          THE WITNESS: I'm through, yeah.
5      Q   (BY MR. TUCKER) But didn't she have
6   medical results that are completely inconsistent
7   with arsine intoxication?
8      A   What are you referring to? Her
9   haptoglobin and hemoglobin?
10     Q   Yes, sir.
11     A   Those medical results indicate that there
12  was not intravascular hemolysis to cause these
13  results to be abnormal.
14     Q   So that is inconsistent with a diagnosis
15  of exposure to arsine, is it not?
16     A   Well, let's go back to on July 11th, 2001,
17  what is our case definition? My case definition
18  would be signs, symptoms or laboratory
19  abnormalities.
20     Q   Either one?
21     A   Or some combination of them.
22     Q   But either one is sufficient for your case
23  diagnosis?
24     A   For my diagnosis if somebody came in and
25  told me they had a headache or were dizzy,

Page 327

1   nausea, their history was clear, or that they
2   didn't have it before, it was of sudden onset or
3   acute onset, and they showed up in an emergency
4   department and I checked their blood for
5   haptoglobin and it was normal, let's say,
6   hypothetically, it's this case, I would say, this is
7   a case that would fit into my case definition for
8   arsine exposure on July 11th, 2001, but not
9   sufficient to cause intravascular hemolysis to
10  change the haptoglobin.
11     Q   And if the intravascular hemolysis is
12  insufficient to change the haptoglobin, is the
13  hemolysis that occurs sufficient to cause any
14  injury?
15     A   Well, that's the second question. That's
16  what I'm arguing, is I think just to be sure we're
17  not confusing the two issues, somebody can have
18  arsine intoxication and no subsequent injury.
19     Q   Intoxication really means --
20     A   And somebody can have poisoning, again,
21  symptoms or laboratory abnormalities and a whole
22  range of effects ranging from two days later
23  they're fine or two years later they still have a
24  headache or severe headaches, or they have
25  peripheral neuropathy, and it dates from

Page 328

1   exposure.
2          So my belief is that there's a spectrum
3   that are consequent to an exposure of arsine, and
4   I think you asked in the absence of an abnormal
5   hemoglobin, can you have chronic health effects.
6          MR. TUCKER: Let's take a minute.
7          THE WITNESS: Okay.
8          (Recess taken.)
9          (Ms. Smith exits the proceedings.)
10     Q   (BY MR. TUCKER) We were at Bart
11  Schnitzer. Can you tell me where Mr. Schnitzer
12  works.
13     A   I can, but I have to look it up.
14         Mr. Schnitzer works at Tuloma
15  Stevedoring, T-u-l-o-m-a.
16     Q   That would be Tuloma as in Tulsa,
17  Oklahoma, Tuloma.
18     A   No kidding? Tuloma.
19     Q   Which direction is that?
20     A   East of Solkatronics.
21     Q   How far away is that from Solkatronics?
22     A   I don't know the distance. I don't have a
23  scale on my map here. It's further than ASEC or
24  Air Exchangers.
25     Q   If you were comparing it to the distance

56 (Pages 325 to 328)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ————————————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 329

1   of Air Exchangers, it's further by a factor of how
2   many?
3       A   Oh, it looks like, I would say, about five
4   times as far.
5       Q   Five times further away?
6       A   Correct.
7       Q   And with respect to Mr. Schnitzer,
8   you've already told us that you do not believe --
9   his kidney issues do not have anything to do with
10  the arsine event of July of 2001.
11      A   Correct.
12      Q   With regard to Mr. Schnitzer, do you find
13  any blood results that would confirm a diagnosis
14  of exposure to arsine?
15      (Ms. Smith re-enters the proceedings.)
16      THE WITNESS:  Mr. Schnitzer, as far as I
17  can tell from his records, did not have any testing
18  done on July 11, 2001.
19      Q   (BY MR. TUCKER)  When was he tested?
20      A   Oh, looks like it was a urine test in
21  December of 1997, and then when he had his
22  kidney failure in February of 2002.
23      Q   So is there any laboratory evidence that
24  would permit confirmation of a diagnosis of
25  exposure to or injury from arsine exposure in July

Page 330

1   of 2001?
2       A   There were no lab tests done in July of
3   2001.
4       Q   Since Mr. Schnitzer was not examined or
5   evaluated or tested at the time of the event, and
6   did not see a physician for evaluation until
7   February of 2002, on what do you base your
8   opinion that Mr. Schnitzer had acute arsine
9   intoxication?
10      A   The symptoms that he reported.
11      Q   Anything else?
12      A   No.
13      Q   Please look at Allen Miller.
14      A   Okay.
15      Q   Do you know where Mr. Miller worked?
16      A   He was another Air Exchangers employee.
17      Q   And do you know what his duties were?
18      A   No.
19      Q   Do you know whether he worked in the
20  office or in the shop?
21      A   I do not.
22      Q   Do you know whether he left his point of
23  employment at any time following the accident?
24      A   I do not.
25      Q   So I guess if I were to ask you if he

Page 331

1   evacuated, where he went, you probably wouldn't
2   have that information, would you?
3       A   I do not.
4       Q   Have you read Mr. Miller's deposition?
5       A   No.
6       Q   And had you read Mr. Schnitzer's
7   deposition?
8       A   No.
9       Q   Are we fortunate to have blood results on
10  Mr. Miller that's contemporary with the event?
11      A   We have blood tests on the day of the
12  incident.
13      Q   What do those blood tests tell us?
14      A   The haptoglobin was normal.  The urine
15  arsenic was normal.  And the hemoglobin was
16  within the normal range, although it was repeated
17  twice, and increased from the first to the second
18  test.
19      Q   But it never got out of the normal range;
20  is that right?
21      A   That's correct.
22      Q   And did he have a urinalysis?
23      A   He did.
24      Q   Would it be -- would it be fair to
25  conclude, sir, looking at the laboratory tests that

Page 332

1   were performed on Mr. Miller consistent with the
2   day of the event, nothing about those laboratory
3   tests indicates arsine poisoning?
4       A   Well, it depends what we want to make of
5   the hemoglobin change from 13.3 to 14.6, whether
6   they want to consider that indicative of an arsine
7   effect on the blood.
8       Q   You previously told us the dose makes the
9   poison, right?
10      A   Well, the dose -- well, I actually didn't
11  ever say the dose makes the poison.
12      Q   Do you disagree with that?
13      A   I would agree that there's generally a
14  dose-response relationship for many but not all
15  chemicals.  There are many chemicals for which
16  there is not a dose-response relationship, but
17  many chemicals for which there are.
18      Q   How about arsine?
19      A   There is a dose-response relationship,
20  but within that dose response is also an
21  individual variability.  So it's not as simple as
22  just saying the dose makes the poison.
23      Q   Now, when you say arsine poisoning, is
24  the fact that Mr. Miller's hemoglobin was reported
25  at two different levels on two different tests, all of



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 333

1  which were clearly within the normal range, are
2  you saying that that's evidence of arsine
3  poisoning?
4      A  Possibly. I mean, that is one way to look
5  at that. It's suggestive. I don't think it's
6  absolutely diagnostic.
7      Q  Do you have any laboratory tests that
8  would indicate anything abnormal?
9      A  All of the lab tests are in the normal
10  range, but it's -- one way to interpret that change
11  in hemoglobin along with the symptoms he
12  reported on that date is some effect of arsine.
13      Q  If you were to take anybody's hemoglobin
14  level as we sit here now at 4:15 in the afternoon
15  in San Francisco, California in your hospital, and
16  then we were to take it again at midnight, and
17  again tomorrow at 4 o'clock, would you expect all
18  three of those results to be the same?
19      A  We would expect them to be close. So
20  that's the question, is this just some normal
21  variability in hemoglobin tests.
22      Q  What is the normal variability in
23  hemoglobin tests?
24      A  It is slight in its variability, and it
25  depends largely on the hydration state. In other

Page 334

1  words, how well hydrated you are. If he was less
2  hydrated, that is if he was more dehydrated
3  between the first and the second test, the
4  hemoglobin count would go up.
5          So one possible explanation for this is
6  that he somehow got dehydrated in the hospital.
7  It's not very likely. Usually it goes the other way,
8  you're hydrated in the hospital.
9      Q  Just so we're clear, the test results were
10  all in the normal range?
11      A  Yes, that's correct. They're in the normal
12  range.
13      Q  I don't note here on your chart the fact
14  that he was diagnosed in the medical records as
15  having arrived at the hospital with a sunburn.
16      A  I don't remember that. I may not have
17  noted it because I didn't consider it significant.
18      Q  Did you have an opportunity to look at
19  his medical history?
20      A  Yes.
21      Q  Did you find anything significant in that
22  medical history?
23      A  In terms of his past medical history?
24      Q  Yes.
25      A  No, I did not.

Page 335

1      Q  Were you aware that in 1996 he had a
2  motor vehicle accident with head trauma, and has
3  experienced headaches off and on since that time?
4      A  I was not aware of that.
5      Q  Would that have been a good thing you
6  would have liked to have known?
7      A  It's a pertinent fact in terms of
8  evaluating the onset of headaches and any change
9  in those, compared with headaches he had prior to
10  the exposure.
11      Q  And were you aware that here he's
12  reporting fatigue? Do you know whether or not he
13  smokes?
14      A  I do not.
15      Q  Does a heavy smoker get fatigue
16  sometimes?
17      A  Smoking itself wouldn't cause fatigue.
18  There would have to be secondary medical
19  problems from smoking.
20      Q  The consequences of smoking can cause
21  fatigue, though, can't they?
22      A  If you had severe obstructive lung
23  disease, that could cause fatigue.
24      Q  His history also reports that in 1997 he
25  had a response to mold exposure.

Page 336

1          Did you know that?
2      A  No.
3      Q  With that added to his history, and the
4  fact that his laboratory results were all normal,
5  do you still contend his differential diagnosis --
6  or did you make a differential diagnoses on him?
7      A  I considered that his symptoms at the
8  time of exposure were consistent with the effects
9  of arsine exposure or arsine poisoning.
10      Q  Every time you've used the phrase
11  "consistent with," are you intending that that may
12  be used interchangeably with the phrase "caused
13  by"?
14      A  At the time of acute exposure, at the time
15  of the incident Mr. Miller reports headache that
16  is, I think, caused by exposure to arsine. Unless
17  it can beshown by these additional facts that you
18  have posited to me or, you know, medical elements
19  that may be present in his past medical history,
20  unless more information comes to light, I think
21  that's caused by exposure to arsine.
22      Q  Then the Hastings diagnosis shown in
23  your chart of fatigue, headache and depression.
24  You say that those continuing complaints are
25  consistent with exposure to arsine in July of

58 (Pages 333 to 336)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

INGRAM v. AIR PRODUCTS        ROBERT HARRISON                June 22, 2005

Page 337

1  2001, which exposure is not sufficient to cause
2  any reaction in the blood beyond normal ranges?
3      A   Okay.  I think I'd like to answer your
4  question, but I think it's then worth clarifying,
5  that there are acute symptoms of arsine poisoning
6  at the time of exposure on July 11, 2001.  Then
7  there were ongoing complaints at the time of Dr.
8  Hastings' examination.
9          And I think it's important to distinguish
10 between those two.  And my opinion is different.
11 At the time of acute exposure, Mr. Miller's
12 headaches are caused by exposure, unless there
13 are other factors that I'm not aware of that would
14 change that opinion after review of additional
15 medical records.  His symptoms now would require
16 additional diagnostic studies.
17     Q   Were those performed?
18     A   Not to my knowledge.
19     Q   With respect to the headache at the time
20 of the event, aren't the headaches that result from
21 arsine a consequence of the hemolysis that arsine
22 causes?
23     A   We don't know that for sure.
24     Q   Have you read that in the medical
25 literature?

Page 338

1      A   I have not.  The central nervous system
2  effects are not necessarily the consequence of just
3  the intravascular hemolysis.
4      Q   Does hemolysis result in headache?
5      A   Not necessarily.
6      Q   Does it result in headache?  Not always,
7  but does it result in headache?
8      A   It may.
9      Q   When we took a break a little bit ago and
10 you and Mr. Ward visited, what did you-all visit
11 about?
12     A   I discussed with him where we were in
13 terms of a deposition today, timewise, that I was
14 probably becoming repetitious to you and/or
15 myself.
16     Q   Anything other than time?
17     A   No.
18     Q   Anything about the contents of your
19 testimony?
20     A   No.
21     Q   Please look at Linda Castro.
22     A   Okay.
23     Q   Do you know where Ms. Castro worked?
24     A   (Witness examines document.)
25         Motor Guide Marine.

Page 339

1      Q   How far was that, relative to how far Air
2  Exchangers is?
3      A   It looks like it's about the same distance
4  away from Solkatronics.
5      Q   Which direction?
6      A   North.
7      Q   Did Ms. Castro have any blood tests that
8  demonstrated exposure to arsine?
9      A   Ms. Castro had a urine test and a blood
10 count.  Those were done on July 14th, 2001, three
11 days after the arsine release.  Both of those tests
12 were normal.
13     Q   Is there any test for Ms. Castro that
14 demonstrates any abnormal value?
15     A   Those were the only two tests that were
16 done that were relevant to arsine exposure; and
17 both of those were normal.
18     Q   Did she miss any work?
19     A   I don't know.
20     Q   Did you review her deposition?
21     A   No.
22     Q   Please look at Mr. Patton.
23     A   Okay.
24     Q   Where was Mr. Patton located?
25     A   (Witness examines document.)

Page 340

1          Air Exchangers.
2      Q   And you report on your summary that he
3  had a test, blood test, which showed a plasma
4  hemoglobin of 19 percent?
5      A   Yes.
6      Q   With normal of 10.4 percent?
7      A   That's correct.
8      Q   And so when you say 19 percent, you're
9  intending that that reflect -- that that record
10 reflects, as far as you know, the same unit of
11 measurement as the 10.4 percent shown as
12 normal; is that correct?
13     A   Correct.
14     Q   And are there any subsequent tests for
15 Mr. Patton to demonstrate plasma hemoglobin?
16     A   No.
17     Q   Do you know anything about Mr. Patton's
18 job?
19     A   No.
20     Q   Do you know whether or not he's a
21 smoker?
22     A   I do not.
23     Q   Do you know whether he's had any
24 previous problems with blacking out before this
25 event?



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006

TULSA ————————————918-583-8600

FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 341

1     A   I didn't see that in his medical records.
2     Q   Do you know whether Mr. Patton had a
3   urine test?
4     A   He did not, as far as I know.
5     Q   Please look at Mr. Sumter.
6     A   Okay.
7     Q   Where did Mr. Sumter work?
8     A   (Witness examines document.)
9         Air Exchangers.
10    Q   And he did a -- had blood work done; is
11  that correct?
12    A   That's correct.
13    Q   Plasma hemoglobin and haptoglobin,
14  right?
15    A   Yes, that's correct.
16    Q   And was the haptoglobin in the normal
17  range?
18    A   Yes.
19    Q   Was the plasma hemoglobin in the normal
20  range?
21    A   No.
22    Q   Do you know what Mr. Sumter's job duties
23  were?
24    A   No.
25    Q   Of the 13 plaintiffs, would you agree that

Page 342

1   Mr. Sumter had the highest plasma hemoglobin
2   reading?
3     A   Yes.
4     Q   Does this high level concern you?
5     A   It indicates -- I have to know what you
6   mean by concern.  It indicates that he absorbed
7   arsine, and it affected his red blood cells.
8     Q   Do you know where he was tested?
9     A   I do.  I'd have to pull that out of the
10  medical records.
11    Q   Was he tested at a hospital?
12    A   I don't recall.
13    Q   Was he retested?
14    A   Not to my knowledge.
15    Q   With a plasma level of 111 percent and
16  normal of 10.4 percent, would you think that
17  the physicians were concerned about him that they
18  would have retested him to determine whether it
19  was going down or up or whatever?
20        MR. WARD:  Object to the form of the
21  question.
22        THE WITNESS:  In his case, retesting
23  probably would have been a good idea.  If I were in
24  the emergency department or in the office or
25  clinic, wherever he was tested, I probably would

Page 343

1   have had him repeat it.
2     Q   (BY MR. TUCKER)  But for whatever
3   reason, the physicians at that institution
4   determined not to do that; is that correct?
5         MR. WARD:  Object to the form of the
6   question.
7         THE WITNESS:  The test was not
8   repeated.  I don't know why.
9     Q   (BY MR. TUCKER)  Would you agree that
10  you would not have been concerned if Mr. Sumter's
11  plasma hemoglobin report had been one percent or
12  less?
13    A   You mean as reported by this laboratory,
14  if it was one percent?
15    Q   As reported --
16    A   It wouldn't --
17    Q   As used by you, however you'd use one
18  percent.
19    A   Well, if the lab report came back as one
20  percent, and the lab normal was up to 10.4
21  percent, this would not have indicated any
22  hemolysis.
23    Q   Is there a difference between arsine
24  exposure and arsine injury?
25    A   Yes.  Exposure can occur without an

Page 344

1   injury.
2     Q   Is there a difference between arsine
3   exposure and arsine poisoning?
4     A   Arsine poisoning means that there is an
5   effect on the body, end organ, or a toxic effect on
6   tissue or an organ or some body function.
7     Q   Do you know that that 111 percent means
8   in the vernacular of the laboratory that made the
9   test?
10    A   I don't understand your question.
11    Q   Well, 111 percent, how does that relate
12  and compare to the figure in your book of 1.5
13  percent grams per dekaliter?
14    A   You know, I don't want to say without
15  looking at the laboratory method and the range of
16  normal as reported by this particular lab and my
17  reference of one and a half percent that I made in
18  my chapter to see how those two correlate with
19  each other in terms of a lab technique and units
20  of measurement.
21    Q   So you'd like to see the lab report and
22  see if that gives you any indication of what they
23  meant by 111 percent?
24    A   Correct.
25    Q   Let me hand you what's been marked as



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY  ———————405-272-1006
TULSA ————————————918-583-8600
FAYETTEVILLE  ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 345

1  Defendants' Exhibit 11. I've taken the liberty of
2  highlighting that page to assist you since you're --
3          MR. WARD: Okay.
4      Q   (BY MR. TUCKER) That's number 11
5  from a previous depositionso we may have to give
6  it a new number here, but those are the records of
7  St. Francis Hospital as they pertain to Mr.
8  Sumter.
9      A   Okay.
10     Q   How does that St. Francis Hospital,
11 Tulsa, Oklahoma laboratory report plasma free
12 hemoglobin?
13     A   Well, they're reporting it as milligram
14 per, but they leave the denominator blank or the
15 basis.
16     Q   Look carefully at that page, Doctor.
17     A   Maybe you can point out to me if they
18 report the unit of measurement. I see the
19 haptoglobin, but I don't see the plasma
20 hemoglobin. It says milligram, but then I don't
21 see milligram per what. I'm looking for subsequent
22 measurements. They do that again. Here it's 22.8
23 on July 12th.
24     Q   Let me represent to you, Doctor, that --
25 did you call St. Francis to ask them what they

Page 346

1  meant by that?
2      A   No, I didn't.
3      Q   And you know today now that's kind of a
4  pivotal question, isn't it, what they meant by 111
5  percent?
6          MR. WARD: Object to the form.
7          THE WITNESS: Well, it's above their
8  laboratory range of normal. And, you know, I'm
9  assuming thatthey're an accredited laboratory and
10 that they're reporting the normal range correctly
11 so that if it's 111 and it's flagged as outside the
12 range, that it is truly outside the range.
13         Your question is how does it relate to
14 1.5 in my chapter. Now, to answer that I need to
15 call the hospital and find out what unit of
16 measurement they use and the technique that they
17 use compared to the 1.5 that I cite in my chapter.
18     Q   (BY MR. TUCKER) Let me suggest to you,
19 Doctor, if you make that call, the hospital will tell
20 you that they're talking about milligrams per
21 dekaliter.
22     A   Okay.
23     Q   If they're talking about milligrams per
24 dekaliter, what does 111 percent mean?
25         MR. WARD: I'm going to object to the

Page 347

1  form. Assumes facts not in evidence.
2      Q   (BY MR. TUCKER) I'd be glad to have
3  you make the phone call while we wait, Doctor, if
4  you don't want to take my word for it.
5          MR. WARD: This is a discovery
6  deposition. Keep going. I made my objection.
7      Q   (BY MR. TUCKER) You didn't call them
8  before now, correct? You didn't call St. Francis --
9      A   I have not called St. Francis.
10     Q   You read the record that says 111
11 percent?
12     A   Correct.
13     Q   It was important enough for you to write
14 it down in your summary, correct?
15     A   Correct.
16     Q   You testified under oath that that's
17 confirming to you a diagnosis of arsine poisoning
18 occurring to this gentleman on July 11th, 2001,
19 correct?
20     A   Correct.
21     Q   But you don't know what 111 percent
22 refers to, and you haven't called to find out; is
23 that right?
24     A   I know what it refers to. It refers to ten
25 times above the lab normal.

Page 348

1          You're asking me the unit of
2  measurement, I don't know that.
3      Q   Is it important to know the unit of
4  measurement?
5      A   Not right now.
6      Q   Well --
7      A   If you want me to correlate it with the 1.5
8  in my book chapter I'll be happy to do that.
9      Q   That's what I want you to do.
10     A   I would be happy to do that but at a later
11 date so I can call the lab and verify their
12 technique of measurement, how they do the test,
13 what units they use, and I'll go back and check
14 the reference that I use in my book chapter.
15     Q   Since, as Counsel points out, this is a
16 discovery deposition and I'm not entitled to ask
17 you to do that, I am entitled to ask you to assume
18 that that's reported by St. Francis in milligrams
19 per dekaliter. That being so, I'd like you to
20 perform the mathematical calculation to convert
21 that to grams per dekaliter. Can you do that?
22     A   I can try. So you want me to go from
23 what, 111 milligrams --
24     Q   What does the report say?
25     A   The report doesn't say. The report says

61 (Pages 345 to 348)


PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ———————————918-583-8600

FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 349

1   milligrams.
2     Q  111 milligrams per dekaliter.
3     A  The report doesn't say dekaliter. You're
4   asking me to assume that it's in dekaliter?
5     Q  Yes, sir, that's correct.
6     A  Okay. So 111 milligrams per dekaliter?
7     Q  Yes.
8     A  And what would you like to convert that
9   to?
10    Q  Convert that to grams per dekaliter.
11    A  So that looks to me like it's .111 if I did
12  that conversion correctly.
13    Q  Just a matter of moving the decimal point
14  over, correct?
15    A  Right.
16    Q  So it's .111 grams per dekaliter?
17    A  If I did the mathematics correctly, that's
18  correct.
19    Q  And if we compare that to the number in
20  your text, then that's .111 grams per dekaliter as
21  contrasted to 1.5 grams per dekaliter; is that
22  right?
23    A  If the 1.5 in my text refers to the same
24  unit of measurement, that's correct. I need to
25  confirm that.

Page 350

1    Q  This .111 is grams per dekaliter.
2   Converting 111 milligrams per dekaliter to grams
3   per dekaliter gets you .111 grams per dekaliter,
4   right?
5    A  Correct.
6    Q  In your book you use the standard of
7   measurement of grams per dekaliter.
8    A  Well, in my book I use 1.5 percent.
9    Q  And how many milligrams per dekaliter is
10  1.5 percent?
11    A  I want to check the reference.
12    Q  Well, just -- isn't it just a matter of
13  moving the decimal point? How many milligrams
14  per dekaliter is one and a half grams per
15  dekaliter?
16    A  I want to check the reference that I refer
17  to and see how the reference of 1.5 percent
18  compares with this lab value.
19    Q  Didn't you testify yesterday that it was
20  grams per dekaliter?
21    A  I don't recall, but if I did, I'll take your
22  word for it. But as far as this particular issue is
23  concerned as to how the 1.5 in my text compares
24  to this 111, I want to check the reference.
25    Q  Do you recall your colleague's book that

Page 351

1   we read from yesterday?
2    A  Yes.
3    Q  Do you recall the units of measurement
4   he used?
5    A  They actually don't use a unit of
6   measurement there. They didn't talk about the
7   1.5. That's from my chapter.
8    Q  He didn't discuss 1.5 percent in your
9   colleague's book?
10    A  No. That's just from my book -- that's
11  just from my chapter. And as far as I can recall, I
12  referenced a -- I believe I reference a 1974 paper
13  byFowler, but I'd have to go back and
14  double-check.
15    Q  Of course you have the right to do that,
16  but I still want you to make the conversion of 1.5
17  grams per dekaliter to milligrams per dekaliter so
18  in case I'm right, we won't have to come back and
19  repeat this exercise at $500 an hour.
20       MR. WARD: You don't have to anyway.
21       THE WITNESS: You know, I just don't
22  want to say as I sit here today, because I don't
23  want to be incorrect on my units of measurement.
24    Q  (BY MR. TUCKER) Well, how did you
25  convert milligrams to grams?

Page 352

1    A  Well, this conversion I know how to do. I
2   moved the decimal point over. But before I give
3   you the answer to what the percent is that I quote
4   in my chapter in terms of units of measurement, I
5   want to check before I give you the answer to that,
6   because I am not certain, and it's an important
7   issue. So I'm not prepared to answer today.
8    Q  That's fine. But I'm willing to take what
9   you told me yesterday for the basis of the question
10  I'm asking you now, which is simply to ask you to
11  perform a simple mathematic calculation of moving
12  the decimal point three places in the other
13  direction.
14    A  Well, no, you didn't ask me that. You
15  said convert 1.5 percent into some amount -- or
16  some amount.
17    Q  Convert 1.5 grams per dekaliter into
18  milligrams per dekaliter. Can you do that for me,
19  please.
20    A  1.5 grams per dekaliter equals --
21    Q  How many milligrams per dekaliter?
22    A  Oh, okay. That's just moving the decimal
23  point over three spaces. So let's move it over one,
24  two, so that's 1500 milligrams per dekaliter.
25       MR. WARD: Excuse me just a second, but



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 353

1  just for point of clarification, dekagram is a
2  hundred, right?
3         MR. TUCKER: A what?
4         MR. WARD: Dekaliter, "deka" means
5  hundred, doesn't it?
6         THE WITNESS: He asked me to convert
7  1.5 grams per dekaliter. You're right. Grams to
8  milligrams is a factor of a hundred.
9     Q   (BY MR. TUCKER) A hundred?
10    A   Let me see. Grams -- see, this is why I
11 want to go double-check.
12    Q   What is a milligram?
13    A   It's a thousand grams.
14    Q   So how could it not be a thousand? How
15 could it not be three decimal places? I'm going
16 with deka.
17        MR. WARD: Deka is a hundred.
18        MR. TUCKER: Nobody is talking about
19 deka.
20        THE WITNESS: So 1.5 grams per
21 dekaliter corresponds to 1500 milligrams per
22 dekaliter.
23    Q   (BY MR. TUCKER) Let me understand
24 this. You're having to take my word for the fact
25 that St. Francis Hospital is reporting in

Page 354

1  milligrams per dekaliter, because even though you
2  had that material and you've used it and reported
3  on it and testified about it today, you never really
4  figured out what they were referring to when they·
5  talked about 111 percent; is that right?
6         MR. WARD: That's an incorrect
7  statement of his testimony. He said it's roughly
8  ten times the normal range reported by the
9  laboratory.
10    Q   (BY MR. TUCKER) Do you know --
11        MR. WARD: So it's an absolutely
12 incorrect characterization of his testimony.
13    Q   (BY MR. TUCKER) Do you know in grams
14 per dekaliter what the normal range is for plasma
15 free hemoglobin as a toxicologist?
16    A   In grams per dekaliter?
17    Q   Uh-huh. Yes.
18    A   I'll check that for you. As I sit here
19 today, I don't want to answer one way or the
20 other.
21    Q   Would it have been a good thing before
22 you gave your opinions to identify what the normal
23 ranges were for plasma free hemoglobin since
24 that's the number-one indicator of hemolysis?
25    A   No. What I was looking at here was the

Page 355

1  range of laboratory normal. And I'm assuming
2  that this lab reporting an upper limit of normal of
3  10.4 is reporting an accurate normal range. I'd be
4  happy to double-check that for you.
5     Q   So what you will be looking to find out
6  would be if 10.4 is 10.4 milligrams per dekaliter
7  as a normal range; is that right?
8     A   I want to -- I will be happy to verify
9  whether the upper limit of the lab normal is
10 correct and consistent with the literature. I think
11 that's your central question there.
12    Q   Just to answer Mr. Ward's question, how
13 many milligrams are present in a dekaliter?
14        MR. WARD: That's not my question.
15 Grams and liters, that's two different
16 measurements.
17        THE WITNESS: I'll check that and get
18 back toyou.
19    Q   (BY MR. TUCKER) Would you agree,
20 Doctor, that there are a hundred thousand
21 milligrams in a dekaliter?
22    A   I'll check. What we're talking about here
23 is whether the range of normal as reported by this
24 particular lab is a correct or toxicologically
25 significant upper limit.

Page 356

1     Q   That's a --
2     A   It's not the specific numbers conversion
3  of milligrams to dekaliter or to liter. It is when
4  they report upper limit of normal at 10.4, that
5  makes sense from a toxicologic point of view, or
6  whether this lab is doing something wrong in the
7  way they report their lab normals.
8     Q   Let's use the phrase toxicologic
9  significance, okay?
10        MR. WARD: Can we use the word
11 toxicological significance?
12    Q   (BY MR. TUCKER) Toxicological
13 significance?
14        MR. WARD: Objection. That's really two
15 words. So I guess it would be a phrase, wouldn't
16 it?
17    Q   (BY MR. TUCKER) If your testimony
18 yesterday was correct thatin your book, which
19 doesn't further identify it, one and a half percent
20 meant grams per kilogram -- or grams per
21 dekaliter, we assume that you were correct
22 yesterday when you told us what your book meant,
23 then Mr. Sumter had a reading of .111 percent
24 when you convert his numbers to grams per
25 dekaliter; is that right?



**PROFESSIONAL
REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006

TULSA ——————918-583-8600

FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS        ROBERT HARRISON                      June 22, 2005

Page 357

1    A   I don't have an opinion without checking
2   my reference and comparing that to the lab --
3    Q   Well, I'm going to --
4    A   -- who did the test on Mr. Sumter.
5    Q   I'm going to ask you to assume that when
6   the lab reported down a value of 111 percent from
7   St. Francis Hospital, that it was reporting a
8   laboratory value of 111 milligrams per dekaliter,
9   okay?  Assume that to be true.  You're an expert.
10  I get to make assumptions and ask you questions.
11   A   (Witness nods head.)
12   Q   Fact number one, assume St. Francis
13  laboratory's report on Mr. Sumter's blood is that
14  his plasma free hemoglobin was 111 milligrams
15  per dekaliter.  Assume as fact number two that Dr.
16  William Harrison, expert toxicologist, testified
17  yesterday --
18   A   My name is Robert.
19   Q   I'm sorry.
20   A   I don't know who William is.
21   Q   He was a hand surgeon.
22   A   Was he as famous as I was?
23   Q   He's a retired hand surgeon.
24       Dr. Robert Harrison testified
25  yesterday in his book that the diagnosis of arsine

Page 358

1   poisoning is confirmed by a plasma free
2   hemoglobin reading of 1.5 grams per dekaliter or
3   higher.  Assume that to be a fact.
4        If you assume those facts to be true, and
5   add one more fact, that that converts to -- that
6   1.5 grams per dekaliter converts to 1,500
7   milligrams per dekaliter, okay?  Those are the
8   numerical facts I want you to assume.
9        Are we clear on what those are?
10   A   Got you.
11   Q   So if we compare Mr. Sumter to Dr.
12  Harrison, when we compare milligrams per
13  dekaliter we're comparing Mr. Sumter has 111,
14  and Dr. Harrison says that confirming diagnosis is
15  1,500, correct?
16   A   I'm understanding the hypothetical so
17  far.
18   Q   When you compare those things, that is
19  the comparison, isn't it?
20   A   With that assumption that you make,
21  that's correct.
22   Q   And flipping it the other way, if we use
23  Dr. Harrison's unit of measurement of 1.5 grams
24  per dekaliter, then Mr. Sumter's blood report was
25  0.111 grams per dekaliter; is that correct?

Page 359

1        MR. WARD:  Object to the form of the
2   question.  He said he needed to check his sources
3   for that to be his measurement.
4    Q   (BY MR. TUCKER)  Assuming those facts
5   to be true.
6    A   If we assume those facts to be true,
7   that's correct, assuming that the conversion
8   factors as you laid out are correct.
9    Q   The only factor that you don't really know
10  about is whether you were testifying accurately
11  yesterday when you said your book was referring
12  to 1.5 percent as grams per dekaliter?  You don't
13  know that anymore?
14   A   That is correct.  See, I need to check the
15  reference because I want to make sure that the
16  numbers here make sense.
17   Q   And number two, you only have my
18  representation that St. Francis Hospital is
19  reporting its plasma free hemoglobin levels in
20  milligrams per dekaliter?
21   A   That's correct.
22   Q   So you, of course, would want to check
23  that out and make sure I didn't screw that up?
24   A   Correct.
25   Q   Don't blame you.

Page 360

1        Are you aware of any of the 192 plaintiffs
2   that had a plasma free hemoglobin reading higher
3   than Mr. Sumter's?
4    A   No.
5    Q   If the facts I'll ask you to assume are
6   correct -- and I ask you to assume that they are
7   correct -- and the highest exposure anybody was
8   found to have as far as any reaction in their blood
9   was concerned that could reasonably be attributed
10  to anything, in other words, the highest plasma
11  free hemoglobin number was .1 -- 0.111 percent
12  grams per dekaliter and the only reference book
13  that we've seen and the only reference material
14  that's in this case so far is that to confirm the
15  diagnosis of arsine poisoning, it requires 1.5
16  grams per dekaliter, can you sit there as an expert
17  witness and say under oath that to a reasonable
18  degree of medical certainty, Mr. Sumter suffered
19  arsine poisoning because of July 11th, 2001?
20   A   Yes.  And it gets back to what --
21  assuming that the facts you said are correct, what
22  we mean by the significance of that 1.5, which
23  when I was writing about it means that you call
24  for packed red blood cells and get ready to
25  transfuse.



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ——————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 361

1     Q   Assume what I said was correct, that my
2  assumptions are true, is your answer still yes?
3     A   Yes.
4     Q   Are you aware of any medical literature
5  that shows you can diagnose acute arsine
6  poisoning with a laboratory reference value of 111
7  milligrams per dekaliter of plasma free
8  hemoglobin?
9     A   There's peer-reviewed literature that says
10  that elevated plasma free hemoglobin indicates
11  arsine exposure and absorption.
12     Q   My question is do you know of any
13  peer-reviewed literature that at that
14  level, 111 milligrams per dekaliter, that you'd
15  have any consequence, particularly long-term
16  consequence of arsine exposure?
17     A   That's a different question. I want to
18  point out that you then moved on to the second
19  issue.
20     The first is, is there an injury in the form
21  of intravascular hemolysis that causes an increase
22  in the normal range of plasma free hemoglobin.
23  And my belief is that there is.
24     Q   Because we have 111 milligrams --
25  assuming I'm correct, milligrams -- it's still an

Page 362

1  increase in hemolysis?
2     A   Correct. If I go and test a hundred
3  people who walk into this, whatever this hospital
4  is, St. Francis I think you said, I'm going to find
5  that almost all of them are going to be within the
6  range less than 10.4 percent.
7     When Mr. Sumter walked in, he's 111
8  percent. He's clearly outside that range. He's
9  different from the hundred people that have
10  walked in. And assuming that there's not some
11  mechanical problem or some artifactual cause of
12  his hemolysis, it represents exposure in my
13  opinion.
14     Q   The second --
15     A   The second part of the question, does
16  that cause long-term injury? I mean, he had an
17  injury and, in fact, intravascular hemolysis. Does
18  that cause long-term health problems? And I
19  believe that's the second question that you asked.
20     Q   And my question -- try to focus on that
21  second question. I want to know if you have
22  access to any peer-reviewed literature that says
23  that with that kind of level of plasma free
24  hemoglobin, 111 milligrams per dekaliter, there's
25  any evidence that anybody is going to have any

Page 363

1  long-term problems as a consequence?
2     A   As I sit here today, I don't have that
3  citation for you, but I'd be happy to look and keep
4  an open mind and try to find that literature.
5     Q   Do you know of any?
6     A   That looks at the spectrum of health
7  effects from given levels of or tested levels of
8  plasma free hemoglobin at the time of acute
9  exposure? There is literature that looks at
10  long-term effects of acute exposure to arsine. I
11  need to look at that literature to see what the
12  laboratory values were, whether they include
13  plasma free hemoglobin, whether they're in the
14  111 range.
15     Q   Have you ever done that?
16     A   Have I done what?
17     Q   Have you made that search previous to
18  today?
19     A   I did a search to look at whether there
20  are chronic effects after acute exposure to arsine
21  gas. And the effects that are reported are central
22  nervous system and peripheral nervous system,
23  peripheral neuropathy.
24     Q   You've never done the search to determine
25  what threshold level of plasma free hemoglobin

Page 364

1  would be consistent with any long-term effects; is
2  that correct?
3     A   Well, I have the articles, but I would need
4  to look back at them and see whether we can
5  answer your question.
6     Q   Are these the articles that are in your
7  notebook?
8     A   In terms of citation, in my citations
9  attached to my report, and also they're in the
10  notebook.
11     Q   So the articles you're going to look at for
12  that information would be either contained in your
13  notebook or in the citations attached to your
14  report?
15     A   Yeah. And I'd be happy to see if there
16  was others out there in the peer-reviewed
17  literature.
18     Q   I just want to make sure that you don't
19  have -- when you say you're going to go back and
20  look, you're talking about going back and looking
21  at the information on which you have already
22  relied; is that correct?
23     A   I will go back and look at that
24  information and any other information that's
25  available in the peer-reviewed and

65 (Pages 361 to 364)



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY  ————  405-272-1006
TULSA  ————  918-583-8600
FAYETTEVILLE  ————  479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 365

1   nonpeer-reviewed literature, including
2   authoritative organizations that might have some
3   information if you're interested in that.
4          MR. TUCKER: Let's go off the record.
5          (Recess taken.)
6          Q   (BY MR. TUCKER) What I'm going to do,
7   I'm going to identify exhibits that we're offering to
8   the deposition from your file. And you can feel
9   free to check it, or we can trust Candy.
10         Number 2, file folder with notes about
11  Daubert. Number 3, letter from Mr. Ward dated
12  12/22/04. Number 4, map re high plasma
13  hemoglobin. Number 5, all client locations map.
14  Number 6, map re 13 clients. Number 7, map re
15  high hemoglobin. 8, map re clients with
16  hematuria. Number 9, letter to Mr. Stoops dated
17  4/30/05. Number 10, billing invoice that refers
18  to Dr. Harrison, November 29, '04. Number 11,
19  billing invoice, January 7, '05. Number 12,
20  billing invoice, May 1, '05. Number 13, billing
21  invoice dated 6/20/2005.
22         Just by way of summing all that up, that
23  all reflects spending a total of five and a half
24  hours on this matter prior to writing your report.
25         Number 14, Charles Biddle medical

Page 366

1   records. Number 15, Theresa Haggard medical
2   records. Number 16, highlighted copy of Gard's
3   report. Number 17, notebook containing
4   Solkatronics documents 00062 through 00383 re
5   investigation, Plaintiffs' Exhibits 57 to 67, the
6   MSDS Air Products, the Hastings report on Mr.
7   Sumter, a map of the port. Number 18, literature
8   notebook sent to Mr. Harrison by plaintiffs'
9   attorneys that we previously identified as research
10  materials. Number 19, notes of Dr. Harrison
11  regarding assignment of the case. Number 20,
12  letters from plaintiffs' attorney dated -- or letter
13  from plaintiffs' attorney dated October 6, 2004.
14  Number 21, two-page letter from plaintiffs'
15  attorney enclosing medicals, dated October 12,
16  2004. Two-page letter from plaintiffs' attorney
17  enclosing medical and other material dated
18  December 16, 2004. One-page letter with medical
19  records dated December 16, 2004. Two-page letter
20  from plaintiffs' attorney with additional records
21  dated May 9, 2005. Number 25, Med-Search.
22  Number 26, hazard assessment, Catoosa,
23  Oklahoma. Number 27, Dr. Harrison's medical
24  chart. Number 28, minutes of the July 17, 2001
25  port meeting. Number 29, Tulsa news coverage.

Page 367

1   Number 30, URS soil samples. Number 31, Rule
2   26. Number 32, article regards chemical
3   terrorism. Number 33, arsine acute toxicity
4   summary. Number 34, IDLH re arsine. Number
5   35, N-I-O-S-H, NIOSH, paper. Number 36, ATSDR
6   paper. Number 37, NIOSH publication. Number
7   38, MSDS from Air Products. Number 39, MSDS
8   from Praxair, P-r-a-x-a-i-r. Number 40, MSDS
9   from Matheson Gas,M-a-t-h-e-s-o-n. Number 41,
10  BOC Gasses. Number 42, ChemWatch. Number
11  43, TRI Explorer. Number 44, weather data.
12  Number 45, NIOSH pocket guide. Number 46,
13  notes made at deposition regarding calculations of
14  dekaliters.
15     A   What did you refer to as Exhibit 27 that
16  said medical chart?
17         MS. SMITH: Harrison medical chart. I
18  think it's that one.
19         THE WITNESS: Oh, it's the table, okay.
20         MR. WARD: Would you tell us what the
21  purpose was of you reading Ms. Smith's notes into
22  the record?
23         MR. TUCKER: She asked me to.
24         MR. WARD: So you're not suggesting that
25  those notes are probative of anything or

Page 368

1   representative of anything. You're just reading
2   notes that Ms. Smith gave you.
3          MR. TUCKER: To identify for the record
4   how we've numbered the exhibits which would be
5   for the good of anybody if we want to go find them.
6          MR. WARD: Would you agree with me
7   that Dr. Harrison wasn't following along with you
8   as you read that, comparing that to exhibits?
9   You'd agree with that, wouldn't you.
10         MR. TUCKER: Dr. Harrison appeared
11  somewhat zonedout.
12         MR. WARD: And no one was checking
13  while you were reading, right? You'd agree with
14  that?
15         MR. TUCKER: That's correct.
16         MR. KENYON: Let's go off the record.
17         (Discussion off the record.)
18         MR. TUCKER: We need to probably
19  record this for custody chains and so forth.
20         Q   (BY MR. TUCKER) With your consent
21  we'd like to ask the court reporter to obtain copies
22  of all these records and have her be responsible
23  for the exhibits.
24     A   And the court reporter will send them
25  back to me?

66 (Pages 365 to 368)



**PROFESSIONAL**
**REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ———————————918-583-8600

FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 369

1    Q   She'll get them back to you.
2    A   That will be fine.
3        MS. SMITH:  Off the record for a second.
4        (Discussion off the record.)
5        MR. TUCKER:  I don't have any further
6    questions at this time.  I would like to remind you
7    that you're going to look for some stuff and give it
8    to your counsel to give to me, correct?
9        THE WITNESS:  Correct.
10       MR. TUCKER:  Exhibits 47, 48 and 49
11   will be the CD-ROM medical records which Dr.
12   Harrison is going to give to the court reporter
13   today.
14       Q   (BY MR. TUCKER)  Those CD-ROMs came
15   to you, as I understand, Doctor, from plaintiffs'
16   attorneys; is that correct?
17       A   Yes.
18       MR. WARD:  Okay.
19           EXAMINATION
20   BY MR. WARD:
21       Q   Dr. Harrison, during the course of Mr.
22   Tucker's questioning, you have from time to time
23   given the opinion that individuals had exposure
24   and/or injury from arsine, have you not?
25       A   Yes.

Page 370

1    Q   And what you've employed as a medical
2    doctor is the technique known as differential
3    diagnosis, have you not?
4    A   Yes.
5    Q   Is the —
6        MR. TUCKER:  Object to the form of the
7    question.
8        MR. WARD:  Huh?  What?
9        MR. TUCKER:  You're supposed to ask
10   him what technique did he use.  You're not
11   supposed to suggest the answer to him.
12       MR. WARD:  Why not?
13       MR. TUCKER:  That's a leading question.
14       MR. WARD:  Why don't you object?
15       MR. TUCKER:  I did.
16       MR. WARD:  Okay.
17       Q   (BY MR. WARD)  Your answer was what?
18       A   Yes.  I have employed the differential
19   diagnosis.
20       Q   And do physicians generally employ
21   differential diagnosis as a way of —
22       MR. TUCKER:  Object to the form of the
23   question.
24       Q   (BY MR. WARD)  -- making a diagnosis on
25   a person?

Page 371

1    A   Yes, they do.
2    Q   And has that method gained scientific
3    acceptance in the medical community?
4    A   Yes.
5    Q   Is it a standard method of making a
6    diagnosis for all physicians in the United States?
7    A   Yes.  It's accepted in the medical and
8    scientific community across the country.
9    Q   Now, in making a diagnosis of arsine
10   exposure, is it important for you to factor in
11   the -- I forget the term, but the likelihood of
12   exposure opportunity?
13       A   Yes.
14       Q   And why is that important?
15       A   It's important to know the process or
16   thecircumstances of exposure to know whether
17   it's -- to know the likelihood that the chemical is
18   released into the air that can then potentially be
19   breathed by the person.
20       Q   And is the opportunity for exposure one
21   of the things that you have considered in making
22   your differential diagnosis?
23       A   Yes.
24       Q   Now, in this particular case do you know
25   what the olfactory threshold is for arsine?

Page 372

1    A   Yes.
2    Q   And what is it?
3    A   0.5 parts per million.
4    Q   And is the olfactory threshold an effective
5    means for knowing whether a person has been
6    exposed to a high enough concentration to produce
7    an injury?
8    A   No.
9    Q   Why is that?
10   A   The threshold for an injury that's set in
11   terms of occupational standards is .05 parts per
12   million, which is a tenth of the olfactory
13   threshold.
14       Q   So if a person smells arsine, is it fair to
15   say that they are way above the threshold for
16   cause of injury?
17       A   That's correct.
18       Q   All right.
19           Now, in this particular case did you note
20   whether any of the plaintiffs had indicated a smell
21   which might be associated with arsine?
22       A   Yes, I did.
23       Q   And what did the plaintiffs report?
24       A   Some of the plaintiffs reported a
25   garlic-like odor.

67 (Pages 369 to 372)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————————405-272-1006

TULSA ————————918-583-8600

FAYETTEVILLE ————————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 373

1    Q  And what would that indicate to you, if
2  they in fact detected a smell, garlicky smell?
3    A  That it was above the odor threshold of .5
4  parts per million.
5    Q  Now, also when reading Exhibit No. 28,
6  which were the meetings of the Tulsa Port of
7  Catoosa, the post-incident evaluation meeting of
8  July 17 -- I think you indicated you did read
9  those, did you not?
10    A  Yes.
11    Q  Now, did you notice that there was a
12  person by the name of Mr. Joseph who was present
13  and spoke at that meeting?
14    A  Yes.
15    Q  And he's identified on Exhibit No. 28 as
16  being the plant manager for Solkatronics.
17    Do you understand that?
18    A  Yes, I see that.
19    Q  Now, I want to draw your attention to
20  some statements that Mr. Joseph made and ask
21  how those bear on your opinions.
22    Mr. Joseph -- on what's Bates stamped
23  PORT-83, page 2 -- says that "in the beginning,
24  looked like a major incident."
25    So if the plant manager is making

Page 374

1  reference to this as what looked like it could be a
2  major incident, would you find that to be relevant
3  to the opportunity aspect for exposure?
4    A  Yes.  I would consider that to be -- that
5  kind of statement means that there's a significant
6  exposure potential.
7    Q  Mr. Joseph continues on; and this is six
8  days after the incident when all his experts from
9  Allentown were flown in.  And when he reports to
10  the group, "As you know, we had an arsine release
11  which went off-site," would that bear upon your
12  opinion as to the opportunity for exposure in this
13  case?
14    A  Yes.
15    Q  When a plant manager makes the
16  statement that "Air Products is poised to address
17  those issues to be sure we compensate people for
18  what happened during that time," would that
19  suggest to you that as the plant manager there
20  was an opportunity for exposure?
21    A  Yes.  It suggests that there was the
22  opportunity for exposure and consequential
23  injury.
24    Q  And six days after the incident, after he's
25  gathered all his so-called experts from Allentown

Page 375

1  and met with them, when he says, "The wind was
2  in a northwest direction, and we know it drifted in
3  that direction," combined with his earlier
4  statement that it drifted off site, would that bear
5  upon your opinion as to whether there was an
6  opportunity for exposure?
7    A  Yes.
8    Q  Because these Air Exchanger employees
9  were northwest of Solkatronics, were they not?
10    A  That's correct.
11    Q  Now, Mr. Tucker asked you some
12  questions about would you want to see the health
13  records of the actual Solkatronics employees, and
14  whether that would assist you in your opinions.  I
15  want to ask you a few questions related to that.
16    One of the persons present at that
17  meeting was Jarrad Garrison, the operations
18  manager for Solkatronics.  And he says that -- I'm
19  going to read here.  He says, "At approximately
20  1:00 p.m., Wednesday, July 11th, we heard a pop
21  from our dock and rush of gas.  I was with one of
22  our lead operators who walked out a different door
23  and saw that we had a gasleak from what we were
24  pretty sure was an arsine cylinder by its location
25  on the dock.  We started evacuating the plant."

Page 376

1    Now, if the employees were in fact
2  evacuated before -- of Solkatronics before there
3  was an opportunity for exposure, would it do any
4  good to see their medical records?
5    A  Probably not, I mean, if they weren't
6  exposed to arsine, because they were able to get
7  out.
8    Q  And he continues, "As we evacuated the
9  plant, I called our safety/environmental manager
10  in Pennsylvania, so he could go ahead and put
11  together the crisis and communication team we
12  have in Allentown.  From that, they contacted the
13  appropriate local authorities for the release."
14    Would it have -- well, as an
15  epidemiologist and a person who has had a number
16  of cases involving chemical exposures, what
17  comment would you make as to where their first
18  call should have been, to Allentown or to local
19  authorities?
20    A  Well, in terms of the emergency response
21  planning that I've been involved with as an
22  epidemiologist and an occupational environmental
23  medicine physician, the first call would be to the
24  local emergency management authorities, the
25  hazardousmaterials crews, the fire department,



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 377

1  who can immediately activate an emergency
2  response network.
3      Q   Now, if Solkatronics' reaction was to
4  immediately evacuate their employees, would you
5  think it would be advisable to notify the neighbors
6  to evacuate also?
7      A   Yes. There should be an immediate
8  activation plan in place to notify, evacuate, or
9  shelter-in-place, as we call it, stay indoors, keep
10  the doors and windows shut after an accidental
11  chemical release.
12      Q   There's a statement on page 8 of this
13  document from a person named Michael Lowther of
14  Solvay Fluorides, Inc. He says, "By the way, we
15  were not notified. What is your location in
16  relation to Solkatronics? We are behind Advanced
17  Research."
18          If neighbors were not notified, would that
19  bear upon your opinion concerning the
20  opportunity for exposure in this case?
21      A   Yes.
22      Q   And on page 16 of that document, the
23  chief of the Claremore Fire Department, David
24  Horton, made a statement that there were 74
25  people that are complaining of symptoms.

Page 378

1          Would that be important in your
2  opinionconcerning opportunity for exposure?
3      A   Yes.
4      Q   And I want to address that statement of
5  Mr. Tilly's, that there were 400 lawyers outside
6  the hospital when this occurred.
7          Do you have any idea how Mr. Tilly made
8  that account?
9      A   No.
10      Q   Do you know whether he was even present
11  at the hospital?
12      A   I do not.
13      Q   Well, let me represent to you that I got a
14  call from one of the family members that asked me
15  to go see their husband at the hospital. And I was
16  there, and I didn't see a single lawyer there.
17          So would that have any bearing on -- if
18  that fact were true, would that have any bearing
19  on Mr. Tilly's statement, do you think?
20      A   Yes, it would. I think that accounts by
21  others who were actually there would be important
22  to consider.
23      Q   Okay.
24          THE WITNESS: I don't want to break up
25  your train of questions, but would you permit me

Page 379

1  to return this page, or do you think you're almost
2  done?
3          MR. WARD: No.
4          (Recess taken.)
5      Q   (BY MR. WARD) Doctor, we were talking
6  about the opportunity for exposure and Mr.
7  Tucker's question to you about whether or not you
8  had examined the hospital records of the
9  Solkatronics or Air Products employees.
10          Part of the materials that you reviewed
11  includes Exhibit No. 17 to this deposition. And at
12  tab M, I want to go through with you the
13  statements made by Air Products employees
14  concerning their opportunity for exposure.
15          Do you see Bob Malek's interview?
16      A   Yes.
17      Q   And he says he didn't smell anything,
18  right?
19      A   Yes.
20      Q   So that would tend to discount the
21  possibility that he was exposed, would it not?
22      A   Yes.
23      Q   And do you see here where he says, but
24  he evacuated?
25      A   Yes.

Page 380

1      Q   And that would discount the possibility of
2  being exposed too, wouldn't it?
3      A   Yes.
4      Q   Would the same be true of Steve Carlson,
5  who was interviewed, the Air Products employee?
6      A   Yes.
7      Q   He didn't smell anything, and he too
8  evacuated.
9          Now, Dusty Johnson is a contractor, not
10  an employee, but do you see where he says he
11  evacuated and didn't smell anything?
12      A   Yes.
13      Q   And likewise, Richard Morgan, a
14  contractor, says that he evacuated and didn't
15  smell anything?
16      A   Yes.
17      Q   Kelly Gary, a contractor, he says he was
18  evacuated and didn't smell anything, does he not?
19      A   Yes.
20      Q   Ron Brown, a contractor, says he was
21  evacuated and didn't smell anything, does he not?
22      A   That's correct.
23      Q   Tom Duncan, a contractor, says he was
24  evacuated and didn't smell anything, correct?
25      A   That's correct.



PROFESSIONAL REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 381

1     Q   Brian Herrick, a contractor, says he was
2   evacuated and didn't smell anything, correct?
3     A   That's correct.
4     Q   David D-i-P-b-o-y-e, a contractor, says
5   hewas evacuated and didn't smell anything,
6   correct?
7     A   Yes.
8     Q   Walt Spiegel, an APCI employee, says he
9   evacuated and didn't smell anything, correct?
10    A   Correct.
11    Q   Same would be true of Ralph Housman, a
12  contractor, correct?
13    A   Yes.
14    Q   Same would be true of Doug Klintworth, a
15  contractor, would it not?
16    A   Yes.
17    Q   Would the same be true of Chuck Jones, a
18  contractor, that is that he evacuated and didn't
19  smell anything?
20    A   Yes.
21    Q   Same be true of Kelly Brown, a
22  contractor?
23    A   Yes.
24    Q   Would the same be true of Doug
25  Cammilaire -- that's C-a-m-m-i-l-a-i-r-e, he

Page 382

1   evacuated and didn't smell anything either, did
2   he?
3     A   That's correct.
4     Q   Mike Brown, a contractor, evacuated.  He
5   didn't smell anything, did he?
6     A   No.
7     Q   Enrique Guerra, G-u-e-r-r-a, evacuated
8   anddidn't smell anything, did he?
9     A   That's correct.
10    Q   Pablo Tolentino evacuated and didn't
11  smell anything?
12    A   That's correct.
13    Q   Claudio Torres Desendy, D-e-s-e-n-d-y,
14  he evacuated and didn't smell anything, did he?
15    A   That's correct.
16    Q   Antonio Guerro, contractor, he evacuated
17  and didn't smell anything, correct?
18    A   That's correct.
19    Q   Umberto A-l-c-a-n-t-a-r-a evacuated and
20  didn't smell anything, correct?
21    A   That's correct.
22    Q   Castor Vega evacuated and didn't smell
23  anything, correct?
24    A   Correct.
25    Q   James Mackey evacuated and claimed to

Page 383

1   have smelled something, correct?
2     A   Yes, that's correct.
3     Q   Issac Saldivar, S-a-l-d-i-v-a-r, evacuated
4   and didn't smell anything, correct?
5     A   Correct.
6     Q   Chris Stewart, a contractor, evacuated
7   and didn't smell anything, correct?
8     A   That's correct.
9     Q   Bruce Stewart, a contractor, evacuated
10  and didn't smell anything, correct?
11    A   Correct.
12    Q   Terry Morris, a contractor, evacuated and
13  didn't smell anything, correct?
14    A   Correct.
15    Q   David Shoras, S-h-o-r-a-s, evacuated and
16  didn't smell anything, correct?
17    A   Correct.
18    Q   Kevin Yoder, a contractor, evacuated and
19  didn't smell anything, correct?
20    A   Correct.
21    Q   Joe Valdez, a contractor, evacuated and
22  didn't smell anything, correct?
23    A   Correct.
24    Q   Randy Stines, a contractor, evacuated
25  and didn't smell anything, correct?

Page 384

1     A   Correct.
2     Q   Robert Mike Mahoney evacuated and
3   didn't smell anything, correct?
4     A   Correct.
5     Q   Diana Davis, a contractor, evacuated and
6   didn't smell anything, correct?
7     A   Correct.
8     Q   Steve Frazier, a contractor, evacuated
9   and didn't smell anything, correct?
10    A   Correct.
11    Q   Jim Wheeler, a contractor, evacuated and
12  didn't smell anything, correct?
13    A   Correct.
14    Q   Chad Potts, a contractor, evacuated and
15  didn't smell anything, correct?
16    A   Correct.
17    Q   Sean Housman evacuated and didn't smell
18  anything, correct?
19    A   That's correct.
20    Q   Ron Honeywell, a contractor, evacuated
21  and didn't smell anything, correct?
22    A   That's correct.
23    Q   Oscar Maldonado, a contractor, evacuated
24  and didn't smell anything, correct?
25    A   That's correct.

70 (Pages 381 to 384)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————— 405-272-1006
TULSA ————————— 918-583-8600
FAYETTEVILLE ————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 385

1    Q    Jennifer Nicol, a contractor, evacuated
2  and didn't smell anything, correct?
3    A    That's correct.
4    Q    Eric Vigland, an employee, evacuated and
5  claimed to have smelled something, correct?
6    A    That's correct.
7    Q    Kathy Ricker, an employee, evacuated
8  andclaimed to have smelled sulfur, correct?
9    A    That's correct.
10    Q    Will James evacuated and claimed to have
11  smelled a sulfur compound, correct?
12    A    That's correct.
13    Q    By the way, according to the literature,
14  does arsine smell sulfury?
15    A    I'm not sure.
16    Q    Sean Chantal, an employee, evacuated
17  and didn't smell anything, correct?
18    A    That's correct.
19    Q    Mark Potteiger, P-o-t-t-e-i-g-e-r, an
20  employee, evacuated and didn't smell anything
21  until he left the work area, correct?
22    A    Correct.
23    Q    Kaila, K-a-i-l-a, Alexander, an employee,
24  evacuated and claimed to have smelled something
25  but didn't know what it was, correct?

Page 386

1    A    Correct.
2    Q    And then lastly, David Vance, an
3  employee, evacuated and claimed to have smelled
4  a sulfur smell, correct?
5    A    That's correct.
6    Q    Now, let's see here, now, back to the
7  minutes of the post-incident evaluation meeting
8  on July 17th, when Jarrad Garrison, the operations
9  manager of Solkatronics, spoke.  He said that at
10  approximately 1 o'clock we heard a pop from our
11  dock and a rush of gas.  Later on he says, we
12  started evacuating the plant.
13        Now, would it be more appropriate to
14  analyze the hospital records of persons who had a
15  significant opportunity for exposure or for those
16  that had no exposure?
17    A    It would be more important to evaluate
18  the hospital records for those who had more or
19  greater opportunity for exposure.
20    Q    So if all the Solkatronics employees
21  evacuated and weren't exposed or didn't have an
22  opportunity for exposure, would it be of any
23  benefit to see their hospital records?
24    A    Probably not.
25    Q    Is plasma free hemoglobin evidence of

Page 387

1  hemolysis?
2    A    Yes.
3    Q    Mr. Tucker asked you a number of times
4  today about artifacts causing elevations in plasma
5  free hemoglobin.
6        Do you recall those questions generally?
7    A    Yes.
8    Q    Has Mr. Tucker or any person for
9  Solkatronics ever given you any evidence that
10  there was in fact an artifact that was causing the
11  hemolysis that was observed in the plaintiffs?
12    A    No.
13    Q    Since there's no evidence in the record
14  concerning any artifact that caused the hemolysis,
15  do you have an alternative explanation for the
16  hemolysis?
17    A    No.  I think alternative explanations are
18  purely speculative.
19    Q    But when I say alternative explanation, is
20  the release of arsine and the exposure to arsine an
21  explanation for the hemolysis?
22    A    Oh, of course.  I didn't understand your
23  question.  I thought alternative, aside from the
24  arsine exposure.
25    Q    I meant an alternative from an artifact.

Page 388

1    A    Oh, no.  There is no other option that I
2  see aside from exposure to arsine.
3    Q    Let's see here, part of the materials that
4  you reviewed in this case included a hazard
5  assessment that was actually made by
6  Solkatronics, was it not?
7    A    Yes.
8    Q    I'm directing your attention to Exhibit
9  No. 26.
10    A    Yes.
11        (Ms. Smith exits the proceedings.)
12    Q    (BY MR. WARD)  Now, in that document
13  they describe several different types of potential
14  releases, do they not, Solkatronics?
15    A    Yes.
16    Q    And in particular I want to direct your
17  attention to the page that's Bates stamped
18  Solkatronics 00434.
19        Do you see those alternate case
20  selections on that page?
21    A    Yes.
22    Q    If you would, take a moment and tell me
23  which of those you believe most closely mirrors
24  the release in this case.
25    A    (Witness examines document.)

71 (Pages 385 to 388)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 389

1     It looks to me like the event description
2  where a cylinder ruptures releasing arsine
3  outdoors.
4     Q   Would that be --
5     A   That's --
6     Q   -- number 2?
7     A   That's number 2.
8     Q   And Solkatronics describes the severity of
9  that particular scenario as being what?
10    A   Major.
11    Q   And on a scale of one to ten, the risk
12 assessment, numerical risk assessment, they place
13 on what?
14    A   Eight.
15    Q   Now, I'd like to draw your attention to
16 Bates stamped page 00438. You see that's the
17 alternate scenario number 2?
18    A   Yes.
19    Q   What is the estimate that -- what does
20 Solkatronics, the defendant in this case, estimate
21 the distance to the toxic end point to be under
22 that scenario?
23    A   .7 miles or 1.1 kilometers.
24    Q   And what does the term "toxic" mean to
25 you?

Page 390

1     A   The toxic end point is actually what it
2  means to Solkatronics, is the immediately
3  dangerous to life and health, the IDLH.
4     (Ms. Smith re-enters the proceedings.)
5     Q   (BY MR. WARD) So the most likely
6  release scenario that Solkatronics has in their
7  release scenarios creates a zone of toxicity of
8  approximately .7 miles; is that right?
9     A   Correct.
10    Q   And you're aware, are you not, that all of
11 these 13 -- well, let's see, I'm not going to ask you
12 to speculate on how far these distances were.
13       So would it -- would that bear upon your
14 opinion as to whether or not a person within .7
15 miles had an opportunity for exposure?
16    A   Yes, it would.
17    Q   If a plaintiff were within Solkatronics'
18 estimated distance toxic end point, that is .7
19 miles, would that increase the likelihood of
20 exposure?
21    A   Yes.
22    Q   Now, you understand, do you not, that
23 Solkatronics flew down a bunch of people from
24 Allentown to assess what happened after this
25 occurred?

Page 391

1     A   Yes.
2     Q   And that they made a report as to their
3  findings?
4     A   Yes.
5     Q   Now, I want to draw your attention to
6  Solkatronics Bates stamp -00068 which is in
7  Exhibit No. 17, and --
8        MR. TUCKER:  What was the name of that
9  again?  I wasn't listening.
10       MR. WARD:  Bates stamp number?
11 -00068.
12       MS. SMITH:  That's in his exhibit.
13       MR. TUCKER:  I just would like to know
14 what you're looking at without having to look over
15 your shoulder.
16       MR. WARD:  It's the introduction to the
17 report that your client authored.
18       MR. TUCKER:  The hazard assessment.
19       MR. WARD:  No.  What do you call it,
20 the --
21       MR. TUCKER:  Eugene Ngai report.
22       MR. WARD:  Mm-hmm.
23       MR. TUCKER:  Thank you.
24    Q   (BY MR. WARD)  There do you see a
25 description of how the release occurred?

Page 392

1     A   Yes.
2     Q   And it says -- and what's your
3  understanding of how it occurred?
4     A   There was a cylinder out on the
5  Solkatronics dock, and about 1 o'clock the valve
6  that was on the cylinder was ejected, releasing the
7  gas.
8     Q   And what's your understanding of how
9  long it took for the primary release to occur?
10    A   About two minutes, according to this
11 report.
12    Q   And do you see there that no employee
13 was in the area to witness the event?
14    A   Yes.
15    Q   So if no employee even witnessed the
16 event and all of them occurred, would that also
17 decrease the chance of exposure to the
18 Solkatronics employees?
19    A   Yes.
20    Q   All right.
21       To you what's the significance of whether
22 this release occurred in two minutes, or the
23 primary release occurred in two minutes versus
24 two hours?
25    A   The primary significance is whether or



**PROFESSIONAL REPORTERS**
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ——————— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                      June 22, 2005

Page 393

1    not there was an evacuation that took place.  If
2    the release was slow, it might have afforded more
3    time to evacuate and had less opportunity for
4    exposure.  When something gets out in two
5    minutes, it's out, it's gone, there's a cloud, and
6    there has to be immediate alarm and evacuation of
7    those that are in the path of that cloud.
8        Q    In terms of the dispersion, would it make
9    any difference whether it was dispersed slowly or
10   quickly in terms of assessing the opportunity for
11   exposure?
12       A    I don't know the answer to that.
13       Q    Now, one of the things that Mr. Tucker
14   asked you about was whether litigation can
15   influence plaintiffs to be untruthful, right?
16       A    Yes.
17       Q    And I guess you've been involved in a lot
18   of matters of litigation over the years, have you
19   not?
20       A    Yes, I have.
21       Q    Would the converse be true, that the
22   threat of a significant economic loss to
23   Solkatronics, could that influence their employees
24   to be untruthful in this matter?
25       A    Yes.  I mean, if the Solkatronics

Page 394

1    employees were worried about their jobs, they
2    might not come forward and complain or to report
3    health effects.
4        Q    Well, what if Solkatronics as a
5    company -- you understand they're a for-profit
6    company, don't you?
7        A    Yes.
8        Q    If Solkatronics as a for-profit company
9    stood to lose a hundred million dollars, for
10   instance, over this release, might that influence
11   their executives to shade the truth?
12       A    Potentially, that's correct.
13       Q    Now, is there any antidote for an arsine
14   exposure?
15       A    No.
16       Q    Mr. Tucker asked you about treatment.
17   What treatments are available?
18       A    Blood transfusions.  That's it.  You
19   remove somebody from exposure, you
20   decontaminate them, and you observe them.  But
21   there's no medication or antidote to prevent the
22   destruction of the red cells.
23       Q    So to the extent that one or more of these
24   plaintiffs were actually injured by the release of
25   arsine, what I'm understanding you to say is that

Page 395

1    unless they get a blood transfusion there's
2    nothing that's going to reverse their injury?
3        A    Correct.
4        Q    Are you aware that hemolysis can occur
5    for up to 96 hours after exposure?
6        A    Yes.  There may be delayed hemolysis.
7        Q    And in this case --
8            MR. TUCKER:  I hate to interrupt, but by
9    way of lodging an objection as to form, I would
10   prefer that you not lead the witness.
11           MR. WARD:  Okay.
12       Q    (BY MR. WARD)  In the blood work that
13   was done on these plaintiffs as a general matter,
14   when was it done?
15       A    Within 24 hours, within a day or the day
16   of the incident.
17       Q    If you were in the position of a treating
18   physician at the hospital where these people were
19   taken, would you want to take additional blood
20   work after 24 hours?
21       A    Yes.  In the ideal world, my
22   recommendation would have been to have everybody
23   get the same type of blood tests, and to follow
24   them up over the course of the next two to three
25   days, and have them come back and repeat it so

Page 396

1    there could be some accurate assessment.
2        Q    Now, as I understand it, you've seen Dr.
3    Banner's report, have you not?
4        A    Yes.
5        Q    He was probably in the best position to
6    dictate the follow-up treatment and diagnosis, was
7    he not?
8        A    I believe so.
9        Q    And would you -- if you were advising Dr.
10   Banner, would you advise -- have advised him to
11   do more testing than what was done?
12       A    I believe Dr. Banner was out there within
13   a day or two of the incident, or was aware by
14   phone or had been notified of the incident.  I don't
15   recall which, but I do understand that he was at
16   least notified about the arsine exposure.  And my
17   recommendation would have been to do uniform
18   testing, get people in according to a standard
19   protocol, and then to do follow-up over the course
20   of several days.
21       Q    I want to ask you a few questions about
22   some individuals that Mr. Tucker asked you about.
23   He was asking about Dr. Kharas, and the possible
24   causes of his fatigue.
25           Were you aware that Dr. Kharas went

73 (Pages 393 to 396)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ———————479-587-1006

Page 397

1  through a divorce contemporaneously with these
2  events?
3     A   I was not aware of that.
4     Q   Can that cause fatigue?
5     A   If the divorce was particularly stressful,
6  yes, it may.
7     Q   And sometimes it can bring on financial
8  pressures?
9     A   Yes.
10    Q   And can that also cause fatigue?
11    A   If those financial pressures increase
12 stress, anxiety or depression, yes, that may lead
13 to fatigue.
14    Q   Mr. Tucker asked you about his
15 hypothyroidism.
16        Can hypothyroidism cause an elevation in
17 plasma free hemoglobin?
18    A   No.
19    Q   As to Mr. Schnitzer, you said that you
20 didn't believe that his kidney problems were
21 related to an arsine exposure.
22        Tell me what the basis of that opinion
23 was.
24    A   It looked to me like he had a form of
25 immunologically mediated or

Page 398

1  immune-system-caused renalfailure. He had an
2  antistreptolysin O that was increased. That's a
3  marker for a certain type of kidney disease. I'm
4  not aware that that's linked to arsine gas
5  exposure.
6     Q   Were you aware that Mr. Schnitzer
7  reported nausea and vomiting at the time of his
8  exposure?
9     A   Yes.
10    Q   Would that be a reason to believe that he
11 did in fact -- that he was in fact exposed to
12 arsine?
13    A   Yes. I think he was.
14    Q   Now, Mr. Tucker asked you a number of
15 questions about the portion in the chapter of the
16 book you wrote having to do with the 1.5 percent.
17        You know what I'm talking about, right?
18    A   Yes, I do.
19    Q   Now, the 1.5 percent, was that a criteria
20 for determining whether the person has been
21 exposed or criteria for treatment?
22    A   It was a criteria for treatment.
23    Q   And what do you mean by that?
24    A   Meaning it's a level that indicates serious
25 hemolysis, the doctor needs to think about

Page 399

1  ordering those red blood cells and prepare to
2  transfuse if the patient deteriorates.
3     Q   That's not a criteria for determining
4  whethor not a person has been exposed to
5  arsine, is it?
6     A   No.  The discussion in that chapter that I
7  wrote was not pertaining to what is the evidence
8  for exposure and a release of arsine gas affecting
9  a large population.  It was if you have somebody
10 in the ER, what do you need to know to get ready
11 for emergency treatment, including blood
12 transfusion.
13    Q   From time to time Mr. Tucker had you
14 look at the lab reports that reported the
15 hemoglobin, blood hemoglobin.
16        Do you recall that?
17    A   Yes.
18    Q   And we saw one, for instance, where the
19 upper range for normal was 10.4.
20        Do you recall that?
21    A   This was the plasma free hemoglobin,
22 that's correct.
23    Q   Right.
24        And in a hospital there's -- there
25 oftentimes is a serology department, is there not?

Page 400

1     A   Yes.
2     Q   And is that where the blood work is done?
3     A   Well, this would be called a chemistry
4  department, actually.
5     Q   And as a treating physician do you
6  ordinarilyrely on what the chemistry department
7  reports to you?
8     A   Yes.
9     Q   Do all treating physicians, as far as you
10 know, rely on what chemistry departments report?
11    A   Yes.
12    Q   In terms of the blood work?
13    A   In terms of the range of values and the
14 blood work that comes back, that's correct.
15    Q   In other words, when you get a blood
16 report, you don't go out and independently test it,
17 do you?
18    A   No.  I rely on the methods, the accuracy,
19 and the validity of the laboratory.
20    Q   And if in that instance St. Francis is
21 correct, that a concentration of over 10.4 is
22 significant, you'd ordinarily rely on that as a
23 physician, would you not?
24    A   Yes, I would.
25    Q   And is there peer-reviewed literature that



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006

TULSA ———————————918-583-8600

FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 401

1  reflects that a plasma free hemoglobin count that
2  is ten times the normal range is a significant
3  marker for arsine exposure?
4      A   Yes.
5      Q   Is there peer-reviewed literature which
6  you're aware of that says that any elevation in
7  plasma free hemoglobin is a marker for exposure?
8      A   Yes. The peer-reviewed literature says
9  that there are a number of markers of arsine
10  exposure; and an elevated plasma free hemoglobin
11  is one of them. Elevated meaning above the normal
12  range.
13      Q   One of the exhibits which have -- I think
14  they marked was a four-page letter from myself
15  which I wrote to you concerning various aspects of
16  the case.
17          Do you remember that letter generally?
18      A   Yes.
19      Q   Is it uncommon for plaintiffs' lawyers to
20  send to you a letter like that outlining their
21  beliefs about the case?
22      A   No, it's not uncommon.
23      Q   And did anything I said in that letter
24  unfairly influence your opinions?
25      A   No, not at all.  Didn't influence my

Page 402

1  opinion at all.
2      Q   Are the opinions that you've expressed in
3  the deposition and in your report yours and yours
4  alone?
5      A   Yes, they are.
6      Q   They're not my opinions, are they?
7      A   No, they're not your opinions.
8      Q   And I didn't have anything to do with
9  drafting or authoring your report, did I?
10      A   Not at all.
11      Q   Now, you made mention from time to time
12  in your deposition about the number of persons
13  who had significant elevations of plasma free
14  hemoglobin.
15          Do you recall, generally, your testimony
16  about that?
17      A   Yes.
18      Q   How many persons of these 13 do you
19  recall had significant elevations?
20      A   Five.
21      Q   So just doing the math -- I'm not going to
22  do the math.
23          But in a population of people outside the
24  Port of Catoosa on that day, what do you think the
25  statistical probability would be for 5 of 13 persons

Page 403

1  to have -- would be to have elevated plasma free
2  hemoglobin?
3      A   Less than five percent.  If the lab range
4  of normal is up to 10.4 percent, that's based on a
5  distribution of normal plasma free hemoglobins in
6  a normal population.  And if you tested a hundred
7  people off the street without exposure to arsine,
8  by chance alone you would expect no more than
9  five of those to have a plasma free hemoglobin
10  above 10.4 percent. It's the way the statistics
11  work out, and the way the lab sets their normal
12  values.  They're set to cover 95 percent -- actually,
13  I take it back.  It should be about two and a half
14  percent or two to three out of the hundred,
15  because the lab sets its values where five percent
16  are going to be lower and five -- sorry, two and a
17  half percent are going to be lower and two and a
18  half percent are going to be higher.  It's called the
19  95 percent normal distribution.
20      Q   Like a bell curve?
21      A   Yes.  So you're going to have two and a
22  half percent, so between two or three out of a
23  hundred people off the street.
24      Q   So if my math is correct, one person out
25  of 40 would have plasma free hemoglobin above

Page 404

1  the normal range?
2      A   Correct.
3      Q   And so would that be an exponential
4  factor to find 5 of 13?
5      A   The odds of finding 5 out of 13 with an
6  elevated plasma free hemoglobin by chance are
7  very large because of just having that or just, you
8  know -- you wouldn't want to bet against the
9  house on that one.
10      Q   It would be very unlikely, would it not?
11      A   Yes.
12      Q   If we have 5 of these 13 people
13  experiencing an elevated plasma free hemoglobin,
14  would that in your opinion have anything to do
15  with the opportunity for the people in the same
16  geographic area to have been exposed to arsine?
17      A   Yes, most certainly.
18      Q   Now, are you aware generally that these
19  Air Exchanger employees were not evacuated from
20  the immediate area of their plant?
21      A   Yes.
22      Q   That they remained outside or inside
23  their plant for perhaps an hour after the release?
24      A   Yes.
25      Q   And with the wind blowing in a

75 (Pages 401 to 404)



PROFESSIONAL REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ——————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Page 405

1  northwesterly direction towards their plant, would
2  that tend to increase or decrease the opportunity
3  for exposure?
4      A   Increase.
5      Q   And Mr. Tucker asked you about the, for
6  lack of a better term, the decay rate of arsine once
7  exposed to air.
8          Do you know of anything that would
9  suggest that arsine, airborne arsine becomes
10 nontoxic in the first hour of its exposure to air?
11     A   I have never seen anything that said that.
12     Q   Mr. Tucker asked you about some of these
13 individuals having symptoms of heat stress.
14         Do you recall that generally?
15     A   Yes.
16     Q   As a physician, would the symptoms of
17 heat stress last for weeks, months and years?
18     A   No.  The symptoms of heat stress last for
19 hours or at most a few days, depending on the
20 severity.
21     Q   And so in doing a differential diagnosis,
22 if a person's symptoms that were consistent with
23 heat stress persisted for months and/or years,
24 could you eliminate heat stress as the cause of
25 their symptoms?

Page 406

1      A   Yes.
2      Q   And would that cause you to include
3  arsine as the possible cause of their symptoms?
4      A   Yes.
5      Q   Given all of the information that you
6  know about the release, the proximity of the
7  exposure, and the historical data about this
8  arsine release, is a dose reconstruction necessary
9  for you to make a differential diagnosis in this
10 case?
11     A   No.  It would be nice to have, but it's not
12 necessary.
13     Q   And why is that?
14     A   I think given all the facts that we know,
15 that there was a release of arsine from a
16 cylinder, the circumstances in the companies
17 around Solkatronics, what we know about what
18 happened in terms of the evacuation that day, the
19 pattern of symptoms, the evidence from the
20 elevated plasma free hemoglobin, I think we know
21 enough to say that arsine is the cause here.
22     Q   Okay.
23         In the exposure cases that you have been
24 involved with, is it the rule or the exception that
25 you know the dose that each person exposed has

Page 407

1  been subjected to?
2      A   It's the exception rather than the rule.
3      Q   Why is that?
4      A   Well, when there's an incident, where
5  there's a sudden release, we don't have exposure
6  data.  There aren't monitors around the release.
7  We haven't planned for it, so people aren't
8  measuring in the minutes to hours after a gas is
9  released.
10     Q   And are you aware that Solkatronics had
11 a system by which they were able to measure the
12 actual releases of arsine at their plant?
13     A   I'm aware that they had arsine monitors.
14 I didn't know that they had an ability to measure
15 arsine.
16     Q   Let me represent to you there's
17 sometestimony in this case that the monitors were
18 recorded via computer, and that Solkatronics has
19 since destroyed that information.
20         Would that information have been helpful
21 to you to have had Solkatronics chose not to
22 destroy it?
23     A   If those monitors were in a place that
24 would have measured the release of that arsine
25 gas, absolutely.

Page 408

1      Q   When we talked about the economic value
2  of corruption of the truthfulness in the legal
3  process, might their destruction of that
4  information bear upon whether they want the
5  truth to be known?
6      A   Depends on their intent.  The answer
7  would be yes if the intent was to destroy evidence
8  so it couldn't be brought to the light of day.
9      Q   Now, you have described in your
10 deposition some of the types of symptoms or
11 injuries caused by arsine exposure.
12         Are some of the symptoms -- well, some of
13 the symptoms are immediate, are they not?
14     A   Yes.
15     Q   Are some delayed?
16     A   Yes.
17     Q   And tell me about the kind of symptoms
18 that are delayed.
19     A   They relate to the nervous system, the
20 central and peripheral nervous system.  Headache,
21 dizziness, trouble concentrating, memory loss,
22 numbness and tingling of the fingers and toes.
23     Q   And so would it be the rule or the
24 exception that people exposed to arsine would
25 report those symptoms in a delayed fashion?



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ──────── 405-272-1006
TULSA ──────────── 918-583-8600
FAYETTEVILLE ──────── 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 │ www.proreporters.com │ Phone: 800-376-1006 │ Fax: 405-272-0559

Page 409

1    A  Yes. I mean, it would be the rule that a
2  proportion of an exposed population would report
3  those type of symptoms in a delayed or an ongoing
4  fashion after an acute exposure.
5    Q  And is that accepted by peer-reviewed
6  literature, best you know?
7    A  Yes.
8    Q  And are any of the symptoms progressive?
9  That is, do they get worse?
10    A  I believe that if somebody has those
11  symptoms and it's been a couple of years after
12  exposure, they're probably going to stay the same.
13  There's some possibility they may get worse, but
14  they probably would stay the same.
15    MR. WARD:  That's all the questions I
16  have.
17    MR. TUCKER:  Let me ask a couple of
18  questions in response to what Mr. Ward asked
19  you.
20    FURTHER EXAMINATION
21  BY MR. TUCKER:
22    Q  You were asked about Air Exchangers,
23  and it was represented to you that Air Exchangers
24  did not evacuate.
25    Do you have any idea what happened at

Page 410

1  Air Exchangers to the employees?
2    A  Exactly what happened to them, no.
3  Aside from the fact that they were not evacuated, I
4  don't know exactly where they were standing and
5  what they did.
6    Q  How do you know they were not
7  evacuated?
8    A  What I recall reading from the exposure
9  analysis.
10    Q  Did they stay in the building all
11  afternoon?
12    A  I don't know the details of where they
13  were standing.
14    Q  Were they evacuated from the building?
15    A  Again, I don't know the details. I don't
16  know whether they were evacuated from the
17  building.
18    Q  Do you know whether they were standing
19  outside after they left the building?
20    A  Again, I don't know whether they were
21  inside or outside.
22    Q  Do you have the depositions of any of the
23  AirExchanger employees?
24    A  I do not.
25    Q  Do you know what any of the people at Air

Page 411

1  Exchangers say about how long they may have
2  been exposed -- in a position to be exposed?
3    A  I do not.
4    Q  Do you recall the approximate wind
5  speeds in that weather report that you looked at?
6    A  I don't.
7    Q  There was a wind speed; is that correct?
8    A  Well, there was a wind speed measured at
9  that particular meteorological station. I don't
10  know how it pertains to the Solkatronics plant.
11    Q  You indicated you would prefer that there
12  be some follow-up on blood testing in the two to
13  three days following the initial testing.
14    Do you recall that?
15    A  Yeah. I was speaking in the ideal
16  situation.
17    Q  Are you aware of whether or not the 13
18  people that you have given opinions about today,
19  of those that did have blood tests taken, are you
20  aware of how many of those people went back for
21  follow-up tests in the next two to three days?
22    A  I'm not aware that any did.
23    Q  And if the records reflect that they did
24  goback for follow-up tests or had follow-up tests
25  on subsequent days, then that would just be

Page 412

1  something else that you missed in the record?
2    A  Correct.
3    Q  You testified --
4    A  Now -- excuse me -- you do jog my
5  memory. I think Mr. Ingram had a test on July
6  11th, he had the 111; and I think he came back
7  the next day, on July the 12th, and it was lower.
8  So he did have a follow-up.
9    Q  Wasn't Mr. Sumter 111?
10    A  Yes. I'm sorry, Mr. Sumter.
11    Q  Anybody else have a follow-up?
12    A  (Witness examines documents.)
13    Not that I recall or I noted in my table.
14    Q  They may have, and you just didn't get
15  them noted?
16    A  Well, I thought I picked up and made a
17  notation of all the pertinent tests.
18    Q  You told Mr. Ward that there is
19  peer-reviewed literature that supports the
20  statement that a finding of plasma free
21  hemoglobin ten times the normal range -- and I
22  presume we're referring to 111 percent for Mr.
23  Sumter versus 10.4 percent as the top normal
24  range reported by the St. Francis laboratory -- is
25  amarker for arsine exposure.

77 (Pages 409 to 412)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————— 405-272-1006
TULSA ————————— 918-583-8600
FAYETTEVILLE ————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 413

1      Do you recall that testimony?
2      A   Yes.
3      Q   And you and I talked about that too,
4  earlier, and that's because all that number tells
5  you is that something has happened to red blood
6  cells. They've been affected by something, and the
7  likely culprit to have affected the red blood cells
8  is arsine, correct?
9      A   Correct.
10     Q   Did you mean to imply by that statement
11  to Mr. Ward that there is peer-reviewed literature
12  that says a plasma free hemoglobin level of ten
13  times the normal laboratory value is equivalent to
14  any injury to the body other than injury identified
15  to the red blood cells?
16     A   I was not answering that question. That
17  was not the question that was posed to me. That's
18  a different question.
19     Q   Is there peer-reviewed literature that
20  supports that conclusion?
21     A   Well, that was, I think, your second issue
22  that I talked about earlier.
23     Q   That's the one you want to look for?
24     A   That's the one that I would look for as to
25  whether or not there is delayed or long-term

Page 414

1  effects.
2      Q   With respect to the employees at Air
3  Products and the fact that they were evacuated, do
4  you know where -- do you know whether any of the
5  employees who were identified to you by Mr. Ward
6  when he read through the fact that they didn't
7  smell anything and didn't feel anything were
8  actually in the cloud that has been described as
9  the cloud that came from the arsine cylinder?
10         MR. WARD: Object to the form. He can
11  testify -- he didn't testify about feeling anything.
12         MR. TUCKER: Smelling anything.
13         THE WITNESS: It looked to me from the
14  witness statements that were read to me by
15  plaintiff counsel that they were not in a cloud,
16  that they said there was a cloud, but they got out.
17  They were not in it.
18     Q   (BY MR. TUCKER) Would it surprise you
19  to learn that two of the people whose names were
20  read and who you were asked questions about by
21  Mr. Ward were actually -- had to walk through the
22  cloud in order to leave the premises?
23         MR. WARD: Object to the form.
24         THE WITNESS: That would be
25  interesting.

Page 415

1      Q   (BY MR. TUCKER) Would it surprise you
2  to know that?
3      A   No.
4      Q   If two of those persons actually walked
5  through the cloud and they reported they didn't
6  smell anything, what does that tell you?
7      A   Well, there's a variability in the ability to
8  smell arsine. And so odor, as I pointed out
9  earlier, is not -- doesn't give sufficient warning.
10  So there are some individuals who might be above
11  the odor threshold who don't pick up that
12  characteristic garlic odor.
13     Q   Is it also possible that the cloud did not
14  contain very much arsine?
15     A   Possible.
16     Q   Why would there be a cloud since arsine
17  is clear, colorless?
18     A   There may have been other types of
19  combustion products mixed in with that.
20     Q   Do you know whether or not there was
21  combustion in the incident?
22     A   I don't know.
23     Q   Do you know whether there was a fire or
24  explosion?
25     A   I know nothing beyond what's in that

Page 416

1  incident report and description analysis done.
2      Q   Did you read the incident report?
3      A   I did.
4      Q   Didn't it say that there was a combustion
5  of some of the arsine?
6      A   I believe that's so.
7      Q   Is arsine flammable?
8      A   Oh, I'd have to check.
9      Q   Would you look at the document right in
10  front of you there, which is identified as
11  Solkatronics 00 whatever.
12     A   Okay.
13     Q   In that document on page 6 in the second
14  paragraph you testified that what happened in
15  this incident was that the valve was ejected from
16  the cylinder. It impacted the cylinder cap, and
17  then basically came out, permitting the contents
18  of the cylinder to escape.
19     A   Correct.
20         MR. WARD: I don't think he testified
21  that's what happened. He testified that's what the
22  report said that's what likely happened.
23         MR. TUCKER: I understand.
24     Q   (BY MR. TUCKER) That's what you
25  testified the sequence was; is that correct?

78 (Pages 413 to 416)


PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ─────── 405-272-1006
TULSA ──────────── 918-583-8600
FAYETTEVILLE ──────── 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 │ www.proreporters.com │ Phone: 800-376-1006 │ Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 417

1      A   Yeah.  I'm basing that on what I read in
2  the report here.
3      Q   Now, I'd like you to turn to the hazard
4  assessment that you testified about earlier.
5  Would you do that for me.
6      MR. WARD:  It's right there.
7      Q   (BY MR. TUCKER)  Turn to page 15,
8  which is what you were looking at earlier.
9      A   Can you give me the Bates stamp number?
10     Q   00434.
11     A   Okay.
12     Q   Isn't that the page in which Mr. Ward
13  asked you to identify what happened here, most
14  likely?
15     A   Yes.
16     Q   And you picked number 1, didn't you, or
17  is it number 2?
18     A   No.  It looked to me like it was number 2.
19     Q   And in that incident you have a cylinder
20  49L.
21     What does that mean?
22     A   I don't know.
23     Q   Do you see that means 49 liters?
24     A   Probably.
25     Q   Do you know how much -- what the

Page 418

1  quantity of arsine for 49 liters is?
2      A   No.
3      Q   A little bit ago you were asked to turn
4  to the next page and look at arsine ARS number 2.
5      MR. WARD:  No, it's not on the next page.
6  It's on -438.
7      MR. TUCKER:  -438.
8      Q   (BY MR. TUCKER)  Does that give a
9  release rate?
10     A   Yes.
11     Q   What?
12     A   130 pounds per second.
13     Q   Look back to page -434, if you would -- I
14  mean -435.  -435 arsine ARS number 2 is cylinder
15  overfill and rupture; is that right?
16     A   Yes.
17     Q   Isn't that the one you identified on the
18  previous page as being the most likely incident?
19     A   Yes.
20     Q   And what quantity of material was
21  released in that?
22     A   It looks like they say that's 130 pounds.
23     Q   Now, it says in -- going back to the
24  previous page, it says the cylinder 49L is
25  overfilled and ruptured.

Page 419

1      Did this cylinder rupture?
2      A   Well, this is similar to a rupture.
3      Q   Did the cylinder rupture?
4      A   Well, I don't know whether it ruptured
5  or not, but it is similar, the most similar to this
6  incident, in that it releases arsine gas out of a
7  cylinder outdoors.
8      Q   We're going to talk about that, but I'm
9  saying did the cylinder rupture?
10     A   Let me ask you what the definition of a
11  rupture is.
12     Q   Didn't you just read to me a minute ago
13  from the report of the incident that what happened
14  was the valve came out of the top of the cylinder?
15     A   Yeah, I would define that as a rupture of
16  a cylinder in some form.  That's why I was asking
17  you what your definition of a rupture is.
18     Q   Look instead, if you would, at scenario
19  number 3.
20     Does scenario number 3 describe a valve
21  failure?
22     A   Yes.
23     Q   Isn't that what happened here, a valve
24  failure?
25     MR. TUCKER:  There's my phone ringing.

Page 420

1      (Discussion off the record.)
2      THE WITNESS:  Well, I'm reading the
3  description for number 3.  It says, "Cylinder with
4  brass connection as weak point of valve insert into
5  cylinder falls over shearing or severely damaging
6  valve releasing contents."
7      That sounds less similar to me than
8  scenario 2, which is a tank rupturing, implying an
9  immediate type of release, releasing the arsine
10  outdoors.  The scenario as described in the
11  analysis on Bates -438.
12     Q   (BY MR. TUCKER)  Let's assume that a
13  tank rupture means that the tank itself physically
14  ruptures, splits.
15     A   Okay.
16     Q   That's a tank rupture, isn't it?
17     A   Well, that's one definition of -- a tank
18  rupture to me, either a tank splits or something
19  comes off and you get the immediate release of the
20  contents in a very short period of time.
21     Q   Look at number 3.  If the valve is
22  sheared, doesn't that then fit your definition of a
23  rupture?
24     A   It's possible.  I guess if a valve shears
25  and it suddenly releases the quantity outdoors, it

79 (Pages 417 to 420)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ——————405-272-1006
TULSA ———————————918-583-8600
FAYETTEVILLE ——————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 421

1    would be the same as number 2. I mean, these
2    EPA exposure scenarios are assuming, I believe,
3    different release rates.
4        Q   Have you ever done one of these?
5        A   I have never done one of these.
6        Q   Do you know what they are? Do you know
7    whata hazard assessment is for?
8        A   It's an assessment to determine risk.
9        Q   Are you an expert in hazard assessments?
10       A   No.
11       Q   Would the answer as to which scenario is
12   most accurate be better left to someone who is an
13   expert in interpreting these?
14       A   I think as to which scenario accurately
15   applies here, exposure scenario 2 or exposure
16   scenario 3, requires the expertise of somebody
17   who -- well, I'm going to see if I can answer your
18   question.
19           I don't think it requires the expertise of
20   another expert. It might require me
21   understanding more carefully what the two
22   different exposure scenarios are meant to imply
23   and how it corresponds to what happened here.
24       Q   For example, if you knew what was meant
25   by tank rupture in this description, that would

Page 422

1    help you, wouldn't it?
2        A   If I knew exactly what is meant by tank
3    rupture, and does it conform to the Solkatronics
4    incident, that would be helpful.
5        Q   Or, conversely, if a sheared valve is the
6    same thing as a failed valve as described in the
7    incident report, that would be good for you to
8    know,wouldn't it?
9        A   Correct. I could have more information
10   or could follow up on that and confirm the
11   exposure scenarios and what they meant.
12       Q   In looking at the hazard assessment -- if
13   you'd give that back to the witness again just for
14   a minute, Mr. Ward -- following through those
15   documents, to ARS arsine scenarios, if it is
16   number 3, if a failed valve as set out in number 3
17   is the same failed valve that occurred on
18   Solkatronics on July 11th, 2003 [sic], then do you
19   find any toxic end point data with respect to that
20   event?
21       A   Not in this document. It looks like they
22   don't do number 3.
23       Q   If you look at number 3, what's the
24   severity of that incident identified to be?
25       A   Minor. I don't know personally. I don't

Page 423

1    know why there isn't exposure scenario number 3
2    here.
3        Q   You were asked about the fact that the
4    people that were at Air Products that were
5    evacuated from the area, which would include the
6    production area, of course, during the time that
7    this tank was venting for two minutes for the
8    primary exposure, none of them smelled anything,
9    and you posited that one explanation for that was
10   that they evacuated before they had achance to
11   smell anything; is that right?
12       A   Yes.
13       Q   Is it also possible that during that period
14   of time that they were evacuating, because of
15   whatever else happened at the time of the
16   accident, the extent to which the arsine burned
17   because it's flammable, the way in which it was
18   dispersing, is it possible there simply wasn't
19   enough concentration of arsine for them to smell?
20       A   It's possible.
21       Q   And do you know which it was?
22       A   I think it was the first alternative.
23       Q   Do you know which it was?
24       A   I don't think anybody -- well, yes, I think
25   it was number one. Based on what other people in

Page 424

1    the vicinity of the Solkatronics plant reported and
2    the testimony from the Solkatronics employees
3    seemed to be pretty firm that they all got out
4    except for a couple of them. It sounds like two
5    may have had to walk through that cloud.
6        Q   Do you know whether any one of the
7    persons whose records you reviewed and about
8    whom you've given opinions today indicated they
9    had smelled a garlic odor, made that observation
10   to anyone at any time before they were told by a
11   third party discussing theincident that one of the
12   incidents of an arsine exposure could be a garlic
13   odor?
14       A   I don't know.
15       Q   You indicated that you thought a
16   physician would want this kind of information
17   regarding plasma free hemoglobin levels in order
18   to determine the condition of his patient, is that
19   right, or words to that effect?
20       A   I said it would be good practice to do
21   some follow-ups tests to look at the delayed
22   hemolysis.
23       Q   Now, are you telling us that in your
24   opinion that an elevation, that the mere fact of an
25   elevation of the plasma free hemoglobin above the



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON          June 22, 2005

Page 425

1  normal reference range constitutes hemolysis?
2      A   Yes.  It indicates that there's an effect on
3  the red blood cells.
4      Q   And there is no gap between the top of
5  the normal reference range and the bottom
6  threshold of what you would consider to be
7  hemolysis; is that correct?
8      A   I didn't understand the question.
9      Q   Well, we have a normal reference range
10 for plasma free hemoglobin that comes from the
11 chemistry department at the hospital.  I think
12 that's a certain point.
13     A   Correct.
14     Q   That's that hospital's normal reference
15 range.
16     A   Correct.  It's based on a population of
17 normal individuals.
18     Q   What I'm asking you is is there
19 peer-reviewed literature that says that as the
20 plasma free hemoglobin level is reported as
21 elevated above the normal reference range, is
22 there some area or further range through which
23 that hemoglobin report can be elevated before
24 someone says this is sufficiently elevated to
25 constitute hemolysis?

Page 426

1      A   There is not.  If the plasma free
2  hemoglobin is above the normal range, it's either
3  the tail end of that bell-shaped curve, and
4  typically that's a mild elevation, it's due to some
5  artifact, mechanical problems of drawing the
6  blood, or it indicates hemolysis.  In this case
7  there isn't any other cause that I can find other
8  than arsine.
9      Q   Might other physicians disagree with you
10 on that?
11     A   I don't know.
12     Q   You indicated that you had reviewed the
13 hospital records for Mr. Sumter, and he's the man
14 who had the highest plasma free hemoglobin levels
15 of anybody that you saw, right, in the people you
16 looked at?
17     A   Yes.
18     Q   And you didn't see them.  You looked at
19 the records for some of them, right?
20     A   That's correct.
21     Q   And you looked at the St. Francis records
22 for Mr. Sumter; is that correct?
23     A   Yes.
24     Q   And you said you're aware that he got one
25 test, and that he was retested; is that right?

Page 427

1      A   Yeah, I think the next day he was 22.
2      Q   Was he ever diagnosed as having evidence
3  of hemolysis?
4      A   I'd have to take a look at the records to
5  see what the exact diagnosis was at the time that
6  he was seen.
7      Q   Do you recall whether he was ever
8  diagnosed with having hemolysis?
9      A   I'd have to take a look at the medical
10 records at the time he was seen to look at the
11 exact diagnosis.
12     Q   I appreciate that, but I am asking what
13 you recall.
14     A   I could take a look at the medical
15 records.I don't recall one way or the other.  I'd
16 have to refresh my memory by looking at the
17 medical records.
18     Q   Well, let me hand you the discharge
19 summary of Mr. Sumter.  I've taken the liberty of
20 highlighting the laboratory for you.  Would you
21 mind reading that into the record, please.
22     A   Just the highlighted, or just the whole --
23     Q   Read the laboratory part.
24     A   Laboratory tests remain negative for
25 hemolysis.  His presenting symptoms resolved.  No

Page 428

1  evidence of any sequelae.
2          MR. WARD:  I'm sorry.  What was the --
3          THE WITNESS:  With no evidence of any
4  sequelae.
5      Q   (BY MR. TUCKER)  What was that first
6  sentence again?
7      A   Laboratory tests remain negative for
8  hemolysis.
9      Q   Is that not the man that you've told us
10 had this gigantically elevated plasma free
11 hemoglobin level?
12     A   Well, first of all, my testimony was not it
13 was gigantically elevated.  I said it was ten times
14 the upper limit of normal.
15     Q   That's that man, isn't it?
16     A   I'm sorry?
17     Q   That is the same man, isn't it?
18     A   What was your question?  I'm sorry.
19 We're talking about Mr. Sumter, that's correct.
20     Q   Yes, same guy.
21         And in the discharge summary the
22 physician discharging him stated in his record
23 that there is no laboratory values or -- what did
24 he say again?  Laboratory values what?
25     A   Would you read my response back.  This



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ————— 405-272-1006
TULSA ———————— 918-583-8600
FAYETTEVILLE ————— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 429

1   is the third time.
2       Q   Well, I didn't write it down.
3       A   Okay. Here you go. You can read it
4   back.
5       Q   Laboratory tests remain negative for
6   hemolysis.
7           What did Dr. Smith, that dictated that,
8   mean by that?
9       A   Well, you'd have to ask Dr. Smith what he
10  meant by it.
11          I also do note that there's no diagnosis
12  here on the discharge summary. This was under
13  hospitalization. So, in fact, I think we need to go
14  back and look at the admission records and the
15  complete hospital records to see if we could find a
16  diagnosis.
17      Q   Did you have an opportunity to read
18  thehistory of Mr. Sumter's present illness as
19  contained in the discharge summary?
20      A   Yes.
21      Q   What was his history of arsine exposure?
22      A   Would you like me to read that?
23      Q   Just the part about how much arsine he
24  was exposed to, and for how long.
25      A   Why don't I just read it into the record.

Page 430

1       Q   Fine.
2       A   The patient is a 41-year-old male who was
3   exposed to arsine yesterday at the Port of Catoosa
4   for a very brief period of time. He moved upwind
5   as soon as he was aware of the odor. Reported
6   some sinus congestion, drainage, sinus irritation,
7   eye irritation and throat discomfort. The patient
8   was admitted to the hospital for evaluation.
9       Q   Now, just so you don't feel like I'm trying
10  to be unfair with you, because I don't want to be
11  unfair --
12          MR. WARD: Object to the side bar. Move
13  to be stricken.
14      Q   (BY MR. TUCKER) -- there's the whole
15  record for Mr. Sumter.
16      A   Okay.
17      Q   Is what you were looking for, the
18  missingpiece, the admissions information there?
19      A   On page 3 of these records, Dr. Xing,
20  X-i-n-g, has impression, which is what you'd
21  usually refer to as the diagnosis. And the first is
22  number 1, arsine exposure.
23      Q   Is that what you're looking for?
24      A   Yeah. That's good enough. It basically
25  says that his doctors thought he was exposed to

Page 431

1   arsine.
2       Q   So is it fair to say that they were --
3   would have been alert for hemolysis?
4       A   That's why they got the elevated -- that's
5   why they draw the plasma hemoglobin, that's
6   correct.
7       Q   And did anywhere in that record anybody
8   ever find anything other than laboratory values
9   remained negative for hemolysis?
10      A   I don't know. These are what would be
11  called typewritten records reflecting the admission
12  and the discharge of Mr. Sumter. There might be
13  some other notes made in the chart itself if we got
14  those from the hospital. In this record here, the
15  answer is no, but it would be important if we
16  wanted to really accurately answer your question
17  to see all the notes that the doctors made.
18      Q   Doctor, I'll represent to you that St.
19  Francis Hospital, they do everythingelectronically,
20  and that does constitute the entire record of Mr.
21  Sumter. There are no handwritten notes.
22      A   There have to be.
23      Q   No.
24      A   There are no -- when the doctor admits a
25  patient and then does visits on the patient, there

Page 432

1   are no handwritten notes?
2       Q   Everything is entered into the computer.
3           MR. WARD: Object to Counsel's
4   testimony.
5           MR. TUCKER: Everything is --
6           THE WITNESS: Okay. Well, you want to
7   pose a hypothetical, then, that there are no other
8   medical records from this hospital? Because I
9   would find it extraordinary. I've never seen a
10  medical record without handwritten records. I've
11  never seen a medical record without handwritten
12  order notes, handwritten nursing notes. I've
13  never seen just a medical record that's completely
14  electronic.
15      Q   (BY MR. TUCKER) Looking back to the
16  discharge summary, Doctor, the doctor that
17  dictated the discharge summary, Brad V. Smith,
18  M.D., stated laboratory tests remained negative
19  for hemolysis?
20          MR. WARD: How many times are you
21  going to repeat that at 7 o'clock in the evening?
22      Q   (BY MR. TUCKER) If you take that
23  doctor's statement at face value, what does that
24  tell you about that doctor's opinion as to whether
25  Mr. Sumter ever demonstrated hemolysis during



PROFESSIONAL REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———— 405-272-1006
TULSA ———— 918-583-8600
FAYETTEVILLE ———— 479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

Case 4:04-cv-00287-CVE-PJC   Document 89-2   Filed in USDC ND/OK on 11/01/05   Page 63 of 64

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 433

1    the time he was at St. Francis Hospital?
2        A   You'd have to ask Dr. Smith about what
3    he meant.
4        Q   Well, what does it mean to you?
5        A   What does what mean to me?
6        Q   Laboratory tests remained negative for
7    hemolysis.
8        A   It means exactly what it states. I don't
9    have any other interpretation about what it
10   means. You'd have to ask Dr. Smith. He may have
11   an opinion. I have a separate opinion about
12   whether or not there was hemolysis.
13           MR. TUCKER:   Thank you, sir.
14           MR. WARD:   Okay. I got to follow up.
15   I'm going to make it really, really brief.
16           FURTHER EXAMINATION
17   BY MR. WARD:
18       Q   Hemolysis means destruction of what?
19       A   Red blood cells.
20       Q   And when destruction of the red blood
21   cells occurs, how is that manifested? I mean,
22   what manifestation is there in blood work if
23   there's been destruction of red blood cells?
24       A   Can affect the haptoglobin. It could drop
25   the hemoglobin. It can cause an increase in your

Page 434

1    plasma free hemoglobin, or it can cause
2    hemoglobin to spill out into the urine. You can
3    pick it up on a dipstick.
4        Q   The last one is hemoglobinuria?
5        A   Yes.
6        Q   And the third one is a rise in plasma free
7    hemoglobin?
8        A   Correct.
9        Q   And that's what was reported in Mr.
10   Sumter's case, correct?
11       A   Correct.
12       Q   And so that would be evidence of
13   hemolysis, wouldn't it?
14       A   Absolutely.
15           MR. WARD:   Okay.
16           THE WITNESS:   I would just want to add
17   that he had a plasma free hemoglobin of over 111
18   on July 11th, and it was 22 the following day,
19   which means that in my view it's very unlikely to
20   be artifactual, becausethere's no reason why it
21   would be 111 one day and then drop the following
22   day. That indicates that he was exposed acutely
23   to arsine and the -- that the hemoglobin
24   circulating in his blood was excreted and was
25   dropping to normal. You can't get any better

Page 435

1    evidence than that.
2            MR. WARD:   Okay. I don't have any
3    further questions.
4            MR. TUCKER:   Did Dr. Smith find that
5    111 to be significant based on what you read?
6            THE WITNESS:   You'd have to ask Dr.
7    Smith. I think what he meant was that the
8    following day his plasma hemoglobin was 22, and
9    that there was no evidence of ongoing hemolysis.
10   But you'd have to ask Dr. Smith to verify that.
11           I've reviewed thousands of medical
12   records, and I see what physicians chart in these
13   toxic exposure cases. And my guess is that if you
14   ask Dr. Smith -- again, I think you'd have to ask
15   him to clarify what he meant -- I think he means
16   that there's no evidence that hemolysis is
17   continuing, because it drops from 111 to 22.
18           MR. TUCKER:   That's all. Thank you.
19           MR. WARD:   Well, I get the last word, so
20   I'll ask one more: Could it mean that there was
21   nohemoglobinuria if Dr. Smith meant no
22   hemoglobinuria?
23           THE WITNESS:   He could have meant
24   that, but I actually think what he means --
25   putting myself in his shoes, I think really he

Page 436

1    means that there's no evidence of ongoing
2    hemolysis. That there is -- he's getting better,
3    which is why they observed him until the following
4    day and repeated the test.
5            MR. WARD:   That's all I have.
6            MR. TUCKER:   I have one more question.
7            MR. WARD:   I am going to get the last
8    one.
9            MR. TUCKER:   Doctor, under the rules
10   you have the right to read and sign your
11   deposition, or you may waive that right. It's your
12   choice.
13           THE WITNESS:   I would prefer to waive
14   the right.
15           MR. TUCKER:   I got the last question.
16           MR. WARD:   Now I've got one more
17   question: Are you sure?
18           THE WITNESS:   Yes.
19           MR. TUCKER:   Thank you.
20           (Exhibit Nos. 47, 48 and 49 marked for
21   identification.)
22           (The deposition proceedings concluded at
23   7:00 p.m.)
24
25

83 (Pages 433 to 436)



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY ———————405-272-1006
TULSA ———————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559

INGRAM v. AIR PRODUCTS          ROBERT HARRISON                    June 22, 2005

Page 437

```
1     STATE OF CALIFORNIA )
2                         ) ss
3     COUNTY OF SAN MATEO )
4          I hereby certify that the witness in the
5     foregoing deposition, ROBERT JAY HARRISON,
6     M.D., M.P.H., was by me duly sworn to testify to
7     the truth, the whole truth and nothing but the
8     truth, in the within-entitled cause; that said
9     deposition was taken at the time and place herein
10    named; that the deposition is a true record of the
11    witness's testimony as reported by me, a duly
12    certified shorthand reporter and a disinterested
13    person, and was thereafter transcribed into
14    typewriting by computer.
15         I further certify that I am not interested
16    in the outcome of the said action, nor connected
17    with, nor related to any of the parties in said
18    action, nor to their respective counsel.
19         IN WITNESS WHEREOF, I have hereunto
20    set my hand this 29th day of June, 2005.
21
22
23    _____
24    CARYE C. TORRES, CSR #10685
25    STATE OF CALIFORNIA
```



PROFESSIONAL
REPORTERS
Experience and service that sets the standard

OKLAHOMA CITY  ————————405-272-1006
TULSA ————————————918-583-8600
FAYETTEVILLE ———————479-587-1006

511 Couch Drive, Suite 100, Oklahoma City, OK 73102 | www.proreporters.com | Phone: 800-376-1006 | Fax: 405-272-0559